UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| J.T.H and H.D.H | ) | |
| | ) | Case No. 1:20-CV-222 ACL |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| MISSOURI DEPARTMENT OF | ) | |
| SOCIAL SERVICES, CHILDREN'S | ) | |
| DIVISION; and SPRING COOK, *in her* | ) | |
| *Individual capacity*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## I. <u>Introduction.</u>

Plaintiffs have brought a five-count Complaint against the Children's

Division (CD) of the Department of Social Services[1] (DSS) and Spring Cook, a CD

employee. *Count I* requests prospective, declaratory relief against CD for violating

procedural due process guarantees of the Fourteenths Amendment to the United

States Constitution (Fourteenth Amendment). *Count II* seeks to enjoin CD from

enforcing allegedly unconstitutional procedures in resolving reports of abuse made

to the State of Missouri's Child Abuse and Neglect Hotline that CD administers.

*Count III*, against Ms. Cook in her individual capacity, claims that she

unconstitutionally retaliated against the plaintiffs for making allegations against

---

[1] For the remainder of this brief, Defendants will refer to the Department of Social Services,
Children's Division, as either "the Division" or "CD"

Scott County, Missouri, and its sheriff by investigating and making a finding of child abuse and neglect against plaintiffs in violation of their rights under the First Amendment to the United States Constitution. *Count IV* alleges that Cook, in her individual capacity, violated plaintiffs' right to procedural due process under the Fourteenth Amendment.  Finally, *Count V*, is a state law claim for malicious prosecution against Ms. Cook for investigating a report of child abuse or neglect and making a finding against plaintiffs.

As will be shown, plaintiffs fundamentally misunderstand Missouri law and procedure governing the investigation and resolution of reports of child abuse and neglect.  Counts I and II fail because plaintiffs lack of standing.  Counts I, II and IV lack merit because Missouri law and procedures comply with constitutional due process requirements. Count III also fails because it does not identify a protected activity plaintiffs engaged in.  Counts III and IV are barred variously by the doctrines of absolute, qualified and official immunity, and Count V fails to allege facts stating a claim for malicious prosecution and is barred by absolute and official immunity. Finally, the Court should decline to exercise its supplemental jurisdiction over the state law claim in Count V.

Accordingly, the Complaint must be dismissed as it fails to state a claim upon which relief may be granted.

## II. Standard of Review.

When evaluating a motion to dismiss, the Court assumes the facts in the Complaint to be true and construes all reasonable inferences from those facts in the

light most favorable to plaintiff.[2] *Morton v. Becker,* 793 F.2d 185, 187 (8th Cir.1986).

Fed.R.Civ.P. 8. However, the Court need not accept as true wholly conclusory

allegations, *Hanten v. School Dist. of Riverview Gardens,* 183 F.3d 799, 805 (8th

Cir.1999), or legal conclusions plaintiff draws from the facts pled, *Westcott v. City of

Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990). In addition, the Court ordinarily does

not consider matters outside the pleadings. *See* Fed.R.Civ.P. 12(d). The Court may,

however, consider exhibits attached to the complaint and documents that are

necessarily embraced by the pleadings, *Mattes v. ABC Plastics, Inc.,* 323 F.3d 695,

697 n.4 (8th Cir.2003), and may consider public records, *Levy v. Ohl,* 477 F.3d 988,

991 (8th Cir.2007). To survive a motion to dismiss, a complaint must contain

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.

Twombly,* 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a

'probability requirement', but "it asks for more than a sheer possibility that a

defendant acted unlawfully. *Ibid.* Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability it 'stops short of the line between possibility

and plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)

(*citing Twombly,* 550 U.S. at 555.)  Although a complaint need not contain "detailed

factual allegations," it must contain facts with enough specificity "to raise a right to

relief above the speculative level." *Twombly,* at 555. "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements," will not

---

[2] The facts are vigorously disputed. If this matter proceeds to a motion for summary judgment or
trial, it will become apparent allegations in the Complaint are so incomplete as to be misleading.

pass muster. *Ashcroft*, 556 U.S. at 678.  A "conclusory" statement is an averment "[e]xpressing a factual inference without stating the underlying facts on which the inference is based". *Blacks Law Dictionary*, 10th Edition for the iPhone and iPad. Version 1.4. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft,* 556 U.S. at 678, *citing Twombly,* 550 U.S. at 555. Mere conclusory statements "are not entitled to the assumption of truth. *Ashcroft*, at 679. "Where the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n] – 'that the pleader is entitled to relief.'" *Ashcroft,* 556 U.S. at 678, *citing Twombly,* 550 U.S. at 555. In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly,* 550 U.S. at 556.

For example, a conclusory allegation that a child abuse investigator fabricated evidence leading to the removal of the plaintiffs' children by a juvenile court is insufficient to state a substantive due process claim where the complaint failed to "allege, describe or detail" what evidence was allegedly fabricated. *Mitchell v. Dakota County Social Services*, 959 F. 3d 887, 899 (8th Cir. 2020).

### III. <u>Legally Relevant Facts as Alleged in the Complaint.</u>

The Complaint alleges the following:  In May 2018, plaintiffs' minor son was sexually abused by a Scott County Sheriff's deputy (Deputy). Complaint, ¶ 13. The perpetrator was a colleague of the Plaintiff Father, also a Scott County deputy. Complaint, ¶¶ 2, 15. The Deputy groomed the minor for sexual abuse through

various social activities and a smartphone app called Grindr.[3] Complaint, ¶ 16.  The sexual abuse took place in the Deputy's marked patrol care while the Deputy was in uniform. Complaint, ¶ 14. Shortly after the incident, the Deputy was arrested by the Missouri Highway Patrol for Statutory Sodomy – 2nd Degree, a class D felony. §566.064 RSMo. Complaint, ¶¶ 17, 18.

In September 2018, Plaintiff Father asserted a claim against the County for the incident with the Deputy.  Complaint, ¶ 20.  On November 7, 2018, Ms. Cook, a CD director/circuit manager appeared at plaintiffs' family home with a deputy juvenile officer (JO) and two state troopers reporting that there had been a hotline call regarding the minor son. Complaint, ¶¶ 5, 23, 24. After initially allowing, the parents eventually refused home visits by Ms. Cook, Complaint, ¶ 33, and they declined a referral to SEMS-NASV for physical exam. Complaint, ¶ 41-42.  A parenting plan had been proposed. Complaint, ¶ 43.

Working with law enforcement, on January 7, 2019, Ms. Cook made a preliminary finding under a preponderance of evidence standard of parental child neglect. Complaint, ¶¶ 27-32, 36-38, 44.  Ms. Cook's finding was based on three incidents: 1) the Deputy's sexual abuse of the son, 2) the son's Facebook sex-messaging with, and alleged sexual abuse by, a local Tae Kwan Do instructor (Instructor), who the father, upon learning of it, went with his daughter and her friend nearby in a car, to confront the Instructor, resulting in an assault and

---

[3] Grindr bills itself as "The Worlds Largest Social Networking App for Gay, Bi, Trans and Queer People." See www.grindr.com.

attempted battery,[4] and 3) a reportedly benign, age-appropriate out-of-state date. Complaint, ¶ 44 a-c.

Meanwhile, the JO to whom Ms. Cook referred the matter made his own investigation that determined there was no evidence to support an allegation of parental neglect. Complaint, ¶¶ 56-60.

After Ms. Cook issued her preliminary investigative findings, plaintiffs sought administrative review, first performed by Ms. Cook, and then by the CD's Child Abuse and Neglect Review Board (CANRB).  Complaint, ¶ 51-52.  On August 27, 2019, the CANRB heard the matter and two days later issue letters holding the *finding of neglect was unsubstantiated*. Complaint, ¶¶ 77, 92.  There is no claim that either plaintiff was listed on the Missouri Child Abuse and Neglect Registry (Central Registry).

Subsequently, the FBI contacted plaintiffs concerning "substantially similar charges."   Complaint, ¶ 93.  It is believed that the FBI visited Ms. Cook's office. Complaint, ¶ 95.  The FBI questioned plaintiffs' daughter "at length about the minor son's sexuality and his sexual conduct." Complaint, ¶ 100.  The FBI eventually closed the investigation.  Complaint ¶103. There is no allegation to establish that Ms. Cook actually made the report to the FBI; rather, the Court is asked to infer without facts that Ms. Cook "contacted the FBI in frustration that the

---

[4] Father did not report the assault, Complaint ¶ 44 b, and the Complaint is silent on whether he reported the second incident of sexually abusive conduct involving his son.

CANRB did not substantiate her earlier allegation, and/or as retaliation against Plaintiffs."[5] Complaint, ¶105.

The Complaint further alleges that it is common and appropriate for 16 year-old teenagers to have an iPhone, drive a car and have access to the internet with a cell phone, subject to parental oversight, and that "…most if not all Missouri parents of 16-year-old teenagers would be found to be neglectful if such facts, and nothing more, constituted *prima facie* objective evidence of parental neglect." Complaint, ¶¶ 45, 46, 48.

## IV. Law Governing Response to Reports of Child Abuse and Neglect in Missouri.

An analysis of plaintiff's claims requires an overall understanding of Missouri law governing how governmental agencies respond to reports of child abuse and neglect. The following background information and arguments apply to the defendant's arguments in support of their motion to dismiss each count. Rather than repeating the information in each section of the brief, it is consolidated here for the convenience of the court and the parties.

### A. Background – Federal and state governments have a compelling interest in requiring government agencies investigating and responding to suspected incidents of child abuse or neglect to work together to resolve cases.

---

[5] These are exactly the type of improper, speculative, conclusory allegations that fail to state a plausible basis for proceeding on a complaint. *Ashcroft,* 556 U.S. at 678. *Mitchell*, 959 F.3d at 899.

While parents have a constitutionally protected liberty interest in the care custody and management of their children under the Fourteenth Amendment, federal and state courts have long held that states have a "compelling" or "substantial" governmental interest to investigate reports of child abuse or neglect, and to take appropriate action to protect children when their parents fail to do so. *See, e.g. Manzano v. South Dakota Dept. of Social Services*, 60 F.3d 505 (8th Cir. 1995)("compelling"); *Thomason v. SCAN Volunteer Services, Inc.* 85 F.3d 1365 (8th Cir. 1996). *Jamison v. Dept. of Social Services*, 218 S.W.3d 399 (Mo. banc 2007) ("substantial"). *Thomason, at 1371,* summarized the law as follows (citations omitted):

> "the liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." Moreover, as the First Circuit has correctly noted "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations."

*Mitchell*, 959 F.3d at 897 (*citing Dornheim v. Sholes*, 430 F.3d 919, 925-926 (8th Cir 2005)) goes further:  "[t]he government has a compelling interest in protecting minor children, especially when it is necessary to protect them from their parents."

A report of child abuse or neglect, especially sexual abuse, may have both criminal and civil components. *First*, a child-adult sexual encounter may be a crime to be investigated, prosecuted and punished under federal and/or state criminal law. See, e.g. §566.064 RSMo. It may also be a crime for parents and others responsible for their care to fail to safeguard children, and insure their needs for

shelter, food, education, etc. are met. This vindicates the general public's interest in

ensuring that those who neglect to care for their children, or who affirmatively prey

upon children, are deterred from such conduct, and those who do so are punished.

*Second*, child abuse/neglect has profound, traumatic, short and long term impacts

on the victimized children, the child's family and the community as a whole. The

United States[6] and Missouri have enacted laws authorizing civil authorities to

conduct civil investigations of child abuse and neglect, and to undertake civil

actions when needed to protect children when parents/guardians fail to do so. These

laws provide the statutory authority, coupled with state and federal funding, to

provide services and treatment for children and families touched by these traumatic

events. As explained in *Owen v. Missouri Dept. of Social Services, Children's Div.*

*Child Abuse and Neglect Review Board*, 535 S.W.3d 421, 424-425 (Mo. App. W.D.

2017):

> The Missouri legislature has enacted a statutory scheme (the Child
> Abuse Act) authorizing…[CD] to establish a child protection
> system…to "promote the safety of children and the integrity and
> preservation of their families by conducting investigations or family
> assessments and providing services in response to reports of child
> abuse or neglect." §§ 210.109.1, 210.109.2. In implementing the child
> protection system… [CD] is authorized to…maintain a central registry
> and to receive reports and establish and maintain an information
> system that operates at all times and is capable of receiving and
> maintaining reports. § 210.109.3. Of significance, the purpose of
> Missouri's Child Abuse Act is remedial—not punitive. Pursuant to this
> Act,…[CD] is not haling out-of-state child abusers into Missouri…to
> take away their liberty interest; rather…[DC] is conducting

---

[6] The federal response to providing services to respond to cases involving child abuse and neglect
includes making available substantial federal grants to support states in this effort. See e.g. 42 USC
§600 et seq. and 42 USC §5106a. Of course, these federal funds come with many federal regulatory
strings attached.

investigations of abuse perpetrated upon Missouri minor children—regardless of who perpetuated the abuse or where the abuse occurred—in order to take steps to protect Missouri minor children while within our state from further abuse at the hands of perpetrators originating from any territorial origin.

This vindicates the public's interest in safeguarding children from further victimization, and that children and families are able to care for each other and have the mental and physical health services to heal from the trauma.

Fundamental differences exist between the approaches of criminal versus civil laws and policies designed to respond to child abuse and neglect. The investigation and prosecution of *criminal* conduct seeks to deter and punish. Law enforcement and prosecutors are involved. Full constitutional protections apply, including trial by jury and proof beyond a reasonable doubt. Federal law enforcement agencies such as the FBI and federal prosecutors may have jurisdiction over crimes involving the mails, the internet, the telephone system or crossing state lines.[7]

---

[7] Some examples of federal crimes against children include: 18 U.S.C. §§ 1073 (Unlawful Flight to Avoid Prosecution), 1201 (Kidnapping, 1462 (Importation or Transportation of Obscene Matters), 1465 (Transportation of Obscene Matters of Sale or Distribution), 1466 (Engaging in the Business of Selling or Transferring Obscene Matter), 1470 (Transfer of Obscene Materials to Minors), 1591 (Sex Trafficking of Children or by Force, Fraud, or Coercion), 2241(a)(c) Aggravated Sexual Abuse, 2243 (Sexual Abuse of a Minor or Ward), 2251 (Sexual Exploitation of Children), 2252 (Certain Activities Relating to Material Involving the Sexual Exploitation of Minors), 2252A (Certain Activities relating to Material Constitution or Containing Child Pornography), 2421 (Transportation Generally), 2422 (Coercion and Enticement), 2423(a) Transportation of Minors with Intent to Engage in Criminal Sexual Activity), 2423(b) Interstate or Foreign Travel with Intent to Engage in a S3exual Act with a Juvenile), and 2425 (Use of Interstate Facilities to Transmit Information about a Minor.).  See https://www.fbi.gov/investigate/violent-crime/cac for more general information about the FBI's work in combating crimes against children.  Also See generally Title 34, Subtitle II, Protection of Children and Other Persons governing the many programs that the United States has initiated to combat crimes against children.

10

In contrast, the *civil* remedies provide prospective protection, treatment and services to the child and family.  Suspected incidents of child abuse and neglect are primarily handled by local, county Juvenile Officers (JOs) and CD. Lesser burdens of proof apply to bring a child under the juvenile court[8] (JC) jurisdiction, or listing an individual in the Central Registry as a perpetrator[9]. Procedures are less formal.

Notwithstanding the significant differences between the criminal and civil responses to suspected child abuse and neglect, they overlap and share common interests. The evidence needed for a criminal case may also be necessary to bring the children under civil court authority for care, protection and treatment, or may be necessary to make a civil finding of child abuse or neglect under the child abuse and neglect hotline system[10]. The methods of gathering and preserving evidence for the civil case may impact how a criminal case is investigated, tried and prosecuted, and vice versa. Finding ways for civil and criminal authorities to reduce duplication of investigatory efforts, save resources and minimize the impact of the investigation on child victims, family members and third parties[11] is an interest is shared by both criminal and civil investigations.

Therefore, the government has an obvious, compelling interest to require state and federal governmental agencies and personnel to work in a coordinated fashion, "hand in glove" to use the Plaintiffs' words[12], when responding to suspected

---

[8] Clear and convincing evidence. *In re C_T_,* 942 S. W. 2d 467 468 n. 4 (Mo. App. S.D. 1997).
[9] Preponderance of the evidence. §210.110(3), (13) RSMo. *Jamison,* 218 S.W. 3d at 403.
[10] Discussed in section IV.B (2) below.
[11] Examples of other third parties are medical and laboratory experts.
[12] Complaint, ¶¶ 22, 35 and 151.

incidents of child abuse and neglect. See, as one example, Congress's findings pertaining to the federal need to improve the investigation and prosecution of child abuse cases 34 U.S.C. §20301.[13] Accordingly, under, §210.145.7 RSMo local CD officials, such as Ms. Cook, *must*

> contact the appropriate law enforcement agency immediately upon receipt of a report [of suspected child abuse or neglect] which division personnel determine merits and investigation and provide such agency with a detailed description of the report received…[T]he local division office shall request the assistance of the local law enforcement agency in all aspects of the investigation of the complaint. The appropriate law enforcement agency shall either assist the division in the investigation or provide the division, within twenty-four hours, an explanation in writing detailing the reasons why it is unable to assist.

Further, §210.145.13 RSMo mandates:

> Multidisciplinary teams shall be used whenever conducting the investigation [of reports of suspected child abuse or neglect] as

---

[13] In enacting statutory authority for federal grants to create and maintain regional child advocacy centers to assist in the investigation of child abuse and neglect, the Congress found that--
**"(1)** over 3,300,000 reports of suspected child abuse and neglect are made each year, and drug abuse is associated with a significant portion of these;
**(2)** the investigation and prosecution of child abuse cases is extremely complex, involving numerous agencies and dozens of personnel;
**(3)** traditionally, community agencies and professionals have different roles in the prevention, investigation, and intervention process;
**(4)** in such cases, too often the system does not pay sufficient attention to the needs and welfare of the child victim, aggravating the trauma that the child victim has already experienced;
**(5)** there is a national need to enhance coordination among community agencies and professionals involved in the intervention system;
**(6)** multidisciplinary child abuse investigation and prosecution programs have been developed that increase the reporting of child abuse cases, reduce the trauma to the child victim, improve positive outcomes for the child, and increase the successful prosecution of child abuse offenders;
**(7)** such programs have proven effective, and with targeted Federal assistance, have expanded dramatically throughout the United States; and
**(8)** State chapters of children's advocacy center networks are needed to--
**(A)** assist local communities in coordinating their multidisciplinary child abuse investigation, prosecution, and intervention services; and
**(B)** provide oversight of, and training and technical assistance in, the effective delivery of evidence-informed programming." CD provides funding for Child Advocacy Centers (sometimes referred to as "regional child assessment centers"). §210.001 RSMo.

determined by the division in conjunction with law enforcement. Multidisciplinary teams shall be used in providing protective or preventive social services, including the services of law enforcement, a liaison of the local public school, the juvenile officer, the juvenile court, and other agencies, both public and private.

See also 42 USC §671(a)(9).[14] In light of the mandated cooperation between law enforcement agencies, JOs and CD it is irresponsible, legally erroneous and baseless to ask this Court to assume that Ms. Cook's actions in working "hand in glove" with local state and federal law enforcement officials constitutes evidence of bias, legal malice, or is otherwise legally inappropriate. This Court cannot and should infer possible misconduct from such cooperation, as the plaintiffs suggest.[15] Such conclusory allegations do not support a claim on which relief may be granted. *Ashcroft,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).  Absent allegations of actual, specific *facts* that Ms. Cook's cooperation with law enforcement officers was motivated by corrupt personal interest against the plaintiffs, her working with law enforcement, as she was required by law, does not raise an adverse inference of nefarious motive and conclusory allegations to the contrary deserves no credence.

JOs are employees of the Judicial Branch of government, independent of the CD. They have the sole, legal authority and responsibility to file petitions in JC

---

[14] States such as Missouri that receive federal funding under Title IV-E for their foster care and child protection systems are required to have procedures in place for the child welfare agency to" report known or suspected instances of physical or mental injury, sexual abuse or exploitation, or negligent treatment or maltreatment of a child" to "an appropriate agency" in their state plan. 42 USC §671(a)(9). In Missouri, the appropriate agencies are CD and law enforcement.
[15] Complaint, ¶¶ 22, 35, 93-105, 151.

under civil law in delinquency[16], status[17] and dependency[18] cases to make the children wards of the Court. §211.031, RSMo. They also have the authority to work with families through a process called voluntary, "informal adjustment" to attempt to avoid the necessity of removing a child from the home. Missouri Rules of Practice and Procedure in the Juvenile and Family Courts. Rule 112.01. JOs are law enforcement officials with the authority of deputy sheriffs. §211.401.2, RSMo. Finally, JOs (as do law enforcement officers and physicians) are authorized to involuntarily remove children from their homes on an *ex parte* basis in emergencies pending judicial action when the children are in imminent danger of death, serious bodily injury or being sexually abused. §210.125 RSMo.  In contrast, CD employees, such as Ms. Cook, are prohibited from removing a child from his or her legal custodian. §210.125.3 RSMo. The CD may only accept children into custody pursuant to a JC order after the JO files a petition. §§207.020.1(17), 210.125 RSMo. The JO does not have statutory authority over Missouri's Child Abuse and Neglect Hotline system or to conduct investigations or family assessments of reports of child abuse or neglect called into the hotline.

### B. The Law Governing the CD's Child Abuse and Neglect Hotline Investigations and Response.

#### (1) Overview.

---

[16] Generally, cases in which a child has engaged in conduct which would constitute a crime if perpetrated by an adult.

[17] Generally, cases in which a child has engaged in conduct which would not constitute a crime, but in which the child is out of parental control.

[18] Generally cases in which a child is without proper care custody and/or support due to the neglect and/or abuse of the child by the child's parents or others.

DSS is an Executive Department of the Administrative Branch of Missouri State Government. Art. IV, §37 Missouri Constitution. §660.010 RSMo. CD, a Division within DSS, see §207.010 RSMo, is charged by law with "establish[ing] a child protection system for the entire state" of Missouri. §210.109.1 RSMo. See also §207.020 RSMo. This responsibility includes, in relevant part: 1) investigating reports of suspected child abuse and neglect and maintaining a Central Registry of those found responsible for child abuse and neglect, 2) providing protective and preventative services to families to prevent abuse and neglect and help preserve and stabilize the family, 3) accepting into care children who have been placed in the legal custody of CD by a juvenile or family court. In fact, CD has many responsibilities[19]:

## (2) The Hotline Investigation and Review Process.

---

[19] See generally Chapters 207, 210, 211, and 453 RSMo. A non-comprehensive list includes: §210.109.2 (promoting safety of children and the integrity and preservation families by coordinating investigations or family assessments and providing services in response to reports of child abuse and neglect); §211.183 (providing protective or preventative services to the family and child and to others in the home to prevent abuse or neglect, to safeguard their health and welfare, and to help preserve and stabilize the family whenever possible, in conjunction with JC); §210.109.3(5) (providing protective or preventative services to the family and child and to others in the home to prevent abuse or neglect, to safeguard their health and welfare, and to help preserve and stabilize the family whenever possible, in cooperation with the JC); §§210.109.3(2), §210.145.1(4) (receiving hotline reports of child abuse and neglect); §210.145.1(1) (ensuring the well-being and safety of children where abuse or neglect has been alleged); §§ 210.109, 210.145 (responding to those reports by conducting family assessments or investigations of reports of child abuse or neglect); §§210.109.3(1), 210.110(3), 210.145, 210.150 (maintaining a Central Registry of persons determined to be responsible for child abuse and neglect); §§210.109.3(2), (4), (7), 210.145, 210.150, 210.152, 210.153 (maintaining an information system and records pertaining to hotline reports, disseminating information to those with a legal right to access it and keeping that information confidential from those who are not permitted access); §210.145.1(3) (providing due process for those accused of child abuse or neglect); and §§ 211.031.1(1) and/or 211.031.1(2) (accepting legal custody of children adjudicated dependent or status offenders by a juvenile or family court).

Chapter 210 and 13 C.S.R. §§ 40-31.010, 020 and 025 set out definitions and

procedures for handling hotline reports, making hotline determinations and seeking

administrative and judicial review of an adverse decision. This section summarizes

governing law.

Reports of child abuse[20] or neglect[21] are called in to the central Child Abuse

Hotline and recorded in the information system.  §210.145.1.  RSMo. See also 13

C.S.R. 35-31.020 Screening and Classification of Child Abuse/Neglect Hotline

Reports.  After the Central Hotline receives the report[22] and determines that there

is enough information to merit an investigation[23] or family assessment[24], the report

---

[20] Child "abuse" in the context of CD's hotline investigations is defined as "any physical injury, sexual abuse, or emotional abuse inflicted on a child other than by accidental means by those responsible for the child's care, custody, and control, except that discipline including spanking, administered in a reasonable manner, shall not be construed to be abuse.  Victims of abuse shall also include any victims of sex trafficking or severe forms of trafficking as those terms are defined in 22 U.S.C. 78 Section 7102(9)-(10)." §210.110(1) RSMo. Child sexual abuse is further defined by CD regulation, which will be discussed elsewhere in this brief. 13 CSR 35-31.010.

[21] Child "neglect" in the context of CD's hotline investigations is defined as the "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being.  Victims of neglect shall also include any victims of sex trafficking or severe forms of trafficking as those terms are defined in 22 U.S.C. 78 Section 7102(9)-(10)." §210.110(12) RSMo.

[22] A "report" is defined as "the communication of an allegation of child abuse or neglect to the division pursuant to section 210.115." §210.110(15) RSMo.

[23] An "investigation" is "the collection of physical and verbal evidence to determine if a child has been abused or neglected." §210.110(10) RSMo.

[24] "Family assessment and services" is defined as "an approach to be developed by the children's division which will provide for a prompt assessment of a child who has been reported to the division as a victim of abuse or neglect by a person responsible for that child's care, custody or control and of that child's family, including risk of abuse and neglect and, if necessary, the provision of community-based services to reduce the risk and support the family." §210.110(8) RSMo. In addition, the law defines "Assessment and treatment services for children" as "an approach to be developed by the children's division which will recognize and treat the specific needs of at-risk and abused or neglected children.  The developmental and medical assessment may be a broad physical, developmental, and mental health screening to be completed within thirty days of a child's entry into custody and in accordance with the periodicity schedule set forth by the American Academy of Pediatrics thereafter as long as the child remains in care.  Screenings may be offered at a centralized location and include, at a minimum, the following:

16

and any relevant information is transmitted to the local CD office.  §210.145.2

RSMo.  13 CSR 35-31.020.  Reports of child abuse or neglect that, if true, would

constitute a suspected violation of "[a list of crimes and] … other crimes under

chapter 566 if the victim is a child less than eighteen years of age" merit a CD

investigation and trigger CD's obligation to report to law enforcement. §210.145.3

RSMo. The Complaint alleges that plaintiffs' son was the victim of sodomy under

§566.064 RSMo, one of the crimes included in §210.145.3 RSMo. Complaint, ¶ 18.

    The local office then determines if the case should be handled as an

investigation or family assessment and services and to commence that process

within certain time frames.  §§210.145.3, 210.145.8 RSMo. 13 CSR 35-31.025. Local

CD can decide to handle a case as an assessment rather than investigation by

assessing the needs of the family and offering services; however, if CD determines

that the child is at risk of abuse or neglect and the family declines to accept

voluntary services, CD may commence an investigation. §§ 210.145.15, 210.145.16

RSMo. If local CD decides to handle the case as an investigation CD is *required* to

contact and work with law enforcement in all aspects of the investigation.

---

    (a)  Complete physical to be performed by a pediatrician familiar with the effects of abuse and neglect on young children;

    (b)  Developmental, behavioral, and emotional screening in addition to early periodic screening, diagnosis, and treatment services, including a core set of standardized and recognized instruments as well as interviews with the child and appropriate caregivers.  The screening battery may be performed by a licensed mental health professional familiar with the effects of abuse and neglect on young children, who will then serve as the liaison between all service providers in ensuring that needed services are provided.  Such treatment services may include in-home services, out-of-home placement, intensive twenty-four-hour treatment services, family counseling, parenting training and other best practices.

Children whose screenings indicate an area of concern may complete a comprehensive, in-depth health, psychodiagnostic, or developmental assessment within sixty days of entry into custody." §210.110(2) RSMo.

§210.145.7 RSMo.  CD can convert an investigation into an assessment and vice

versa, but CD must notify law enforcement if it decides to stop the investigation.

§210.145.15 RSMo. CD's decision to stop an investigation does not bind law

enforcement. §210.145.15 RSMo. If the local office decides to proceed, a timely

investigation must be commenced.  §210.145.8 RSMo. 13 CSR 35-31.020(6).  In most

cases this includes directly observing the child within 24-72 hours. *Id.* Under

§210.145.10 RSMo, a CD investigation is broad in scope:

> The investigation shall include but not be limited to the nature, extent,
> and cause of the abuse or neglect; the identity and age of the person
> responsible for the abuse or neglect; the names and conditions of other
> children in the home, if any; the home environment and the
> relationship of the subject child to the parents or other persons
> responsible for the child's care; any indications or incidents of physical
> violence against any other household or family member; and other
> pertinent data.

As is seen, CD must determine whether a preponderance of evidence establishes

that the child was abused or neglected, whether an alleged perpetrator must be

listed in the Central Registry[25], whether referral to the JO for JC action is

necessary to assure a child's safety, and whether to offer voluntary, preventative

services to the child and family to prevent or eliminate the need to remove the child.

---

[25] The **"Central registry"** is "a registry of persons where the division has found probable cause to believe prior to August 28, 2004, or by a preponderance of the evidence after August 28, 2004, or a court has substantiated through court adjudication that the individual has committed child abuse or neglect or the person has pled guilty or has been found guilty of a crime pursuant to section 565.020, 565.021, 565.023, 565.024, 565.050, 566.030, 566.060, or 567.050 if the victim is a child less than eighteen years of age, or any other crime pursuant to chapter 566 if the victim is a child less than eighteen years of age and the perpetrator is twenty-one years of age or older, a crime under section 568.020, 568.030, 568.045, 568.050, 568.060, 568.080*, 568.090*, 573.023, 573.025, 573.035, 573.037, 573.040, 573.200, or 573.205, or an attempt to commit any such crimes.  Any persons placed on the registry prior to August 28, 2004, shall remain on the registry for the duration of time required by section 210.152." §210.110(3) RSMo.

CD is must also update the information system and complete the investigation within 45 days of the receipt of the report unless good cause exists for extending the deadline. §210.145.17.  RSMo. However, investigations of reports of sexual abuse must be completed within 120 days of the report. §210.145.17(3) RSMo.[26]

Once CD has completed the investigation and decided whether to make a finding of child abuse or neglect, it must update the information system and give timely[27] written notice of the decision to the alleged perpetrator and the child's parents. §210.152.2 RSMo.  If CD determines that a preponderance of the evidence supports a finding of child abuse or neglect it will issue a preliminary finding, copies of which are sent to the alleged perpetrator and the child's parents. §210.152.2 RSMo. 13 CSR 35-31.025(2). However, CD *will not list the individual as a perpetrator of child abuse or neglect in the Central Registry until the alleged perpetrator has been given notice and opportunity for administrative review*.  *Jamison*, 218 S.W.3d 399. 13 CSR 35-31.025.

When notified that CD has issued a preliminary finding of child abuse or neglect, the alleged perpetrator has three options. *First*, do nothing and waive his or her right to administrative or judicial review; in which event, CD will list the individual in the Central Registry. *Second*, if they disagree, he or she may request

---

[26] The Supreme Court of Missouri has held that CD's failure to complete the investigation and notify the alleged perpetrator of the decision within those deadlines is not jurisdictional, and does not divest CD of the authority to complete and conclude the investigation. *Frye vs. Levy*, 440 S.W.3d 405 (Mo. Banc 2014). *Williams vs Dept. of Social Services, Children's Division*, 440 S.W.3d 425 (Mo. Banc 2014).
[27] Notice must occur within 90-days of the report, or 120-days in cases involving sexual abuse. §210.152.2 RSMo.

administrative review of the decision. 13 CSR 35-31.025 and §210.152.4, .5 RSMo. In these cases CD will not list the individual in the Central Registry unless and until the CANRB upholds CD's findings. Notably, when an alleged perpetrator requests CANRB review, the CANRB's decision is CD's decision, and the preliminary findings of the investigator or Circuit Manager is not. 13 CSR 35-31.025(11).[28]  *Third*, the alleged perpetrator can waive administrative review and file a Petition for Circuit Court de novo review. §536.100 RSMo.[29] In these cases CD will list the alleged perpetrator's name in the Central Registry, because the individual has waived his or her right to administrative review. *Id*. However, the individual can ask the court to stay CD's decision and stay Central Registry listing pending resolution of the judicial review. §536.120 RSMo.[30]  In the case at bar, the

---

[28] "The decision of the [CANRB] will be the agency's final decision upholding or reversing the preponderance of the evidence finding of abuse or neglect." 13 CSR 35-31.025(11).

[29] Section 536.100 provides, in relevant part: "[i]n cases, whether contested or not, where the law provides for an independent review of an agency's decision by a board other than the administrative hearing commission and further provides for a de novo review of the board's decision by the circuit court, a party aggrieved by the agency's decision may, within thirty days after it receives notice of that decision, waive independent review by the board and instead file a petition in the circuit court for the de novo judicial review of the agency's decision. The party filing the petition under this section shall be considered to have exhausted all administrative remedies."

[30] "Pending the filing and final disposition of proceedings for review under sections 536.100 to 536.140, the agency may stay the enforcement of its order and may temporarily grant or extend relief denied or withheld.  Any court in which such proceedings for review may be pending may issue all necessary and appropriate process to stay or require the agency to stay the enforcement of its order or temporarily to grant or extend or require the agency temporarily to grant or extend relief denied or withheld, pending the final disposition of such proceedings for review.  Such stay or other temporary relief by a reviewing court may be conditioned upon such terms as shall appear to the court to be proper.  No such stay or temporary relief shall be granted by a reviewing court without notice, except in cases of threatened irreparable injury; and when in any case a stay or other temporary relief is granted without notice the court shall then make an order, of which due notice shall be given, setting the matter down for hearing as promptly as possible on the question whether such stay or other temporary relief shall be continued in effect.  No such stay or other temporary relief shall be granted or continued unless the court is satisfied that the public interest will not be prejudiced thereby." §536.120 RSMo.

Complaint alleges that plaintiffs pursued CANRB review. Complaint, ¶ 51. Accordingly, plaintiffs were not listed in the Central Registry, nor have they alleged otherwise.

When CD receives a request for administrative review the local circuit manager or her designee will review the report to decide to uphold or reverse the finding. 13 CSR 35-31.025(2)(B).  This step is not required in state statute, but it affords the alleged perpetrator an opportunity to have the case reviewed before it goes to the CANRB.  Nothing in state law or CD regulations prohibits the Circuit Manager from conducting an investigation, making a preliminary investigative finding or conducting this initial step to review her own work. It is not unusual, for example, for Courts to provide opportunities for parties to ask judges to reconsider their decisions and have an opportunity to correct any errors before proceeding with an appeal. Plaintiffs' suggestions that Ms. Cook's acted improperly in this regard are meritless. Complaint, ¶¶ 52-54. Ms. Cook violated no regulation, and even if she did, plaintiffs do not contend that her actions violated any constitutional right. Complaint, ¶54, footnote 1.  If the Circuit Manager reverses the finding the matter is concluded. 13 CSR 35-31.025(2)(C). If the Circuit Manager upholds the finding, the case goes to the CANRB. *Id.*

The CANRB is a 9-member board within DSS responsible for providing an independent review of child abuse and neglect determinations where the alleged perpetrator is aggrieved by CD's preliminary finding. §210.153.1 RSMo. Members are appointed by the Governor with the advice and consent of the Senate. §210.153

RSMo. CANRB members include various professionals with training or expertise in child abuse/neglect, and may include parents, foster parents or grandparents. §210.153.2 RSMo. Plaintiffs have not alleged that the CANRB lacks independence or is incapable of providing fair, pre-deprivation reviews of CD decisions. Nor have they alleged that CANRB members were unqualified, biased or prejudiced against them. This issue is not before the Court. See *Jamison,* 218 S.W.3d at 406-408.

Plaintiffs correctly describe CANRB procedures as informal. Alleged perpetrators have a right to counsel, and to appear personally or to submit written arguments. §210.153.4(2). They may present witnesses §210.153.4(2). 13 CSR 35-31.025(8)(F). Testimony is not given under oath, nor does the law provide for compulsory attendance or cross-examination of witnesses. See § 210.153 and 13 CSR 35-31.025. The rules of evidence do not apply and hearsay evidence can be considered. *Id.* The CD and the alleged perpetrator may submit written materials and exhibits for consideration. 13 CSR 35-31.025(9)(A)(4). There is no right to extensive, formal discovery, but the Circuit Manager will provide a copy of investigation, including all records provided to the CANRB, with the exception of confidential information or other information that could jeopardize child safety. 13 CSR 35-31.025(9)(A)(3). See also §210.150.2(5) RSMo and 42 USC §5106a(b)(3). Complaint, ¶ 70. The hearings are generally short, with the child's representative, the CD and the alleged perpetrator being given 20 minutes (if requested) to present their case. 13 CSR 35-31.025(10). Although the CANRB may grant additional time to a party, 13 CSR 35-31.025(10)(A), the Complaint does not allege that plaintiffs

22

asked, or were refused, additional time.[31]   The CANRB will notify CD, the alleged

perpetrator and the child's representative of its decision within 5-working days. 13

CSR 35-31.025(12). The CANRB's decision is the CD's final decision. 13 CSR 35-

31.025(11).

Although the CANRB reversed Ms. Cook's preliminary finding and plaintiffs

were never listed in the Central Registry, because they are essential to the analysis

of the procedural and substantive due process claims, it is necessary to explain the

available post-deprivation remedies had the CANRB upheld the finding.

An alleged perpetrator who is aggrieved by a CANRB decision has a right to

file a Petition in State Circuit Court for *de novo* judicial review. §§ 210.152.4 and

210.153 RSMo.  The court must base its decision on the evidence produced at trial,

and must independently determine whether a preponderance of evidence

establishes that abuse or neglect occurred. *Jamison,* 218 S.W.3d at 416. The Court

is in no way bound by the CD's previous decision.  *Owen,* 535 S.W.3d at 424.  CD

has the burden to prove that plaintiffs abused or neglected the child. The rules of

civil procedure and evidence apply, including the right to conduct discovery, retain

counsel, subpoena and cross-examine witness. *C.S. v. Missouri Dept of Social*

*Services*, 491 S.W.3d 636, 649 (Mo. App. W.D. 2016).

### (3) Other Opportunities for Judicial Review.

---

[31] See *Jamison*, at 404-408, for a summary of the process.

In addition to the statutory procedures for seeking administrative and/or judicial review under §§ 210.153 and 536.100, plaintiffs could have petitioned for a Writ of Prohibition in the Circuit Court to prohibit Ms. Cook and/or CD from proceeding with the investigation, from communicating with law enforcement, to compel Ms. Cook to recuse herself, to preclude her from entering a preliminary finding, or to order the CANRB to provide more formal procedures. *Owen,* 535 S.W.3d at 426-427 and n. 6.

Plaintiffs could also have petitioned for Writ of Mandamus to seek a Court order compelling Defendants and the CANRB to provide any and all of the procedures that they believed were constitutionally required before or during the CANRB. *Frye v. Levy*, 440 S.W.3d 405, 408 (Mo. Banc 2014) (plaintiff failed to seek a writ of mandamus to enforce a mandatory, 90-day deadline to complete a child abuse/neglect investigation and the legislature provided no other procedure to enforce the deadline). *Pitts v. Levy*, 315 S.W.3d 755 (Mo. App. W.D. 2010)(court may issue a writ of mandamus to compel CD to proceed with administrative review, notwithstanding a pending criminal investigation). The Complaint does not allege that the plaintiffs exercised their opportunity to pursue any of these remedies. Certainly, pursuing those remedies before the alleged deprivation took place would have provided a more timely opportunity to raise their concerns about the process. *Parker v. Parker*, 2008 W.L. 697416 (U.S.D.C. ED Mo. 2008) (failure of plaintiff to seek an available, pre-deprivation remedy fatal to a claim for violating right to procedural due process.)

24

### (4) That law enforcement, the JO and the FBI did not take action is legally irrelevant to the resolution of any of the issues in this case.

Plaintiffs allege that law enforcement, the JO and the FBI conducted independent investigations and determined there was no probable cause to take action under their respective statutory authority. These conclusory allegations are wholly irrelevant because they do not permit the Court to even infer a mere possibility of misconduct by Ms. Cook, and therefore cannot support a claim for relief. *Ashcroft*, at 678; *Mitchell,* at 899.

Plaintiffs allege that Ms. Cook referred the matter to the local JO, who conducted his own investigation and took no action. Complaint, ¶¶ 56-61, 63. Of course, there is nothing remotely wrong with Ms. Cook referring the matter to the JO, especially where plaintiffs admit that their son was a victim of a felony sodomy. Plaintiffs allege that the JO did not find evidence of parental neglect, but this did not have any effect on Ms. Cook's investigation. Complaint, ¶ 61.  But the JO's findings and decisions are irrelevant because the JO's actions are governed by different laws, legal standards and burdens of proof. It is the JO's responsibility to determine whether to remove a child from the home on an *ex parte* basis if the child is in imminent danger of serious physical harm or a threat to life as a result of abuse or neglect or sexual abuse. §210.125 RSMo. Also, a JO must promptly file a petition with the JC when a child has been brought into judicial or temporary protective custody. See Generally, the Missouri Rules of Practice and Procedure in the Juvenile and Family Courts. Rules 123, 124. To make the child a ward of the JC

25

the JO must have a sufficient basis in fact to plead and prove grounds for the JC to assert jurisdiction over the child and family under §211.031 RSMo. The JO must prove her case by clear and convincing evidence. *In re C_T_,* 942 S. W. 2d 467 468 n. 4 (Mo. App. S.D. 1997).  That CD has made a finding of abuse or neglect is not controlling on the JO; that a child may have been abused or neglected does not mean that it is necessary or appropriate to remove the child from the home and the custody of the parents where the child can remain in the home while the conditions which caused the abuse or neglect if the child can be safely remediated. The JO, for example, has the discretion and authority to engage in a process of informal adjustment.  Missouri Rules of Practice and Procedure in the Juvenile and Family Courts. Rule 112.01.

Plaintiffs further allege that the Sheriff's Department and Highway Patrol who were involved in the investigation did not charge plaintiffs with a crime. Complaint, ¶¶ 62, 63. Of course, this is erroneous as a matter of law because the decision to file criminal charges is made by the prosecuting attorney and not investigating police officers. Even if it was true, the elements of any criminal charges[32] that the prosecuting attorney must prove beyond a reasonable doubt differ fundamentally from the elements CD is required to establish by a preponderance of

---

[32] See, for example, the list of crimes that may be included in the Central Registry in §210.110(3). These include §§ 565.020, 565.021, 565.023, 565.024, 565.050, 566.030, 566.060, or 567.050 if the victim is a child less than eighteen years of age, or any other crime pursuant to chapter 566 if the victim is a child less than eighteen years of age and the perpetrator is twenty-one years of age or older, a crime under section 568.020, 568.030, 568.045, 568.050, 568.060, 568.080*, 568.090, 573.023, 573.025, 573.035, 573.037, 573.040, 573.200, or 573.205, or an attempt to commit any such crimes.

the evidence to list an individual in the Central Registry as a perpetrator of child abuse[33] or neglect[34]. Also, the Complaint's speculative allegations are meaningless because it may be equally inferred that the Sheriff and/or the Highway Patrol were not investigating criminal activity by plaintiffs or their children but were investigating whether their son was the victim of additional sex crimes. The Complaint concedes the son's sexual activity with the Instructor, but we do not know from the Complaint whether the investigation of that incident was complete or whether criminal charges had been filed.

Finally, plaintiffs ask this Court to infer that because the FBI lodged no criminal charges as of the filing of the Complaint, that Ms. Cook's preliminary finding was unwarranted. Again, the laws and policies governing the FBI differ fundamentally from those governing Ms. Cook. The Complaint alleges no competent, non-conclusory facts from which a reasonable person could infer the target and scope of the FBI investigation, who made the referral to the FBI, when the referral was made, and why. It is equally plausible that the FBI was not investigating plaintiffs or their children, but was looking into federal law violations by men who used wire communications to entice a minor to have sex. Further, the Court could equally infer from the Complaint's allegations that a member of law enforcement made a report to the FBI. Finally, even if Ms. Cook called in the report to the FBI, and even if she had ill-will against the plaintiffs, *there was nothing*

---

[33] §210.110(3), (13) RSMo
[34] §210.110(3), (13) RSMo

*improper or inappropriate for Ms. Cook to call the FBI* based on the facts of this case. As discussed above, CD is required by law to work with federal and state law enforcement officials in investigating child abuse and neglect. That adult men used wire communications to groom and engage in sex with a child is sufficient in itself for Ms. Cook to make an FBI report. It is up to the FBI, not Ms. Cook, to determine whether they have jurisdiction to investigate.

As is seen, that the JO, state and federal law enforcement did not remove the child or file criminal charges against plaintiff has no bearing on this case.

## V. <u>Plaintiffs lack standing to bring claim under Counts I and II for declaratory and injunctive relief.</u>

### A. Overview.

Article III of the United States Constitution confines federal court jurisdiction to justiciable cases and controversies. *Mosby v. Ligon*, 418 F.3d 927, 933 (8th Cir. 2005). Such cases and controversies include only claims that allege some injury in fact redressable by a favorable judgment. *Id*. To establish standing a plaintiff must show an injury in fact traceable to the defendant's conduct that will likely to be redressed by a favorable decision. *Mitchell*, 959 F.3d at 896. This applies to both declaratory and injunctive relief.

### B. Count I – Declaratory Relief.

Count I seeks a declaratory judgment that *Jamison* is "no longer good law and it deprives the Plaintiffs of adequate procedural due process." Complaint, ¶¶

28

130-132. They bring their claim pursuant to 28 USCA §2201, Complaint, ¶ 8, which provides in relevant part [emphasis added]:

> [I]n a case of *actual controversy* within its jurisdiction, [exceptions omitted] any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

Under the federal declaratory judgments act and the United States Constitution "[a] federal court has no power to issue a judgment in a case unless it involves an actual controversy between adverse parties in an advisory proceeding. No exception is made for declaratory judgments." *Vorbeck v. Schniker*, 660 F.2d 1260, 1265 (8th Cir. 1981). United States Constitution, Art 3, §2, cl. 1 (cases and controversies clause).  Absent an actual controversy between the parties, the case is not ripe for adjudication, *Id.,* and the court lacks subject matter jurisdiction. *Wax'n Works v. City of St. Paul*, 213 F.3d 1016, 1020 (8th Cir. 2000). *Johnson v. United States*, 534 F.3d 958 (8th Cir 2008). See also:  *Mitchell*, at 897, n 2.

Moreover, even where an actual controversy exists the decision to enter a declaratory judgment is discretionary, not mandatory. *Aluminum Ltd. v. Dept. of Rev. of State of OR*, 724 F.2d 1294 (7th Cir 1984).  Under 28 USCA §2201, the Court "may," rather than "shall," enter a declaratory judgment.

Here, entry of a declaratory judgment would violate 28 USCA §2201 and the United States Constitution because no current, actual controversy exists between the parties. Defendants conducted a child abuse hotline investigation working in

conjunction with law enforcement. Ms. Cook made a preliminary investigative finding that plaintiffs were responsible for child neglect.  Plaintiffs sought CANRB administrative review, which found in plaintiffs' favor, and that decision, not Ms. Cook's preliminary finding, was the CD's final decision. Further, the Complaint affirmatively alleges that any deprivation causing harm to plaintiffs would flow from being listed in the Central Registry. Complaint, ¶¶ 65, 120, 121. The Complaint does not allege that defendants listed plaintiffs in the Central Registry; in fact, it alleges the opposite: the CANRB overturned the preliminary finding and plaintiffs were never listed.

As a result, entry of a declaratory judgment cannot put plaintiffs in a better substantive position vis-à-vis defendants, and would be an advisory opinion prohibited under 28 USCA §2201 and the cases and controversies clause of the United States Constitution. Dismissal is warranted under Rule 12 (b)(6).

## C. Count II – Injunctive Relief.

Plaintiffs seeking prospective relief based upon past actions must show that they face a real and immediate threat that they would suffer similar injury in the future. *Mitchell,* at 896 (quoting *Mosby*, at 933).  Speculative future harm does not confer standing. *Mitchell,* at 896.   Nor does the mere fact that injurious activity took place in the past suffice. *Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1161 (8th Cir. 2019). Moreover, the possibility of being charged with a crime in the future is a matter of speculation insufficient to grant standing. *Mosby,* at 933.

Here, the CANRB found for plaintiffs - that is the CD's official decision. The JO and FBI have closed their investigations.  There is no suggestion of further investigation. The "Damages" section of the Complaint, ¶¶ 120-127 lists nothing to suggest real and immediate threat of repeat injury.  In effect, there is no real and immediate threat of a similar future injury.  Under *Mitchell, Mosby* and *Frost*, plaintiffs lack standing to for injunctive relief.

*Mitchell* is particularly compelling. There children were removed from the home due to suspected parental abuse. After their return, parents sued, *inter alia*, to challenge the constitutionality of Minnesota's child welfare statutes. The trial court dismissed the complaint, and the 8th Circuit affirmed, because plaintiffs faced no real and immediate threat of repeat injury and lacked standing to challenge the statutes.  969 F. 3d at 895-898. Similarly, these plaintiffs, who obtained a favorable result from the CARNB and face no real, immediate threat of similar future injury, lack standing.  Under *Mitchell,* and pursuant to Rule 12 (b)(1), this Court lacks subject matter jurisdiction over Count II.

## VI. Assuming Arguendo that Plaintiffs Have Standing, Counts I, II, and IV Fail to State Causes of Action on the Federal Procedural and Substantive Due Process Claims.

### A. Counts I, II and IV fail to sufficiently allege that defendants violated plaintiffs' right to procedural due process because the Complaint fails to establish that plaintiffs were deprived of any constitutionally protected life, liberty or property interest, and they received all process that was due.

To plead a claim for a violation procedural due process under the Fourteenth Amendment and §42 USC §1983, a plaintiff must establish two elements. *First,*

31

there is a life, liberty or property interest that is protected under the due process clause. Absent such an interest, there is no due process violation. *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir 2007). *Second*, the State deprived plaintiff of that interest without sufficient process. *Clark v. Kansas City Mo. School Dist.,* 375 F.3d 698 (8th Cir 2004). *Warren v. Bd. Of Educ. Of the City of St. Louis*, 200 F.Supp.2d 1053 (USDC ED Mo. 2001). The Second element has two parts: 1) whether there has been a deprivation of the constitutionally protected interest, and 2) whether the procedures utilized to deprive the plaintiff of that interest were constitutionally deficient. *Id.*  The Complaint fails to establish these elements.

### (1) Plaintiffs have failed to allege that they have life, liberty or property interest protected under the fourteenth amendment.

The Complaint fails to establish a life, liberty or property interest at issue. Not a single allegation seeks to vindicate a "life", "liberty" or "property" "interest." These four words appear nowhere in the Complaint. Counts I, II and IV should be dismissed on that basis alone.

Notwithstanding, plaintiffs hint at two interests.  *First*, they allege that *Jamison* is no longer good law "insofar as it deprives Plaintiffs of adequate procedural due process before a 'stigma plus' deprivation by being placed on the Central Registry" [sic] [Complaint, ¶ 131].  *Second* they allege that that Ms. Cook's "investigation and findings were an unreasonable and arbitrary intrusion upon Plaintiffs' familial relationship." [Complaint, ¶ 147].

Regarding the "stigma-plus" theory, although *Jamison*, 218 S.W.3d at 406-408 held that a Central Registry listing implicates an individual's constitutionally protected liberty interest, other courts disagree.  Significantly, the United States Supreme Court's "stigma-plus" test requires that to establish the "plus" element" plaintiff must show that the stigma distinctly alters or extinguishes "a right or status previously recognized by state law." *Paul v.* Davis, 424 U.S. 693, 710-712 (1976).  Accordingly, several courts have held that merely listing an individual as a perpetrator on a Central Registry is insufficient to satisfy the "stigma-plus" test.  To satisfy the test, plaintiff must establish that he or she suffered actual harm such as being discharged from a job, or that the individual's employment may be at risk, or that the type of job was the individual's chosen profession.  As explained in *Georgia Dept. of Human Services v. Steiner*, 815 S.E.2d 883, 892 (Ga. 2018):

> Our decision…is consistent with…other jurisdictions holding that the impact of a child abuse registry listing on future job prospects is insufficient to provide a constitutionally protected liberty or property interest. See *Smith v. Siegelman*, 322 F.3d 1290, 1296-1298 (11th Cir. 2003) (although inclusion in Alabama's child abuse registry could adversely affect future employment rights, registrant could not show a protected liberty interest where he had not been "discharged, demoted, or rejected from a job" or even "passed over for promotion"); *Duran v. Buckner*, 157 So.3d 956, 970-971 (Ala. Civ. App. 2014) (citing *Smith* and holding that general allegations of harm to future job prospects were insufficient); *Watso v. Colorado Dep't of Social Servs.*, 841 P.2d 299, 304-305 (Colo. 1992) (possibility that appellants might be screened by future employers should they seek childcare-related employment insufficient to form protected property interest); *New Jersey Div. of Youth & Family Servs. v. M.R.*, 314 N.J.Super. 390, 715 A.2d 308, 314-315 (N.J. Super. Ct. App. Div. 1998) (theoretical impact on ability to be a childcare provider insufficient to satisfy the "plus" element of stigma-plus test).

The Georgia Supreme Court cited *Jamison* to support its analysis because plaintiffs in *Jamison* had been listed in the Central Registry before the CANRB hearing, and that inclusion may prejudice their ability to practice their profession as nurses.

Unlike *Jamison*, the Complaint alleges 1) plaintiffs received a pre-deprivation CANRB hearing, and 2) the CANRB overturned Ms. Cooks' preliminary investigative finding. Complaint, ¶ 92. The Complaint does not allege that plaintiffs were listed in the Central Registry or that they suffered any actual loss of their jobs or professional credentials due to the investigation or preliminary investigative finding. At most, the Complaint alleges that *if* the plaintiffs had been listed in the Central Registry it "*would have*" adversely impacted Plaintiff Father's ability to work in law enforcement and Plaintiff Mother's ability to return to public-school teaching. Complaint, ¶ 65. [emphasis added]. Of course, this is speculation about what might have happened had defendants acted differently. But CD's process overturned the finding and plaintiffs were never stigmatized.

Therefore, the issue before this court is whether plaintiffs have a constitutionally protected life, liberty or property interest in defendants' decision to conduct a child abuse and neglect investigation or family assessment under their civil law mandate, to work with law enforcement officials as law enforcement conducted a criminal investigation and to make a preliminary investigative finding of child neglect that was never entered into a Central Registry. Defendants can locate no precedent that establishes that the plaintiffs have a constitutionally protected life or property interest in the issues before the court, and there are no

34

allegations in the Complaint that make such a claim.  Defendants submit that no violation of a protected liberty interest is pled.

Regarding intrusion into the familiar relationship, although parents have a constitutionally protected liberty interest in the care, custody and management of their children, *Manzano,* 60 F.3d at 509-510, that interest yields to a state's compelling interest in protecting minor children, "particularly…where the protection is…necessary against the parents themselves." *Thomason,* 85 F.3d at 1371. And, parents do not have a due process liberty interest to be free from child abuse or neglect investigations. *Id.* (citing *Watterson v. Page,* 987 F.2d 1, 8 (1st Cir 1993)). In effect, plaintiffs have no protected liberty interest in challenging perceived or actual "procedural irregularities" in the investigation process unless and until there is a final decision to list them in the Central Registry.

Plaintiffs appear to contend that they have stated a liberty interest because the "state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is imminent danger from abuse." Complaint, ¶ 147, footnote 20, citing *Croft v. Westmoreland County Children Youth*, 103 F.3d 1123, 1126 (3rd Cir. 1997). While that may be true, the state indeed has a compelling interest in protecting children from child neglect, especially if there is a reasonable suspicion that parental neglect may expose the child to a risk of sexual abuse. It is also necessary to consider the protection the state offers. In Missouri, DSS/CD services range from referrals and voluntary in-home supportive services to keep the

child at home, to recommending to the JO or law enforcement that the child be removed due to an imminent danger of death, serious bodily injury or sexual abuse.

*Croft* does not apply. There a Children's Services worker who received an anonymous tip that the father had sexually abused his daughter, told him to leave home and cease contact until the investigation was complete, or she would remove the child.  County policy required that parents accused of sexual abuse prove beyond any certainty that there was no sexual abuse before the child could be left with his parents. The father left the home. The worker, in fact, had no opinion whether abuse occurred.  The 3rd Circuit held that these facts stated a claim for interfering with the parental liberty interest in companionship with his child.

In contrast, the Complaint alleges that plaintiffs' minor son had been sodomized by one adult male and had an unspecified sexual relationship with his Instructor. The son, groomed for sex, had sexually explicit communications with these adults over the internet and with an iPhone using Grindr or Facebook. The Complaint further alleges that the Plaintiff Father took along his daughter and her friend when he confronted the Instructor.  As could be expected when accusing an adult of criminal sex with a minor, a physical altercation took place in view of his daughter and her friend. As a trained law enforcement officer, plaintiff showed stunningly poor judgment.  His bringing his daughter and her friend to the incident would lead any objective person to question his parental judgment. Plaintiff Father did not report the assault and attempted battery, and the Complaint is silent on whether he reported the sexual interaction (both sexual activity and using Facebook

over the iPhone to discuss sex) between the minor son and the Instructor. The above gave Ms. Cook articulable evidence for a reasonable suspicion that the minor had been abused or neglected, that he was at imminent risk of further abuse or neglect, and that plaintiffs were not properly and effectively supervising his iPhone and internet use.  Plaintiffs substantially concede that point.  Complaint, ¶ 48. Finally, it is extremely dangerous for a child to use wire communications such as the internet to hook up with adults for sex. This child's conduct posed a danger to himself, and Ms. Cook had ample evidence that plaintiffs were not providing proper care for the child. Further, unlike *Croft*, there is no allegation that Ms. Cook threatened to remove plaintiffs' son from home.[35] To the contrary, the Complaint alleges that Ms. Cook proposed a parenting plan, presumably to work with them to reduce the risk of further sexual abuse to their son. Complaint ¶ 43. However, the parents declined to cooperate. See Complaint ¶¶ 33, 41-42.

Accordingly, plaintiffs fail to state a claim for a protected liberty interest, and they thereby fail to establish a procedural due process violation.

### (2) Plaintiffs have not suffered a constitutionally recognized deprivation of a constitutionally protected interest.

Assuming *arguendo* that plaintiffs have alleged specific facts showing protected "stigma-plus" reputation or family integrity liberty interests, there was no "deprivation" of these interests. That is because "the constitutional rights to due process protects against deprivation, *not investigation*, and due process is satisfied

---

[35] Indeed, she did not have legal authority to remove the child from the home. §210.125 RSMo.

for purposes of [§§210.109-210.165] and the Central Registry when an alleged perpetrator is given notice and an opportunity to be heard before his or her name can be listed in that registry." *Frye,* 440 S.W.3d at 414; *Owen*, 535 S.W.3d at 426 (citing *Jamison*, 218 S.W.3d at 410 [emphasis supplied]). Missouri courts are consistent with United States Supreme Court precedent.

> [N]either the Due Process Clause of the Fifth Amendment nor the Confrontation Clause of the Sixth Amendment is offended when a federal administrative agency, without notifying a person under investigation, uses its subpoena power to gather evidence adverse to him. The Due Process Clause is not implicated under such circumstances because an administrative investigation adjudicates no legal rights …

*Frye*, at 415 (citing *S.E.C. v. Jerry T. O'Brien Inc.,* 467 U.S. 735 (1984)).  Here there was no deprivation because plaintiffs were never listed in the Central Registry, *Frye,* at 414; nor did they actually, or threaten to, remove the children from the plaintiffs' custody. See also *Neal v. Fields*, 429 F.3d 1165 (8th Cir. 2005) (mere investigation without suspension of license does not deprive nurse of a property interest sufficient to support constitutional due process violation).   As is seen, defendants have not "deprived" plaintiffs of a life, liberty or property interest; therefore, Counts I, II and IV must be dismissed under Rule 12 (b)(6).

### (3) Plaintiffs have received all legal process due.

Assuming, without conceding, that plaintiffs have suffered a deprivation of a protected interest, the Complaint fails to state a claim because they have received all of the process due under the Fourteenth Amendment.

Plaintiffs contend that *Jamison* is no longer good law because it "deprives Plaintiffs of an adequate procedural due process before a "stigma plus" deprivation by being placed on the Child Abuse & Neglect Registry. Complaint, ¶ 131. Like here, plaintiffs in *Jamison* argued that due process required a full evidentiary, pre-deprivation hearing on the record, with the right to subpoena witnesses, conduct discovery and cross examine witnesses under oath before their names were entered in the Central Registry. The Court rejected that argument and held that Missouri's informal, CANRB procedures met procedural due process requirements.  *Jamison*, 218 S.W. 3d at 412-415. Plaintiffs ask this court to revisit the arguments resolved in *Jamison,* but that is not needed.

*Clark,* at 702, summarizes the legal standards for analyzing procedural due process (citations omitted):

> Due process is a flexible concept, requiring only "such procedural protections as the particular situation demands." The fundamental requirement of due process "is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " When a state employee's unauthorized, random acts deprive a person of property, the state employee's acts do not violate "the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." This rule is premised on "the states' action ... not [being] complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." However, when an established state procedure or a foreseeable consequence of such a procedure causes the loss, an adequate postdeprivation remedy is of no consequence, and we focus solely on the process afforded by the established procedure.

Plaintiffs do not allege a lack of meaningful or adequate notice. Rather, they allege that procedures before the CANRB were insufficient. Therefore, defendants will focus on this issue.

*Mathews v. Eldridge*, 424 U.S. 319 at 335 (1976), held that courts must weigh three factors when determining what process is due: 1) the private interests at stake; 2) the "risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any," of different procedures; and 3) the state's interest. Defendants have outlined the extensive administrative and judicial remedies that the plaintiffs have to seek both pre and post deprivation review in section IV B (1)-(3).  Application of *Mathews'* balancing test weighs conclusively in favor of defendants.

*Private Interest.* It is difficult to discern the actual, as opposed to speculative, private interest plaintiffs seek to vindicate in the lawsuit. They have a generally recognized interest in family integrity and in avoiding stigmatization by being listed in the Central Registry. But they have no right to be free from investigation *Frye*, at 414, and they were never stigmatized by a Central Registry listing.

Moreover, they have no constitutionally protected interest in the procedures utilized in the investigation, or in the possible disclosure of the fact of the investigation to their employer or other members of the multidisciplinary team involved in the investigation.  *Neal,* 429 F. 3d 1165.  Nor do have a constitutionally protected interest in having a *hearing* during the preliminary investigation. It

would be absurd, and procedural due process does not require, that a state agency to provide a hearing before even issuing notice of a state agency's decision.

*Risk of erroneous deprivation.* The risk of an erroneous deprivation is low to non-existent. Plaintiffs could have waived administrative review, go directly to court and seek a judicial stay of CD's preliminary findings pending a full civil trial on the merits. §536.100 RSMo. They did not. Instead, they elected to follow the informal, inexpensive and simple, pre-deprivation CANRB review process, followed by an opportunity for *de novo* judicial review, with a full evidentiary hearing, the right to pretrial discovery, with the defendants bearing the burden of proof. *See: e.g. Jamison*, 218 S.W.3d 399; *Owen*, 535 S.W.3d at 424-425 and *C.S.*, 491 S.W.3d at 649. Regardless of the remedy chosen, plaintiffs had an opportunity for a full evidentiary hearing, on the record, following full civil discovery before a Circuit Judge. Plaintiffs have not contended that their right to trial *de novo* contains any more risk of an erroneous deprivation than any other civil proceeding.  Further, that plaintiffs prevailed before the CANRB provides compelling evidence that the procedures are reasonably capable of providing a just result.

*The State's Interest.* The State has a compelling interest in investigating reports of child abuse and neglect, in keeping a Central Registry of individuals responsible for abuse and/or neglect to protect children from abuse and neglect and to provide the accused with opportunities to challenge those findings. The State also has a compelling interest in providing alleged perpetrators with an independent, simple, low-cost administrative review process of an adverse investigative finding

41

before they are listed in the Central Registry. Alleged perpetrators who want to seek a full judicial without a CANRB hearing also have that option. §536.100 RSMo.

When applying the *Matthews* balancing test the supreme courts of United States and Missouri have held that due process is satisfied by providing an informal, initial check against a mistaken deprivation to allow the individual to tell his/her side of the story, followed by a post-deprivation evidentiary hearing. *Cleveland Board of Ed. v. Loudermill*, 470 US 532 (1985) (school employee discipline process). Due process does not require a full evidentiary hearing with sworn testimony in pre-deprivation administrative hearings if an adequate post-deprivation remedy is available. *Jamison*, 218 S.W. 3d at 413.   See also: *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir 2005) (informal administrator conference followed by the opportunity for an evidentiary hearing, satisfies procedural due process requirements in decision to list someone on a Central Registry); and *Mitchell*, 959 F. 3d at 898 (due process not violated where children were removed from home without a *pre-deprivation* notice or hearing where post-deprivation hearing was held within 10-days of removal[36]).

Applying, *Matthews*, *Loudermill*, *Jamison*, *Dupuy* and *Mitchell*, plaintiffs received all process they were due, and Counts I, II and IV must be dismissed.

### B. Count IV fails to state a claim for a substantive due process violation against Ms. Cook.

---

[36] Plaintiffs did not claim that the procedural safeguards at the post-deprivation hearing were inadequate.

Count IV also contends that Ms. Cook violated plaintiffs rights to substantive due process in that: she investigated and made findings of parental neglect against plaintiffs based on an anonymous hotline tip; that an anonymous hearsay report alone does not create probable cause for parental abuse or neglect; the fact that the plaintiffs' son drove a car, accessed the internet with his iPhone and had been sexually abused by a trusted law enforcement officer do not change the analysis; that Ms. Cook's findings were allegedly unreasonable and arbitrary intrusion on the plaintiff's familiar relationship, and that the plaintiffs were damaged. Complaint, ¶¶ 143-147. These allegations fails to state a substantive due process violation

As explained in *Mitchell*, 959 F.3d 887, 898 (citations omitted):

> To state a substantive due process claim against a state official, a plaintiff must demonstrate that…the official's conduct shocks the conscience…Conscience shocking conduct only includes "the most severe violations of individual rights that result from the brutal and inhumane abuse of official power." "Only a purpose to cause harm *unrelated to the legitimate object of* the government action in question will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation."

Initially, we note that the alleged substantive due process claim are based on impermissible conclusory allegations. *Mitchell*, 959 F.3d 887. Moreover, the Complaint neither attaches as an exhibit, nor sets-out verbatim, Ms. Cook's investigative findings and/or report, which would be the best evidence of her findings and the basis for them. Based on this Complaint, the court is in no position to ascertain what her findings actually were and their underlying factual basis.

Instead, plaintiffs plead conclusions favorable to their theory of the case that cannot support the claim, as a matter of law.  *Ashcroft*, at 678.

Plaintiffs allege that an anonymous hearsay report alone does not create probable cause for finding parental neglect.  Complaint, ¶ 145.  While true, that begs the question.  First, no allegation of fact that supports a conclusion that the report was the reason Ms. Cook made the preliminary investigative finding, or that it was the only basis for making her decision.  In fact, the Complaint alleges ample justification for the finding:  the minor had been groomed for sexual abuse by an adult male using a smartphone app, the adult later sodomized the boy, the boy Facebook sex-messaged with another male, who the father confronted in what led to a physical altercation *in the presence of his daughter and her friend*.  Finally, there are no allegations of fact supporting a contention that the plaintiffs were damaged.

Second, even assuming these conclusory allegations are true, they do not support a substantive due process claim.  Nothing "shocks the conscience."  There is no "brutal and inhumane abuse of official power."  Nothing bespeaks an intent to cause harm "unrelated to the legitimate object of government action."   Indeed, the allegations show that Ms. Cook reasonably investigated two incidents of sexual abuse of plaintiffs' minor son and followed the letter and spirit of state and federal law. Given the use of the smartphone app Grindr and Facebook sex-texting, she had a reasonable concern about the minor's cell phone access.  Everything that the Complaint alleges Ms. Cook did was related directly and proportionately to responding to the known child-sexual abuse, evaluating how the parents responded

to the information, and trying and ascertain whether the child was injured or

showed physical evidence of abuse[37]. As a matter of law, the Complaint does not

state a claim for violation of substantive due process.

Notably, these facts are substantially less shocking than those in *Mitchell*. In

*Mitchell*, the children were removed from the home without a pre-deprivation

hearing and the investigator allegedly directed a racial slur to the parents.  959 F.

3f at 898.  Notwithstanding defendant's drastic measure of removing the children

and the offensive racial slur, such was found to not shock the conscious sufficient to

violate substantive due process.  If the facts alleged in *Mitchell* fail to shock the

conscience, these facts fall far short of the standard.

## VII.   Assuming A*rguendo* Plaintiffs Have Standing, Count II's Claim for an Injunction Must be Dismissed Because it Fails to State a Cause of Action.

In addition to a lack of standing, Count II fails allege all of the elements

required for injunctive relief. Whether a court should enter a preliminary injunction

requires balancing: (1) the threat of irreparable harm to the movant; (2) the state of

---

[37] The Complaint, ¶¶ 41, 42, alleges that there was a request to refer the son to SEMO-NASV to "inspect the son's genitals and rectum for evidence", which the parents declined. The Complaint does not specify that Ms. Cook made the request, although making such request was necessary and appropriate under the circumstances. Declining the physical exam is another fact that would cause a reasonable child abuse investigator to question the parents' judgment. SEMO-NASV is the Southeast Missouri Network Against Sexual Violence, an agency that provides advocacy, treatment, counseling, forensic interviews and services for those affected by sexual trauma, including medical exams performed by providers who are specially trained in abuse and sexual assault evaluations. https://www.semonasv.org/. This agency receives funding through DSS §210.001.2(11) RSMo. Missouri has a SAFE Care Network of trained providers to provide forensic examinations, training, support and treatment for victims and suspected victims of child abuse and neglect. For more details see §334.950 RSMo. §595.220 RSMo. It is notable that a minor child can consent to a Sexual Assault Forensic Examination without parental consent under Missouri law. §595.220.2 RSMo.

balance between this harm and the injury that granting the injunction will inflict on other parties; and (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981).  This case fails the test:

*(1) Threat of Irreparable Harm to Movant.* Plaintiffs allege no irreparable harm absent entry of a preliminary injunction. Plaintiffs filed this case *after* they invoked and followed the procedures that they contend violated their constitutional rights, and after those procedures resolved the case in their favor.  Plaintiffs have not *specified* what prospective relief could put them in a better position than they were when the facts played out in 2018-19. Because they do not allege an ongoing investigation, they are not asking that an investigation be stayed; nor do they appear to be asking to enjoin defendants from following these proceedings in a current CANRB proceeding, because they do not allege that there are any pending proceedings involving the plaintiffs. Further, plaintiffs have not alleged that defendants took any further, substantive action involving their family, other than asking the court *to infer* that on some unspecified date, possibly in early 2020, Ms. Cook "contacted the FBI in frustration that the CANRB did not substantiate her earlier allegation, and/or as retaliation against Plaintiffs." Complaint, ¶¶ 93-105, 105. However, these are exactly the type of improper, speculative, conclusory allegations that fail to state a plausible basis for proceeding on a complaint. *Ashcroft* 556 U.S. at 678. *Mitchell*, 959 F.3d at 899. Certainly, plaintiffs are not asking to enjoin CD and Ms. Cook from reporting suspected incidents of child

46

exploitation and sexual abuse involving internet and wire communications to the FBI.  Further, any harm they may be claiming is too speculative or attenuated to state a claim, as discussed above. *Mitchell*, 959 S.W.3d 887. Moreover, plaintiffs have failed to allege how injunctive relief would address an actual, current or prospective case or controversy between the parties.  Absent irreparable harm, the Complaint fails prong-1 of the *Dataphase* test.

(2) *Balance between the harm and the injury granting the injunction will inflict on other parties to the litigation.* In light of the Complaint's failure to allege that any pending child abuse or neglect investigations or CANRB proceedings involving these plaintiffs, coupled with plaintiffs' failure to specify what injunctive relief they are requesting, the Complaint fails to establish how the balance of harms weighs in their favor. The Complaint fails prong-2 of the *Dataphase* test.

(3) *Probability of Success on the Merits*. There is no probability of plaintiffs succeeding on the merits.  This Court lacks subject matter jurisdiction over two of the claims.  Even if the Court had subject matter jurisdiction, the Complaint fails to state a claim for a violation of procedural or substantive due process, and first amendment retaliation. The Complaint and request for preliminary injunction fails the prong-3 of *Dataphase*.

 (4) *The Public Interest*. The public has a compelling interest in robust, flexible procedures for responding to reports of child abuse or neglect. Defendants incorporate by reference the arguments in the preceding sections of this brief. The Complaint fails to pass prong-4 of the *Dataphase* test.

Under *Dataphase*, Count II fails allege a claim for injunctive relief and should be dismissed on that basis also.

## VIII. Count III's First Amendment Retaliation Claim Against Spring Cook Fails to State a Claim.

Count III seeks to state a First Amendment retaliation claim against Ms. Cook pursuant to §1983 on the following averments: Ms. Cook investigated and made findings of parental neglect against the plaintiffs; Plaintiff Father made allegations against Scott County and its Sheriff and these allegations played "a part" in Ms. Cook's investigation and finding of neglect against plaintiffs, that Ms. Cook's adverse actions would chill a person of ordinary firmness from continuing in the protected activity, and Ms. Cook's adverse action was motivated at least in part by the plaintiffs' exercise of that activity. Complaint, ¶¶s 135-140. Of course, these allegations must be disregarded. *Ashcroft* 556, U.S. at 678.

That said, *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014), explains the law governing a First Amendment retaliation claim:

> "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out." *Hartman v. Moore,* 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). "To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir.2004) (citing *Naucke v. City of Park Hills,* 284 F.3d 923, 927–28 (8th Cir.2002)). Under the third prong, a plaintiff must show that the retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action. *Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir.2010). In other words, the plaintiff must show he was "singled out

because of [his] exercise of constitutional rights." *Id.* (quotation omitted); *see also Hartman,* 547 U.S. at 256, 126 S.Ct. 1695 ("[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution.").

In retaliatory arrest cases, we have identified a fourth prong: lack of probable cause or arguable probable cause. *Galarnyk v. Fraser,* 687 F.3d 1070, 1076 (8th Cir.2012) (" 'Lack of probable cause is a necessary element of' a First Amendment retaliatory arrest claim." (quoting *McCabe v. Parker,* 608 F.3d 1068, 1075 (8th Cir.2010))); *McCabe,* 608 F.3d at 1078–79 (finding plaintiffs' First Amendment claims moot because secret service agent had arguable probable cause for their arrest); *accord Redd v. City of Enterprise,* 140 F.3d 1378, 1383 (11th Cir.1998).

Count III fails because plaintiffs fail to aver non-conclusory facts that would permit this court to infer misconduct.  *Ashcroft,* 556 U.S. at 678.

### A. Count III fails to allege sufficient facts to support a finding that Plaintiffs engaged in a protected activity.

From the Complaint we know: 1) plaintiffs' son suffered felonious-sexual by the Deputy, Complaint, ¶¶ 13-19;  2) Plaintiff Father asserted a claim against the County that was eventually resolved, Complaint, ¶¶ 20-21; 3) CD employee Ms. Cook, routinely works with the Sheriff's Department when investigating reports of child abuse or neglect (*as required by law;* §210.145. RSMo), Complaint, ¶ 22; 4) Ms. Cook conducted an investigation of a report of child abuse or neglect that included interviewing the children more than once and proposing a forensic interview at SEMO-NASV, Complaint, ¶¶ 24-32; 5) plaintiffs eventually refused Ms. Cook home-visits and asked her to recuse herself from the case, Complaint, ¶¶ 33-34; 6) plaintiffs allege that recusal is "customary" because CD and law enforcement work

49

"hand in glove"[38], Complaint ¶35; 7)  after denying the request to recuse, Ms. Cook

continued the investigation with the Highway Patrol, Complaint ¶¶37-49; 8) Ms.

Cook made a preliminary investigative finding of child neglect. Complaint, ¶¶44 -

50; and 9) Ms. Cook referred the matter to JC. Complaint, ¶ 56.  Of course, these

allegations must be viewed in light of CD's legal mandate to conduct child

abuse/neglect investigations in conjunction with law enforcement and juvenile

authorities.

Tellingly, the Complaint does not specify what protected activity plaintiffs

engaged in, what plaintiffs said about Scott County or the Sheriff's Department,

what claims they lodged against the County and Sheriff, or how they were resolved.

We do know that Ms. Cook was employed by DSS/CD, a state agency, while Scott

County and the Sheriff's Department are separate, local government agencies. We

know of no link between the plaintiffs' unspecified actions and Ms. Cook's

statements. We know of no reason CD or Ms. Cook had to be concerned about the

plaintiffs' disputes with separate agencies. There is no allegation that plaintiffs

made statements against Ms. Cook or CD. In short, the Complaint contains no

factual averment explaining what specific activity plaintiffs engaged in that would

support a plausible claim for retaliation. Under prong-1 of the *Peterson* test,

plaintiffs have failed a state a claim for First Amendment retaliation.

---

[38] Given that Ms. Cook and CD are required by law to work with local law enforcement in all cases, under *Ashcroft* this is another impermissible conclusory allegation. Whether or not it is customary, recusal is not required by law and failure to recuse is certainly not unconstitutional.

### B. Count III fails to allege a plausible claim that Ms. Cook took an adverse action against Plaintiffs that would chill a person of ordinary firmness from continuing in the activity.

Count III fails to allege a plausible claim that Ms. Cook took an adverse action against plaintiffs that would chill a person of ordinary firmness from continuing in the activity. Again, this conclusory allegation is insufficient to support a cause of action. *Ashcroft*, 556 U.S. at 678. As discussed above, we do not know specifically what protected activity the father engaged in, other than unspecified allegations against Scott County and its Sheriff that were resolved in an unspecified way. We do not know from the Complaint whether Ms. Cook was aware that he engaged in *any* protected activity. How or why the plaintiffs would be chilled by Ms. Cook's alleged actions is not supported by any allegations of fact. Certainly, plaintiffs were not deterred from making complaints because they successfully pursued and prevailed on their request for CANRB review.  Finally, plaintiffs have not alleged that Ms. Cook took any adverse action against them for almost a year. Notably, the actions the Complaint alleges that Ms. Cook took were well within the scope of her statutory authority and discretion, as discussed above. Count III thereby fails prong-2 of the *Peterson* test.

### C. Plaintiffs fail to aver any non-conclusory allegations in the Complaint that Plaintiffs' protected activities constituted a substantial, but-for cause of Ms. Cook's decision.

To state a First Amendment retaliation claim, *Peterson* requires that plaintiffs establish that their protected activities constituted a "substantial", "but-for cause" of Ms. Cook's decision. Plaintiffs must aver facts, not conclusions, that

51

establish Ms. Cook "singled out" plaintiffs because they chose to exercise their constitutional rights. *Ashcroft,* at 678. *Peterson,* at 602.  The Complaint only alleges that Plaintiff Father's protected first amendment activity "played a part" in Ms. Cook's decision to investigate and make findings of parental neglect against the plaintiffs. Complaint, ¶137. This fails to meet the requirement that plaintiffs allege **specific facts** to establish a plausible claim that the Plaintiff Father's First Amendment activities were a substantial "but for" cause of Ms. Cook's decision. The Complaint thereby also fails prong-3 of *Peterson.*

D. **Ms. Cook had sufficient facts to raise a reasonable suspicion that plaintiffs' minor son was a victim of child sexual abuse and parental neglect to initiate a child abuse and neglect investigation and to make a preliminary investigative finding of parental neglect.**

*Peterson*, at 602, held that lack of probable cause is a necessary element in a first amendment retaliatory arrest claim. While this is not an  arrest case, defendants suggest that given the compelling government interest in protecting children from child abuse and neglect this principle applies equally, if not more forcefully, to state child welfare investigators responding to reports of child abuse or neglect. However, defendants would suggest that the standard in this case should not be probable cause, but whether a child abuse investigator has received a report that would raise a reasonable suspicion of child abuse/neglect.

We know from the Complaint that Ms. Cook received a report that plaintiffs' minor son had been sodomized by an adult male who was known to the family, who groomed him for sex over a period of time and who communicated with the child

52

through the Grindr app on his iPhone. That information alone is sufficient to trigger the mandatory obligation of law enforcement officers to report suspected child abuse or neglect to CD[39].  As a matter of law that information alone is sufficient to justify CD initiating an investigation to determine if the parents' actions or inactions played a role in the incident, and whether the child and/or child's family may benefit from CD services to help families whose children are victims of sexual abuse. §210.145.3 RSMo.  Missouri law expressly provides that reports of child abuse or neglect that, if true, would constitute a suspected violation of "… other crimes under chapter 566 if the victim is a child less than eighteen years of age" merit CD investigation and trigger CD's obligation to report to law enforcement. §210.145.3 RSMo. Again, the Complaint alleges that plaintiffs' minor son was sodomized by an adult in violation of §566.064 RSMo, one of the statutes that triggering CD investigation. Complaint, ¶ 18. We further know from the Complaint that was not the only incident; he had also engaged in Facebook sex-messaging with the Instructor. Complaint, ¶ 44.b. We further know that Plaintiff Father confronted the Instructor and had a physical confrontation in the presence of his daughter. *Id*. Finally, Plaintiff Father, as a POST certified law enforcement officer, and the Plaintiff Mother, a teacher, are both required to report suspected child abuse to CD. §210.115.1 RSMo.[40] A mandatory reporter's failure to report a suspected child abuse

---

[39] §210.115.1 RSMo

[40] **210.115.  Reports of abuse, neglect, and under age eighteen deaths — persons required to report — supervisors and administrators not to impede reporting — deaths required to be reported to the division or child fatality review panel, when — report made to another state, when.** — 1.  When any … social worker, day care center worker or other child-care worker,

53

is a crime. §§210.115.1 and 210.165 RSMo. Here, we know that plaintiffs did not report the assault, but the Complaint is silent as to whether plaintiffs reported the incident involving the Instructor. Further, the Complaint states that Ms. Cook proposed that plaintiffs submit a parenting plan, presumably to work with them to help their son. Complaint, ¶ 43. We also know that the plaintiffs refused further home visits by Ms. Cook. Complaint, ¶ 33. The Complaint is silent about what plaintiffs did to provide care and treatment for their son and daughter under these difficult circumstances. Nothing in the Complaint alleges that Ms. Cook suggested that the child or a parent be arrested or criminally charged. These allegations in the Complaint gave Ms. Cook a reasonable basis for concluding there was sufficient evidence to issue a preliminary, investigative finding of child neglect by the parents.

For the above reasons, Count III fails to state a claim.

## IX.    <u>Defendant Spring Cook is Entitled to Absolute Immunity From Liability on Counts III and IV for Her Decision to Make a Preliminary Finding of Child Neglect and Present the Case to the CANRB.</u>

Ms. Cook's decision to make a preliminary investigative finding and notify the plaintiffs in writing initiated the process for plaintiffs to request CANRB or judicial review. The role of a

---

juvenile officer, probation or parole officer, jail or detention center personnel, *teacher, principal or other school official*, minister as provided by section 352.400, *peace officer or law enforcement official*, …, or *other person with responsibility for the care of children* has reasonable cause to suspect that a child has been or may be subjected to abuse or neglect or observes a child being subjected to conditions or circumstances which would reasonably result in abuse or neglect, that person shall immediately report to the division in accordance with the provisions of sections 210.109 to 210.183.  No internal investigation shall be initiated until such a report has been made.  As used in this section, the term **"abuse"** is not limited to abuse inflicted by a person responsible for the child's care, custody and control as specified in section 210.110, but shall also include abuse inflicted by any other person. [Emphasis added]. Surely Plaintiffs, as parents, are persons with the responsibility for the care for children and are mandatory reporters of child abuse neglect as provided in this statute.

social worker in filing proceedings to protect abused minors is functionally comparable to a prosecutor's initiation of the judicial process, warranting absolute immunity from liability from damages. *Mazor v. Shelton*, 637 F.Supp. 330, 334-335 (N.D. Cal. 1986) as cited in *Thomason*, 85 F.3d at 1373.  *Dornheim*, 430 F.3d 919 (government social worker absolutely immune from liability for §1983 damages for giving evidence in judicial proceedings related to child custody/abuse investigation). Courts grant absolute immunity because it is essential to protect the governmental official's special or adjudicative function. *Mazor,* at 333 (citing *Butz v. Economou,* 438 U.S. 478, 508–517 (1978).  In deciding whether a governmental official is entitled to absolute immunity the Court must consider the "nature of the official's function, not his or her status." *Mazor, at 334.*

Absolute immunity from civil liability must apply to CD employees when they make the difficult decision of a finding of child neglect and initiate administrative and subsequent judicial review of that finding. Like prosecutors, CD employees often balance conflicting evidence in difficult circumstances based on the facts and the applicable law to substantiate a civil finding of child abuse or neglect and initiate the alleged perpetrator's right to notice and opportunity for a hearing. "Like prosecutors, it is 'very difficult if not impossible' for social workers to be absolutely certain whether the information on which they act is objectively true." *Mazor,* at 334. "It is essential that social workers perform their duties to minors without fear of intimidation from dissatisfied parents. If courts allow retaliatory suits, social workers would be inclined to act only in cases in which they are absolutely certain that the alleged conduct occurred." *Id.* Fearing vexatious and baseless lawsuits, CD employees will avoid needed action in difficult and close cases rather than risk being sued. This will undoubtedly put the lives and safety of children at

risk. The place to challenge these decisions is the administrative review process, followed by *de novo* judicial review, not later federal court damage suits using 20/20 hindsight.

This Court should dismiss Counts III and IV against Ms. Cook because she is shielded by absolute immunity on those claims.

## X.   Defendant Spring Cook is Entitled to Qualified Immunity the Damage Claims in Counts III and IV.

Ms. Cook also has qualified immunity from liability on Counts III and IV. A Rule 12(b)(6) dismissal based on qualified immunity is appropriate "when the immunity is established on the face of the complaint." *Dornheim*, 430 F.3d at 926. As explained in *Pearson,* 555 U.S. at 231: qualified immunity protects government officials from suit rather than simply being a defense to liability, at 231;   the ""driving force" behind the doctrine is to ensure that insubstantial claims against government officials will be resolved prior to discovery, *Id.*; a government official's right to qualified immunity from suit can be effectively lost if a case is erroneously permitted to go to trial, *Id.*; it shields a government official who reasonably believes that her conduct complies with the law, *Id.,* at 244; and, it protects from mistaken judgments, whether in law or fact, *Id.,* at 231.

Even if the Complaint sufficiently pled and established a constitutional violation Ms. Cook would be protected by qualified immunity from damages under Counts III and IV. As stated in *Mitchell*, 959 F.3d at 901-902:

> "When a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse." *Dornheim*, 430 F.3d at 926 (internal quotation marks omitted). "The

56

> need to weigh a parent's right to familial integrity against the state's interest in protecting the child makes it difficult to overcome a qualified immunity defense in the context of a child abuse investigation." Id.

See also *Thomason*, 85 F.3d 1365 (applying qualified immunity to a child abuse investigator).

Here, we know from the Complaint that two different men abused plaintiff's son and that the son had been groomed through a smartphone app and had engaged sex-messaging on Facebook. We also know that Plaintiff Father confronted one perpetrator, resulting in an assault, in his daughter's presence. These circumstances would provide a child abuse investigator a reasonable basis to believe that she had legal authority to investigate possible neglect.  Further, there is no clearly established federal law that Ms. Cook violated; in fact, the opposite is true. Ms. Cook acted fully within the bounds of her authority under law. However, even if Ms. Cook's decision to make a preliminary finding of child neglect was mistaken, it does not contravene any of plaintiffs' clearly established, constitutional rights, as explained in the preceding sections of this brief, and Ms. Cook is still protected from liability for damages. Qualified immunity protects government officials from mere mistakes in judgment. *Pearson*, at 231.

Under, *Dornheim, Pearson, Mitchell* and *Thomason*, Ms. Cook is has qualified immunity from liability on Counts III and IV.

**XI.** **Count V Must be Dismissed Because it Fails to State a Claim on Which Relief May be Granted, or, in the Alternative, Because this Court Should Decline to Exercise its Supplemental Jurisdiction.**

### A. Defendant Cook is entitled to official immunity from suit for Malicious Prosecution.

#### (1) Official Immunity Doctrine Explained.

Missouri public employees are immune from liability for alleged acts of negligence committed during the course of their official duties for the performance of their discretionary acts. *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. Banc 2008). Official immunity protects individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties without concerns about personal liability. *Southers* at 611. A discretionary act is one that requires the exercise of reason in adapting means to an end and discretion in determining how *or whether to act*. *Southers*, at 610.

Official immunity, like federal qualified immunity, is more than immunity from judgment, it is "immunity from suit." *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. Banc 2019). A public official is afforded official immunity so long as she was acting within the scope of her authority and without malice. *Id.* Courts must be cautious not to construe the doctrine narrowly, lest they frustrate the need to relieve public servants of the burden of litigation. *Id.* at 191. The General Assembly has affirmed this principle in §105.711.5 RSMo: "[n]o... employee of...any [state]agency...shall be individually liable...for conduct...arising out of and performed in connection with...official duties on [agency's ]behalf." That official immunity affords immunity from suit makes a Motion to Dismiss particularly

appropriate because it avoids subjecting the public employee to the stress, time, disruption and expense of litigation.

A narrow exception to official immunity applies when a public officer fails to perform a *ministerial* duty required by law. *Alsup,* at 191 (emphasis added) states:

> [A] ministerial…duty is one in which a certain act is to be performed "upon a given set of facts in a prescribed manner *in obedience to the mandate of legal authority*, and without regard to the [public official's] judgment or opinion concerning the proprietary of the act to be performed." [citations omitted] Thus, the central question is whether there is any room whatsoever for variation in when and how a particular task can be done. If so, that task – by definition – is not ministerial.

The phrase "in obedience to the mandate of legal authority" is frequently misunderstood and misapplied. As *Alsop* also explains, at 192-93:

> T[]hat a statute or regulation may confer authority – or even a duty – to act in a given situation says nothing about whether the act…is… ministerial…. [E]ven when a[n]…act appears to be… required by statute, official immunity will still apply if the official retains authority to decide when and how the act is to be done. [citations omitted]… [E]ven though a statute might require a public official to act "fairly", "competently", "safely" or "reasonably"…the performance of that action will fall within official immunity because what constitutes fair, competent, safe, or reasonable may differ from time to time, place to place and official to official.

In fact, the legal analysis for determining whether an act is ministerial is the same as the Court must apply in determining whether to grant a Writ of Mandamus: if a writ of mandamus would not be proper to compel an official to perform an act… official immunity protects an official from liability for injuries arising from performing that act.  *Alsup*, at 191-192. We now apply these principles.

### (2) Ms. Cook's Actions were discretionary, not ministerial, and therefore she is immune from liability for Malicious

### Prosecution under the official immunity doctrine as a matter of law.

The Complaint's allegations, as set-out above, establish that Ms. Cook's decisions and actions were discretionary, not ministerial. Knowing of the sex abuse by two adults of the child, who was groomed by the smartphone app Grindr and engaged in Facebook sex-messaging, of a father who took his daughter to a confrontation with a perpetrator, of parents who allowed continued iPhone use and who declined a medical exam for injury from the sexual encounters and declined a parenting plan, Ms. Cook was called upon to exercise professional discretion in determining whether the evidence supported a preliminary finding of neglect.  That she allegedly called the FBI based on the information of cell-phone/internet involvement was another judgment required within the scope of her duties.  Under *Alsup,* official immunity applies.

Notably, official immunity has specifically been applied to CD employees. See: *Hutson v. Walker*, 688 F.3d 477 (8th Cir. 2012) (social worker's handling of a child's care is generally inherently discretionary); *James v. Friend*, 458 F.3d 726 (8th Cir. 2006) (affirmed a finding of official immunity of a CD worker in a wrongful death case).

Although official immunity may not protect public officials if their conduct was willfully wrong or done with malice or fraud, *Southers,* 263 S.W. 3d at 610 & n. 7, p**laintiffs allege no non-conclusory facts to establish that Ms. Cook's conduct was willfully wrong, malicious or corrupt.**  There are no allegations

that she had any personal interest in the case, or that she would personally benefit from the decisions she made.

### B. Ms. Cook is absolutely immune from liability for Malicious Prosecution under Count V under Missouri State law.

Ms. Cook is absolutely immune from liability for damages for malicious prosecution under §105.711.5, RSMo, which provides:

> [n]o officer or employee of the state or any agency of the state shall be individually liable in his or her personal capacity for conduct of such officer or employee arising out of and performed in connection with his or her official duties on behalf of the state or any agency of the state.

Ms. Cook was a state employee of DSS/CD. Her actions were done in the context of her authority and responsibility under §210.110 through §210.165 RSMo. There is no evidence that she intentionally filed a false report under §210.115 RSMo. Improper, conclusory allegations notwithstanding, the discussion in the preceding sections of this Memorandum conclusively establish that she had a good faith, factual and legal basis for taking all of her actions.  Accordingly, under, §105.711.5 she cannot be held civilly liable in her personal capacity for those actions.

### C. Count V fails to plead the elements of a claim for Malicious Prosecution.

As explained in *Copeland v. Wicks*, 468 S.W.3d 886, 889 (Mo. 2015) (citations omitted):

> [t]o prevail on a malicious prosecution claim, a party must prove…: (1) commencement of an earlier suit against the party; (2) instigation of that suit by the adverse party; (3) termination of the suit in the party's favor; (4) lack of probable cause for filing the suit; (5) malice by the adverse party in initiating the suit; and (6) damage sustained by the party as a result of the suit. Malicious prosecution actions are not

favored in the law as public policy supports uncovering and
prosecuting crime.  As such, courts require strict compliance with the
requisite elements.

Count V fails to state a claim for malicious prosecution[41] because it does not

establish 1) instigation of a judicial proceeding, 2) lack of probable cause, or 3)

malice.

    *1. Institution of Judicial Proceeding*.  No Missouri court has recognized a

claim for malicious prosecution arising from an administrative proceeding.  *Holland*

*v. Healthcare Servs. Of the Ozarks*, 347 S.W. 3d 166, 168 n. 2 (Mo. App. 2011).  MAI

23.07 requires that defendant in a malicious prosecution suit to have instigated or

continued "a judicial proceeding" against plaintiff.  When recently presented the

opportunity, U.S. Magistrate Judge Nannette Baker, declined to "supplant the

judgment of the Missouri courts and extend" the tort of malicious prosecution

beyond "civil or criminal lawsuits." *Abernathy v. White*, 2019 WL 4750247 (E.D. Mo.

Sept. 30, 2019) (citing *Holland*).  Here, Ms. Cook did not institute any lawsuit

against plaintiffs; she conducted an investigation and made an internal,

---

[41] Defendants submit that in addition to a strong public policy supporting the
uncovering and prosecuting crime, an equally compelling governmental interest applies to
uncovering child abuse and neglect, ensuring that children are safe and protected from
further abuse and neglect, and providing safe care and treatment for children and families
impacted by child abuse and neglect. Hence, suits for malicious prosecution against child
welfare investigators should be disfavored, and courts should require strict compliance for
pleading and proving the requisite elements. Rather than including in the Complaint Ms.
Cook's actual findings or her report showing the basis of her decisions, plaintiffs
impermissibly characterize some of her findings in conclusory fashion.  The court should
require accurate pleading of facts before requiring a child welfare investigator to defend
herself against a claim of malicious prosecution. Under A*shcroft,* this court should give no
credence to Count V's conclusory allegations.

*preliminary finding* that did not result in listing plaintiffs in the Central Registry. There was no civil or criminal lawsuit; rather, it was an administrative proceeding. Under *Abernathy,* lacking the requisite judicial proceeding, there is no claim for malicious prosecution.

*2. Probable Cause*. That plaintiffs' minor son was sodomized by an adult colleague of the Plaintiff Father was itself sufficient basis for Ms. Cook to investigate the report. §210.145.3 RSMo. Plaintiffs' subsequent actions or inactions, including the decision to confront, in his daughter's presence, the Instructor provided additional bases warranting the investigation and preliminary finding.

Moreover, to establish parental neglect sufficient to list an individual in the Central Registry CD is not required to establish probable cause that a crime has been committed. Instead, CD need only establish that persons responsible for the care, custody and control"[42] of a child "fail[ed] to provide the proper or necessary support, education as required by law, nutrition or medical, surgical, *or any other care necessary for the child's well-being*. Victims of neglect shall also include any victims of sex trafficking or several forms of trafficking as those terms are defined in 22 U.S.C. 78 Section 7102(9)-(10)." §210.110(12) RSMo. [emphasis added]. Plaintiffs' minor son had sexual liaisons with at least two adult men who he interacted with him through his cell phone, one of which is now charged with a felony.  The Complaint is silent about what, if anything, plaintiffs did to protect him

---

[42] Under Missouri law, the parents or legal guardians of a child are, by definition in statute, responsible for their care, custody and control. §210.110(16) RSMo.

from further predatory sexual actions – other than Plaintiff Father's ill-conceived confrontation of the Instructor.  The Complaint avers that Ms. Cook based her findings on plaintiffs allowing their son to have an iPhone, to use the internet and drive a car. Complaint, ¶¶ 45-48. That mischaracterizes. It is not merely that plaintiffs' son had the iPhone, used the internet or drove the car; the iPhone and internet were the tools used to sexually groom and victimize him.  The danger from an iPhone for a sexually-groomed child who has a history of using an iPhone/ internet to meet adults is self-evident.  The Complaint is silent about *what plaintiffs did* to safeguard their son from further victimization.  Notably, the Complaint says Ms. Cook proposed a parenting plan, but is silent as to whether plaintiffs accepted her offer. Complaint ¶ 43.  Plaintiffs admit that they stopped cooperating with Ms. Cook, refusing further home visits.  Complaint, ¶¶ 33. Given the nature of the Complaint's improper, conclusory allegations and the seriousness of the known criminal sexual abuse, Ms. Cook had a factual basis – probable cause if you will – to make the preliminary finding of parental neglect that is used for listing an individual in the Central Registry.

*3. Malice.*  The Complaint's allegations of malice are conclusory averments of law unsupported by credible allegations of fact; they do not satisfy the *Ashcroft/ Twombly* test that requires plaintiffs to allege enough facts to raise a reasonable expectation that discovery will reveal evidence of a plausible claim. Complaint, ¶¶ 112.c, 113.b., 117, 128, 142, 149, 158 (and footnote 21) and 160. It appears that plaintiffs are inferring malice from the following: the assumption that Ms. Cook

called the FBI and instituted the FBI probe in retaliation for Plaintiff Father's[43] unspecified statement after the CANRB set aside her preliminary finding, that she conducted a child abuse and neglect investigation, that she made a preliminary finding of child neglect, and that she allegedly made a comment about "getting" Plaintiff Father's POST license.[44]

Different definitions of "malice" apply to malicious prosecution claims arising out of criminal prosecutions versus civil proceedings. *Sanders v. Daniel Int'l. Corp.*, 682 S.W. 2d 803 (Mo banc 1984). In the civil context, MAI (Civil) 16.01(1) (8th ed) provides:

> The term "maliciously" as used in this [these] instruction[s] means intentionally doing a wrongful act without just cause or excuse. It does not necessarily mean hatred, spite or ill will.

In the criminal context, the MAI (Civil) 16.01(2) (8th ed) provides:

> The term "maliciously" as used in this [these] instruction[s] means [acting intentionally with an evil motive], [or acting with reckless indifference to the rights of others], [or acting primarily for a purpose other than bringing an offender to justice].

Defendants assert that, while these are civil matters, the criminal standard should apply here because the state has a compelling interest in protecting children, and the state and state actors have no personal interest in outcome of the litigation they initiate. The sole purpose for child protection investigations is the public interest of safeguarding children from abuse and neglect, and to provide services to children and families.

---

[43] Complaint, ¶¶ 93-99, 105, 155-57.
[44] Complaint, ¶ 66.

Regardless, Ms. Cook clearly had a good faith, legal and factual basis for investigating the report of child abuse, making the preliminary finding and reporting the information to the FBI for the reasons discussed above in this Memorandum.  As to the alleged statement that she was going to "get" Plaintiff Father's POST license, that does not in itself support an inference of legal malice, as seen in *Mitchell*. There a state child welfare worker investigating abuse allegedly told parents: "why are all black families so quick to spank their children?,"  "you are unfit to be parents and don't deserve to have children," and "I am going to do everything in my power to see that the children are never returned to your custody." 959 F. 3d at 895.  Acknowledging the unprofessional, inappropriate nature of the statements, at 898, the court nonetheless held "[n]o conduct by the individual defendants" showed sufficient malice to deny official immunity. At 903.  Similarly, here, although the statement, if made, was unfortunate and unprofessional, it does not rise to the level of proof of legal malice.  In fact, the Plaintiff Father likely knew that his POST license may be on the line because as a POST certified law enforcement officer he was required to report suspected child abuse and neglect to the CD, and failure to do so was a crime. §210.115 and 210.165 RSMo.  As a result, not a single *non-conclusory allegation of material fact* supports this court finding that Ms. Cook showed malice under either MAI 16.01(1) ("intentionally doing a wrongful act without just cause or excuse") or MAI 16.01(2) (acting with an evil motive or with reckless indifference, or for a purpose other than bringing an offender to justice).  Nor does a single, *non-conclusory allegation of material fact*

66

support a finding that she acted other than to ascertain the circumstances of the crimes against plaintiffs' son and what was needed to protect him; in effect, they show that she was acting within the scope of her legal responsibilities and authority.

For all if the reasons stated in section XI A-C, Count V should be dismissed for failure to state a plausible claim.

### D. Absent a viable federal claim, and assuming *arguendo* that it is not otherwise dismissed, this court should decline to exercise its supplemental jurisdiction and dismiss Count V on that basis.

A federal court may exercise supplemental jurisdiction over state law claims based where the federal court has original jurisdiction over a federal claim that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a). As explained in *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), supplemental jurisdiction must be exercised cautiously:

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

See also: *Boldthen v. Indep. Sch. Dist. No. 2397*, 865 F. Supp. 1330, 1340 (D. Minn. 1994); 28 U.S.C. §1367(c)(1) and (3).

This court should decline to exercise supplemental jurisdiction over Count V and dismiss that count without prejudice because all of the plaintiffs' federal law claims are meritless and must be dismissed for the reasons explained above. 28 §1367(c)(3). This court should also decline to exercise supplemental jurisdiction over Count V because the question of whether or not a CD employee may be mulcted in damages for malicious prosecution under state law raises both a novel and complex question of state law. 28 U.S.C. §1367(c)(1).  See e.g. *Udoh v. Minnesota Dept. of Human Services*, 735 Fed.Appx. 906 (Mem) (8th Cir. 2018).

## XII. <u>Conclusion.</u>

For the above stated reasons, defendants' motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim on which relief may be granted must be granted and each and every Count should be dismissed with prejudice.

Respectfully submitted,
**ERIC S. SCHMITT**
Attorney General

*/s/Edward V. Crites*
Edward V. Crites #33985
Assistant Attorney General
815 Olive Street, Suite 200
St. Louis, Missouri  63101
Tel:  (314) 340-7861
Fax:  (314) 340-7029
Edward.crites@ago.mo.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2020, the foregoing was filed electronically via the Court's electronic filing system and was served by operation of the CM-ECF system on all counsel of record.

*/s/ Edward V. Crites*
Assistant Attorney General