UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| J.T.H and H.D.H | ) | |
| | ) | Case No. 1:20-CV-222 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| MISSOURI DEPARTMENT OF | ) | |
| SOCIAL SERVICES, CHILDREN'S | ) | |
| DIVISION; and SPRING COOK, *in her* | ) | |
| *Individual capacity*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS SUGGESTIONS IN OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

## I. <u>Introduction</u>

Defendants previously filed a Motion to Dismiss the Complaint in its entirety, including Count II for a Preliminary Injunction[1]. Many of the points and authorities in support of the Motion to Dismiss apply to the issues presented in Plaintiffs' PI Motion. While incorporating those arguments directed to Count II by this reference, these suggestions will discuss points raised in the PI Motion in light of the Plaintiff Father's Declaration and the additional evidence Defendants submit herein. When the Court has had the opportunity to review the record, it will be apparent that Plaintiffs' Complaint and PI Motion wholly lack foundation.

## II. <u>Issues relevant to the disposition of the Plaintiffs' PI Motion.</u>

---

[1] Defendants will refer to this as the "PI Motion" in this brief.

Plaintiffs' PI Motion, based solely on Count II of the Complaint, is against the Department of Social Services (DSS), Children's Division (CD).  PI Motion, pp. 1-2. Count II contends that the Child Abuse and Neglect Review Board's (CANRB) procedures deny the Plaintiffs' right to procedural due process. They ask this Court for a preliminary injunction prohibiting CD from

> enforcing the Missouri Child Abuse & Neglect Central Registry statutory and regulatory process, RSMo 210.152 and 210.153, and Missouri CSR 35-31.025 without providing the following procedural due process rights to attend [sic] to any child abuse and neglect investigations, findings, and hearings against the alleged perpetrator:
> 1. Right to obtain all evidence, including disclosure of Children's Division's entire file, and to compel production of all evidence if necessary with some process to compel production;
> 2. Right not to be charged money for disclosure of Children's Division's evidence;
> 3. Right to cross-examine Children's Division witnesses where there are conflicting narratives of the truth, in light of an alleged perpetrator's interest in avoiding 'stigma plus" placement on the Missouri Child Abuse and Neglect Central Registry.

Defendants will therefore confine their response to the PI Motion on addressing the facts and law applicable to Count II and the Plaintiffs specific requests for injunctive relief. Because they are beyond the scope of the three items requested in the PI Motion, Defendants object to Plaintiffs' inclusion of arguments relating to the adequacy of notice, which is unrelated to the relief requested.

The PI Motion  should be denied because: 1)  Plaintiffs lack Article III standing[2]; 2) Plaintiffs  have not pled this case as a class action and therefore lack standing to request preliminary relief on behalf of unspecified "others" who are not

---

[2] For the reasons specified in the Defendants' Motion to Dismiss.

parties to this case; 3) Plaintiffs have failed to establish an arguable case that any of the factors listed in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981), have been met; 4) Plaintiffs have adequate remedies at law; and 5) the procedures Plaintiffs request the Court implement at the administrative review stage are simply not required to comply with procedural due process requirements.

## III. <u>The Record for PI Motion.</u>

In part III of their brief, Plaintiffs suggest that the court hold an evidentiary hearing. While Defendants do not object to oral argument, they submit that dismissal of this case is warranted as a matter of law based on the Complaint alone. In the event the Court decides to consider the PI Motion, Defendants submit that the case can be resolved by reference to the affidavits and declarations submitted by the parties without an evidentiary hearing. Defendants, however, will be prepared to defend the case at an evidentiary hearing.

## IV. <u>Factual Summary</u>

The parties appear to agree on the following facts:

- Scott County Sheriff's Deputy Brandon Cook sexually abused the Plaintiffs' 15 year old son (Son) in or about May of 2020.[3] The abuse took place in Brandon Cooks' marked patrol car when he was on duty and in uniform.[4] Brandon Cook groomed Plaintiffs' Son through the Scott County Sheriff's Explorer program, at a crawfish boil, at the Scott County rodeo ground and

---

[3] Complaint, paragraph 13.
[4] Complaint paragraph 14

through a smartphone app called Grindr.[5] Brandon Cook was arrested by troopers from the Missouri State Highway Patrol and is charged with Statutory Sodomy -2nd degree, a Class D felony. §566.064 RSMo. The criminal charges are pending.[6]

- JTH holds a Missouri POST law enforcement license[7], and that at the time Brandon Cook sexually abused Plaintiffs' Son he was a colleague of JTH at the Scott County Sheriff's Department.[8]

- JTH, as Son's next friend, asserted claims against Scott County related to the incident involving Brandon Cook.[9] Defendants believe that those claims were settled out of court.[10]

- In 2020, the Plaintiffs' minor Son also became sexually involved with another adult, male Tae Kwon Do instructor after the Son's 16th birthday.[11] When JTH found out that the instructor was messaging about sex with his son JTH confronted him in person, stated that his Son was a minor and asked him to stop all contact.[12] The instructor then assaulted JTH.[13] Plaintiffs' minor daughter and her friend were nearby in JTH's car and witnessed the

---

[5] Complaint, paragraph 16.
[6] Complaint, paragraph 19
[7] Complaint, paragraph 2.
[8] Complaint, paragraph 15.
[9] Complaint, paragraph 20.
[10] Complaint, paragraph 21.
[11] Complaint, paragraph 44.b.
[12] Complaint, paragraph 44.b
[13] Complaint, paragraph 44.b

incident.[14] JTH did not report the assault, and apparently did not report the sexual abuse of his Son by this second individual.[15]

- Spring Cook is the Circuit Manager for the Scott County CD office in Sikeston[16], and she and her team members work closely with Scott County deputies to respond to hotline investigations, as required by law.[17]

- Plaintiffs' minor Son, with his mother's consent went on a date with another teenaged boy that allegedly involved driving to a shopping mall across the Arkansas state line, seeing a movie and having a meal.[18]

Plaintiffs and Defendants also appear to generally agree that CD received a hotline report pertaining to the family on November 7, 2018; Ms. Cook conducted the investigation[19]; Ms. Cook met with HDH, JTH (once) and the children on several occasions between November 7 and the end of November of 2018;[20] in a letter dated November 23, 2018, Plaintiffs' lawyer asked Ms. Cook to recuse herself, and Plaintiffs refused further home visits by Ms. Cook;[21] Ms. Cook made a preliminary finding of neglect on January 7, 2019;[22] Plaintiffs appealed the finding to the CANRB;[23] Ms. Cook reviewed her finding when she received the request for

---

[14] Complaint, paragraph 44.b
[15] . Complaint, paragraph 44.b.
[16] Complaint, paragraph 5.
[17] Complaint, paragraph 22.
[18] Complaint, paragraph 44.c.
[19] Complaint, paragraph 49
[20] Complaint, paragraphs 23, 31, 32
[21] Complaint, paragraph 33, 34
[22] Complaint, paragraph 44.
[23] Complaint, paragraph 51

administrative review;[24] the CANRB held a hearing on August 27, 2019;[25] Plaintiffs

were represented by counsel at the hearing but Ms. Cook was not;[26] and, the

CANRB overturned Ms. Cook's preliminary finding.[27]

Finally, the parties agree generally that CANRB hearings are conducted

informally. Testimony and other evidence are not received under oath, cross

examination is not permitted, and there is no record or transcript of the

proceeding.[28] Nor is there a right to pre-hearing discovery or to take depositions.

However, CD does provide "information and findings" to the alleged perpetrator and

the parents prior to the hearing.[29] §210.150.2(4) and (9) RSMo and 13 CSR 35-

31.025(9)(A)(3). Each party has an opportunity to make a 20-minute presentation.[30]

Under applicable regulations, the alleged perpetrator and the child's parents

may submit written information to the CANRB before the hearing,[31] and the

CANRB has discretion to provide extra time to the parties.[32] The record does not

indicate that Plaintiffs asked for additional time to present their case.

From the affidavits and written records accompanying these suggestions, it is

apparent that the two incidents of sexual abuse raised in the Complaint were the

---

[24] Complaint, paragraph 52. Plaintiffs expressly do not contend that this review forms a constitutional violation.
Complaint, paragraph 54, footnote 1.
[25] Complaint, paragraph 77.
[26] Complaint, paragraph 83.
[27] Complaint, paragraph 92.
[28] Complaint, paragraph 69.
[29] Complaint, paragraph 70.
[30] Complaint, paragraph 69.
[31] 13 CSR 35-31.025(9)(A)(4) and (9)(B).
[32] 13 CSR 35-31.025(10)(A).

tip of the iceberg.[33] Plaintiffs' Son told Ms. Cook that he had been getting on the Grindr app since he was about 12-13 years old.  Affidavit of Hannah Wright, Exhibit A, p. 0019 and Exhibit C, p. 0198.[34]   The Grindr app is a social networking platform available on cell phones and the internet that enables gay, bi, trans and queer people to connect.[35]  The first time his parents found out he was using Grindr, they took his cell phone away. Wright, 0198. When he got his phone back at age 15 his parents set no boundaries. *Id*. He said his parents told him that they would do weekly checks on his phone, but they never did. *Id*.  About 3-4 months after Son got his phone back he again downloaded Grindr and started sending and receiving nude pictures. *Id*. Some photos he received were from children his own age, but most were from older men. *Id*. Son said he would meet the men in his driveway or go to their homes. *Id*. He said his parents were sleeping when he would meet the men in the driveway. *Id*.  Son told his sister what he was doing, but she told on him. *Id*. His sister also told him about the dangers of what he was doing, so he did not talk with her much. *Id*. Son told Ms. Cook that he had sex 3 times and had given 17 people blow jobs. *Id*. Son told Ms. Cook that his parents had purchased a security camera but they never put it up or did anything with it. *Id*. Son said his parents put an app called "Live 360"[36] on his phone to track his movement, but they did not check the app. *Id*. Also, he could "pause" the app and go where he wanted while it showed he

---

[33] The Defendants do not view the date with the young man in Arkansas as an "incident", as will be discussed in more detail elsewhere in this brief.

[34] Hereinafter citation to paragraphs in Wrights' affidavit will be to "Wright, ¶___" and to pages contained in the affidavits Exhibits A, B, and C will be the Bate-labeled numbers, e.g. "Wright, (bates page #)".

[35] See www.grindr.com, https://apps.apple.com/us/app/grindr-gay-chat/id319881193 and Grindr - Gay chat - Apps on Google Play

[36] Ms. Cook refers to this app as "Live 360", but it is actually "Life360". See www.life360.com

was where he was supposed to be; his parents knew this but did nothing about it. *Id.* He told Ms. Cook that he had purchased sex toys, that his parents knew he had, and that they just told him that he was "crazy" for doing it. *Id.*

Son said he could talk with his mother, but he did not have a good relationship with his father. *Id.* Son told Ms. Cook that his father is never home. *Id.* Son told Ms. Cook that he was "addicted" (to Grindr-type apps) *Id.* 0201, that he gets attention when he uses Grindr and he likes the attention. *Id.* 0195. He said that not many gays his age were in his area. *Id.* Son indicated that he was open to receiving counseling and would welcome the opportunity to participate in a support group for gay children. *Id.* 0201.

Son and Ms. Cook talked about Ms. Cook's concerns about Son getting hurt and about whether he would be willing to get counseling. *Id.* 0198. Son told Ms. Cook that he had been in counseling before, but stopped going because he did not like the counselor. *Id.* Son said that someone should block the apps so that he would not be tempted. *Id.*

HDH corroborated Son's story. She told Ms. Cook that they allowed their children to have a cell phone when they reached age 12. *Id.* 0199. HDH said that her Son got in trouble when he was 12 because they found messages about him being with an older man. *Id.* This is when they learned about the Grindr app. *Id.* HDH said that she told JTH and "he took care of it." *Id.* HDH said that they informed Miner Police Department[37] about it and then Scott County came and took

---

[37] The City of Miner is located in Scott County, Missouri.

the tablet. *Id.* HDH told Ms. Cook when they gave the phone back to their Son it was only for texting and calling. *Id.* However, she and her husband set no boundaries for their Son and they did not talk to him about getting back on Grindr. *Id.*

HDH disclosed that she was struggling with how to handle her children's online behaviors. HDH told Ms. Cook that she could not control or manage what her children get on and what they do with their phones. *Id.* 0194.  HDH said that she tried to take the children's phones away before, but the children refused. *Id.* HDH told Ms. Cook that she does not monitor the children's phones so she does not know if anything has been going on since the last time it happened. *Id.*  HDH said that that they got the Live 360 App for the children's phones, but HDH does not pull up the history or track what the children have been doing. *Id.* 0199.  HDH said that she knew that the children knew how to pause their location. *Id.*

HDH said that she did not know about the incident with the police officer until the Highway Patrol came to the home, and she did not find out about the incident with the taekwondo instructor until August or September of 2018. *Id.*

HDH disclosed that Son had recently met someone on line and had met with him in Arkansas on Sunday. She told Ms. Cook that the boy was 16 years old, and she knew that the boy's parents were not happy about it. *Id.* 0194

HDH and Ms. Cook talked about what could be done to help the family. HDH told Ms. Cook that Son used to be on medication and in counseling, but they stopped taking him. *Id.* 0199.  HDH also told Ms. Cook that she had been in a bad spot a few

years ago and had been on medication, but she had stopped taking the medication and was not seeing anyone. *Id.* They discussed getting Son back into counseling. *Id.* Her husband, JTH, was an over the road trucker and was frequently on the road. *Id.* 0194.  HDH told Ms. Cook that she and her husband have a lot of communication problems. *Id.* 0199.  JTH is home perhaps 1-2 days each week. *Id.* HDH told Ms. Cook that her husband likes to be the dictator and tell everyone what to do. *Id.* HDH told Ms. Cook that she and her husband are never on the same page. *Id.*  HDH told Ms. Cook that she does not really have a support system at this time. *Id.* HDH said that her father is not in good health, that he does not know Son is gay, and that it would destroy him if he knew. *Id.* HDH said that she has a sister but they really do not get along.  *Id.* HDH said that she only has one friend. *Id.* HDH said that JTH is not physically abusive, but he is emotionally and verbally abusive to her and the children. *Id.*

Ms. Cook spoke with JTH once, on November 9, 2018, as he was not home during her other visits. When Ms. Cook introduced herself, JTH told her that he knew her from working with her a long time ago when he was an officer in Charleston. *Id.* Ms. Cook asked whether he had a problem with her working on this case or if he felt that it was a conflict for him and he replied "No, you are very professional and just doing your job." *Id.*  JTH said that he was a trucker, he had just started a job with Fed Ex and he was not home a lot. *Id.* He told Ms. Cook that he did not know about anything really going on because his wife was home more than he was. *Id.*

Plaintiffs' oldest daughter told Ms. Cook that she was aware of her brother's conduct and concerned with her brother's safety.  *Id.* 0194, 0201.

On November 15, 2018, Ms. Cook and HDH met at HDH's home. During that visit they developed a safety plan which consisted of 1) gathering information on how to block apps on a phone or how to synch their phones, gather the log ins for each of the children's phones and do random checks, HDH setting rules for the children's internet and phones use, and HDH setting expectations for their home and come up with a better plan for how to communicate with each other.  Affidavit of Spring Cook, ¶20 (hereinafter "Cook, ¶__").  However, the process of finalizing and implementing the plan was cut short when Plaintiffs, through counsel, notified CD that there would be no further communication except through counsel and that any further actions would be court ordered. Cook, ¶23.

Ms. Cook denies that she made her preliminary finding because she was upset about Plaintiffs' alleged statements made about the Sheriff's Department. *Id.* ¶39.  She further denies that she reported Plaintiffs or their children to the FBI. *Id.* ¶37.  Ms. Cook's decisions were made out of a concern for the welfare of the Plaintiffs' children, particularly the Son and pursuant to her lawful duties as a CD employee and no other purpose.[38]

## V. **Spring Cook had a reasonable basis in fact and law to make a preliminary finding that the Plaintiffs' should be listed in the Central Registry for child neglect.**

---

[38] Cook, ¶¶ 14-27, 30, 43.

The theory of Plaintiffs' PI Motion is that Ms. Cook had no basis in fact or law to make her preliminary finding of neglect, and they attack her motives. Plaintiffs contend, without factual support, that Ms. Cook found that "Plaintiffs Parents were neglectful and therefore responsible for their son's abuse at the hands of Brandon Cook, in that they allowed their teenage son to drive a car, have a cell phone, and use social media."[39]  This is clearly not the case.

Under §210.110(12) RSMo, the term "neglect" is defined as:

> **Neglect"**, failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being.  Victims of neglect shall also include any victims of sex trafficking or severe forms of trafficking as those terms are defined in 22 U.S.C. 78 Section 7102(9)-(10);

Ms. Cook had a basis in fact supporting each element of this definition. The Son was a child under age 18-years at the time of the incident. §210.110(4) RSMo. Under §210.110(16)(a), the child's parents or legal guardians are, by definition, "those responsible for the care, custody, and control of the child." The Legislature utilized broad language for a reason. CD's mandate is to both to investigate and make findings, and to offer services to mitigate the impact of trauma and to prevent or eliminate the need for a child to be involuntarily removed.[40] The Central Registry is not a tool to punish perpetrators; rather, it is intended to protect children and provide services to families in need.[41] In light of that purpose, ample evidence

---

[39] PI Motion, page 2.
[40] The law governing CD's responsibilities was discussed in the Defendants' Motion to Dismiss, so the Defendants refer the court to that discussion.
[41] *Owen v. Missouri Dept. of Social Services, Children's Div. Child Abuse and Neglect Review Board*, 535 S.W.3d 421, 424-425 (Mo. App. W.D. 2017).

supported Ms. Cook's preliminary finding that Plaintiffs failed to provide the proper
or necessary medical care or any other care necessary for the child's well-being. The
supportive evidence for her finding mostly came from information that HDH, the
Son and the other children, and all of it is contained in her report that CD provided
to Plaintiffs' counsel, free of charge,[42] before the CANRB hearing.

Ms. Cook summarized her finding of neglect against HDH regarding HDH's
Son in her January 7, 2019, preliminary finding notice as follows:

> [HDH] failed to provide the proper or necessary support, education as
> required by law, nutrition or medical, surgical, or any other care
> necessary for the child's well-being in that: [Son] has been meeting
> people on a 'Grindr App' starting at the age of 13 years of age. [Son]
> continues to meet older men on the 'Grindr' App and has sexual
> relations with them either in his driveway of his parent's home or he
> goes to their home. [HDH] is aware of at least 2 incidents occurring
> and is still not properly supervising her child or seeking out help for
> her child. [HDH] was aware of her child receiving messages from an
> older man and receiving gifts and her husband went and confronted
> the man and she didn't report it to proper law enforcement. [Son]
> admitted to having sex with the man his dad confronted. Even through
> [HDH] knew about her son meeting older people on-line and having
> sexual relationships with them, [HDH] still allowed her child to go to
> Arkansas by himself to meet a person he met on line.[43]

Ms. Cook summarized her finding against JTH regarding his son in her January 7,
2019, preliminary finding notice as follows:

> [JTH] failed to provide the proper or necessary support, education as
> required by law, nutrition, or medical, surgical or any other care
> necessary for the child's well-being in that: [Son] has been meeting
> people on a 'Grindr App' and has sexual relations with them either in
> his driveway of his parent's home or he goes to their home. [JTH] is
> aware of at least 2 incidents occurring and is still not properly
> supervising his child or seeking out help for his child. Mr. Hill was
> aware of his child receiving message from an older man and receiving

---

[42] Wright, ¶ 10.
[43] Cook, Ex G.

gifts and went and confronted the person but never reported the incident to any law enforcement agencies. [Son] admitted to having sex with the man his father confronted and receiving gifts from him. Even though [JTH] knew about his son meeting older people on-line and having sexual relationships with them, [JTH] still allowed his child to go to Arkansas by himself to meet a person he met on line.[44]

These findings, supported by the record, meet §210.110's definition of "neglect."

Notably, Plaintiffs do not allege in their Complaint or the PI Motion that the facts as Ms. Cook found them, or as Ms. Cook set out in her report, were incorrect. Instead, they attack her motives and disagree with her application of the definition of "neglect."

In summary[45], the facts are: there were more than two sexual incidents between the Son and adult men; the Son had been in trouble for using Grindr to meet men before the incidents in 2018; HDH and JTH had previously taken the Son's cell phone away before for using Grindr; JTH and HDH did not monitor the children's cell phone use even after they were on notice that the Son was again using it inappropriately; JTH and the Son did not have a good relationship; JTH was an over the road trucker who was rarely home, leaving HDH to deal with the children; HDH was struggling to handle the children and could not control their cell and internet phone use; and HDH and JTH had problems communicating with each other and working together to deal with the challenges of raising their children.

Further, Plaintiffs' Son recognized that he was "addicted" (his word) to Grindr and the attention that he received from men. The Son recognized that

---

[44] Wright, 0033-0035.

[45] The detailed facts, too long to set out in this Memorandum, are presented in affidavits and defendants invite the Court to review them. *See*: Cook, ¶ 12; Wright 0050, 0058-0080, 0113-0153 and 0186-0210.

someone should put a block on his cell phone to prevent him from engaging in dangerous behaviors; Plaintiffs failed to do so. The Son was open to participating in a support group for gay youth, was struggling with the lack of gay kids his age from whom he could receive support, and was open to counseling. Moreover, Daughter 1 was very concerned that her brother's actions endangered him, and all of Plaintiffs' children expressed concern about the yelling going on in the family.

Moreover, Ms. Cook's finding was expressly predicated on her concerns about the Son's history of meeting older men on line and then engaging in sexual activity, and not simply because Plaintiffs allowed him to go on a date with a boy in Arkansas. While the Son said he had not been on "Grindr" recently because he had a new boyfriend, Ms. Cook could reasonably suspect that the Son was at risk for continuing his pattern of seeking sexual adult male attention over the internet if his relationship ended, as is common with teens. Further, given the Son's past behaviors, Ms. Cook and this Court could reasonably conclude that it would have been appropriate under the circumstances for JTH and/or HDH to ask that the Son's first date with his new boyfriend take place under some type of supervision. Moreover, it would have been reasonable for one of the Plaintiffs to meet the young man in-person to verify that he was not an adult.

Further, the facts on record support the fact that Ms. Cook was working with HDH and the Juvenile Officer (JO) to develop a safety plan which would include counseling for the children. The JO and Ms. Cook set an appointment for the family with a counselor, but the family did not show up. Cook, ¶¶ 21, 22, 26.  A seasoned

child abuse and neglect investigator could reasonably conclude that Plaintiffs' failure to even get counseling for their son and put some reasonable restrictions on his internet usage when he clearly needed and requested it was a failure to provide care necessary for the child's well-being.

Ms. Cook's action are further supported by Defendants' expert in Child Abuse investigations, Emerson "Skip" McGuire.[46] Chief McGuire is a 40 year veteran of law enforcement, an expert in child sexual abuse investigations, and expert in child sexual exploitation using the internet and social media. Based on his review of the reports, Chief McGuire has opined that the Son "was at grave risk of harm from sexually transmitted diseases, sexual exploitation and being trafficked."[47] He further opined that "based on my training, experience, and expertise that C.D.H.'s parents were reckless in: (a) allowing persons who knew/should have known the age of the child have sexual contact with their child and not report such contact; (b) failing to report this perpetration and allowing this perpetrator the potential to continue to have contact with this child and other children; (c) once knowing the extent of the sexual conduct engaged by C.D.H., failing to seek medical examination to determine his potential injuries and exposure to sexually transmitted diseases to include HIV/AIDS."[48] He also opined that "C.D.H.'s father was reckless in taking his minor daughter with him to physically confront C.D.H.'s perpetrator who was a martial arts instructor.  C.D.H.'s father's failure to report the crime to law

---

[46] *See*: Affidavit of Emerson "Skip" McGuire.
[47] Affidavit of Emerson "Skip" McGuire, ¶ 11.
[48] Affidavit of Emerson "Skip" McGuire, ¶ 12.

enforcement or call in a hotline report was dangerous and violated standard POST training and law enforcement policy and practice."[49] The Son's nude image is undoubtedly in the public domain, where it can be exploited and will follow him into the future with endless potential for consequences.[50] Children like Plaintiffs' Son who identify as LGTBQ are especially vulnerable to exploitation due to the sometimes confused and negative responses from family and the community.[51] This is illustrated by the sense of isolation that HDH expressed to Ms. Cook when she said that her father would probably have nothing to do with the family if he found out his grandson was gay.[52]

Before Ms. Cook could finish the process, Plaintiffs' attorney's letter of November 23, 2018 asked Ms. Cook to recuse herself from working with the family, and informed CD that Son would not work with CD unless court ordered.[53] Only *after* the family stopped cooperating with CD, and *after* they failed to show for the counseling appointment, and *after* Plaintiffs' attorney's letter, did Ms. Cook send a referral to see if the JO felt that there was sufficient basis to file a petition in juvenile court.[54]  The JO declined to file the petition, **not** because the JO determined that there was insufficient evidence to establish "neglect" for purposes of listing Plaintiffs in the Central Registry, as Plaintiffs would have this court believe, but because "there appears to be insufficient evidence of child abuse or

---

[49] Affidavit of Emerson "Skip" McGuire, ¶ 13.
[50] Affidavit of Emerson "Skip" McGuire, ¶ 6.
[51] Affidavit of Emerson "Skip" McGuire, ¶ 7.
[52] Wright, 0199.
[53]  Complaint, ¶ 34; Wright, 0203
[54] Wright, 0017-0021.

neglect to bring the juvenile within the jurisdiction of the Juvenile Court" pursuant to §211.031.1(1). A critical distinction must be made: the grounds required to bring a juvenile under juvenile court jurisdiction must meet a clear and convincing evidence standard; the grounds for listing someone in the Central Registry must meet the preponderance of the evidence standard.[55] Further, the JO noted that while declining to file a petition, there was an ongoing law enforcement investigation and the JO was open to reconsidering its position if additional evidence developed. Finally, the JO concluded "…this is a very complicated case and we are hoping future reports will give us a better indication of what is actually going on in [Son]'s life and if one or both of our agencies' intervention could be of help to this child."[56]

In addition, Ms. Cook, as the fact finder for purposes of making a preliminary finding, had the discretion to make decisions about the credibility of the witnesses and the relative weight to give each item of information presented to her. She was free to believe or disbelieve Plaintiffs and their children on any particular point. See *Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858 (8th Cir. 2020).

Plaintiffs have adduced no credible facts to show that Ms. Cook acted out of malice or in retaliation. The *only* support for their argument is their request that the court *infer* she was upset about some unspecified statements Plaintiffs made about the Scott County Sheriff and/or his deputies, and their baseless claim that

---

[55] This is why Plaintiffs claim that they wanted to cross examine Ms. Cook about the JO's decision not to file a petition in juvenile court is nonsense. PI Motion, p. 28, item number 11. That the JO and law enforcement did not pursue charges against Plaintiffs has absolutely no bearing on the decision that the CANRB had to make.
[56] Wright, 0022, ¶ 7.

Ms. Cook called the FBI after the CANRB overturned her preliminary finding. Such supposition, inference and speculation are insufficient to attack the motives of a hard working public servant whose goal is to protect children and provide services to child victims of sexual abuse. Child abuse investigators "are presumed to act in good faith" and the Plaintiff who claims otherwise has the burden of proving otherwise. *Mitchell v. Dakota County Social Services*, 959 F.3d 887, 899 (8th Cir 2020). Plaintiffs have adduced no **facts** to establish that Ms. Cook acted in anything but a professional manner.

That the CANRB ultimately overturned her finding on administrative review is significant only to establish that CD's procedures worked as intended, and cannot be used to infer that Ms. Cook acted in bad faith. A governmental official is not liable in a subsequent action merely because the official's decision was overturned after subsequent review. See *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213 (1967) (defense of good faith and probable cause is available to police officers in an action for false arrest and imprisonment brought pursuant to 42 U.S.C. §1983). If the law were otherwise child protection agencies would be effectively paralyzed. Child protection cases require that child protection workers make difficult decisions, frequently based on incomplete information that is unavailable to them when the decision has to be made. Child abuse investigators would be chilled from making these difficult decisions if they face personal, civil liability if their decision were overturned. *Mazor v. Shelton,* 637 F.Supp. 330, 333 (N.D. Cal. 1986). State agencies

may find it very difficult to recruit and retain qualified staff under these circumstances.

## VI. There is no basis in fact or law to grant Plaintiffs' PI Motion.

### A. Count II of the Complaint should be dismissed for the reasons set forth in the Defendants' pending Motion to Dismiss.

The arguments warranting Count II's dismissal as set-out in Defendants Motion to Dismiss equally apply here and will not be repeated.  Defendants will, however, address specific points raised and cases relied upon in the PI Motion.

### B. Plaintiffs lack standing to ask for relief for anyone other than themselves in their IP Motion.

In their IP Motion, pp. 2, 46, Plaintiffs assert that they are seeking "equitable relief and others as discussed below."  The Complaint and the PI Motion do not specify who these "others" are.

Generally, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). But this rule is not absolute, as explained in *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004):

> we have limited this exception by requiring that a party seeking third-party standing make two additional showings. First, we have asked whether the party asserting the right has a "close" relationship with the person who possesses the right. *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Second, we have considered whether there is a "hindrance" to the possessor's ability to protect his own interests. *Ibid.*

The Court also noted that it has approved third party standing "when enforcement of the challenged restriction *against the litigant* would result indirectly in the

violation of third parties' rights." *Kowalski,* at 130 (emphasis in original), citing *Warth,* 422 U.S. at 510. Plaintiffs have the burden to plead and prove facts to establish third party standing.

None of the exceptions to the third party standing rule apply here. This case is not pled as a class action. The Complaint does not comply with the requirements of Rule 23. Plaintiffs plead no facts to establish that they have an interest that is "close" to these hypothetical "others" that they seek to benefit, nor do they plead or argue any set of facts that would establish that the Defendant's application of the CANRB procedures *against the Plaintiffs* would in any way hinder the rights of any other person.

**C. <u>Plaintiffs lack Article III standing to request injunctive relief.</u>**

Plaintiffs cite *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016), *as revised* (May 24, 2016) in support of their argument that they have standing to seek a preliminary injunction. In fact, *Spokeo* illustrates that Plaintiffs lack standing.

In *Spokeo,* a consumer named Robins sued a website operator that published inaccurate information about him in violation of the Fair Credit Reporting Act. Spokeo's website and search engine conducted computerized database searches and supplied the information to the person who used the service.  Spokeo contended that Robins lacked Article III standing to sue under the FRCA. The 9th Circuit held that Robins had standing; the Supreme Court reversed, holding, at 1547, that to have Article III standing plaintiff bears the burden of establishing three elements:

> The plaintiff must have (1) suffered an injury in fact, (2) that is fairly
> traceable to the challenged conduct of the defendant, and (3) that is

likely to be redressed by a favorable judicial decision. *Id.,* at 560–561, 112 S.Ct. 2130; *Friends of the Earth, Inc.,* 528 U.S., at 180–181, 120 S.Ct. 693.

Moreover, at the pleading stage, plaintiff must "clearly…allege facts demonstrating each element." *Spokeo,* at 1547 (citing *Warth,* 422 U.S. at 518.)

### 1. <u>The Plaintiffs have not suffered an "injury in fact" sufficient to confer Article III standing to seek a preliminary injunction.</u>

Plaintiffs have not suffered an "injury in fact" sufficient to confer standing.

As explained in *Spokeo*, at 1548, to establish an injury in fact:

> …a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S., at 560, 112 S.Ct. 2130 (internal quotation marks omitted).

Accordingly, Plaintiffs bears the burden of pleading and proving each of these three elements. For an injury to be "particularized" it must impact the plaintiff in a personal and individual way. *Spokeo* at 1548. Standing is not conferred when the injury is merely "a generalized grievance shared in substantially equal measure by all or a large class of citizens". *Warth*, 422 U.S. at 499. For an injury to be "concrete" it must be *de facto*, "that is, it must actually exist", it must be real and not abstract. *Spokeo* at 1548. A plaintiff may not "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo* at 1549. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n5 (2013)).

Here, Plaintiffs have not suffered an injury in fact. There is no credible argument that they face a substantial risk from a "certainly impending" injury. First, as Defendants established in their Motion to Dismiss and in their arguments below, Plaintiffs do not have a constitutionally protected due process right at a pre-deprivation review process to obtain discovery of CD's entire, un-redacted file, to compel the production of evidence, to receive copies of documents free of charge, or to cross-examine witnesses at the pre-deprivation CANRB hearing. Second, even if they had those rights, Plaintiffs suffered no injury. The CANRB overturned the preliminary finding following the procedure that Plaintiffs elected to follow and now challenge after the fact. Plaintiffs were never listed in the Central Registry as perpetrators of child abuse or neglect, so the harms that they allege may transpire if the CANRB decided differently never transpired.

Finally, Plaintiffs have no credible argument that they face a substantial, concrete risk of a "certainly impending" injury. Plaintiffs support their argument on this point by asking this court to infer that Ms. Cook continued her campaign against the Plaintiffs by contacting the FBI in frustration after the CANRB issued its decision and by the fact that there have been two recent calls to the Plaintiffs' home pertaining to their daughter. This claim is baseless. First, Ms. Cook did not "go to" the FBI about this case either before or after the CANRB issued its decision.[57] Ms. Cook has no personal knowledge of how the FBI became involved, who reported the matter to the FBI and what prompted the FBI to conduct an

---

[57] Cook, ¶37.

investigation.[58] Moreover, Ms. Cook took no action involving Plaintiffs after the CANRB concluded the case other than to close her case file.[59] Second, CD did not handle the subsequent hotline reports involving the Plaintiffs' daughters as hotline investigations.[60] They were handled and concluded as family assessments[61], and Plaintiffs faced no risk of a Central Registry listing. Also, while Ms. Cook does supervise the Scott County Office, she played no part in conducting or concluding these family assessments.[62]

Moreover, Plaintiffs contend that the Scott County Sheriff's Department action in recent months in communicating with their 16-year old daughter by social media is evidence in support of their claim against CD. Plaintiffs fail to explain how the Sheriff's Department actions can be attributed to CD. The Sheriff's Department is not a party to this case, and CD and the Sheriff's Department are separate, independent agencies with separate missions.[63] It is, of course, true that CD and the Sheriff's Department work together when conducting hotline investigations and taking actions to protect children. However, in this case, any action by the Sheriff's Department's in reaching out to Plaintiffs' daughter was not part of a joint operation with CD.[64] CD and its employees who handled the family assessments knew nothing of such Sheriff's Department activity until Plaintiffs

---

[58] Cook, ¶37.  Even had Ms. Cook contacted the FBI, it would not have been improper.  As explained in Defendants' Motion to Dismiss, a sufficient basis exist in the facts Plaintiffs acknowledge for the FBI to conduct an investigation.
[59] Cook, ¶ 36.
[60] Affidavit of Elizabeth Michelle Palmer, ¶¶ 7-9; Affidavit of Jeri Leigh Nichols, ¶ 7; Affidavit of Heather Sides, ¶ 7.
[61] Affidavit of Elizabeth Michelle Palmer, ¶ 14; Affidavit of Jeri Leigh Nichols, ¶ 10; Affidavit of Heather Sides, ¶ 10. Section D.1 below discusses family assessments and how they are handled.
[62] Affidavit of Elizabeth Michelle Palmer, ¶ 10; Affidavit of Jeri Leigh Nichols, ¶ 12; Affidavit of Heather Sides, ¶ 12.
[63] Defendants discuss this in detail in their Motion to Dismiss so it is unnecessary to reproduce that argument here.
[64] Affidavit of Elizabeth Michelle Palmer, ¶ 11; Affidavit of Jeri Leigh Nichols, ¶ 11; Affidavit of Heather Sides, ¶ 11.

raised it in this lawsuit.  No action by the Sheriff's Department played a part in the family assessment process. The bottom line is that CD has no pending matter involving Plaintiffs and their children, other than this lawsuit.[65] There is therefore no credible, concrete risk that Plaintiffs will be "injured" by the CANRB procedures that benefited them in the past, and that they now challenge as unconstitutional. Absent a concrete, particularized injury, Plaintiffs' complaint of harm is only a generalized, hypothetical grievance that any Missouri resident may claim to possess. Under, *Warth*, this hypothetical, generalized grievance that fails to confer Article III standing.

### 2. <u>The Plaintiffs have not suffered any injury-in-fact, so Plaintiffs cannot trace a non-existent injury to the Defendant</u>

The second element of the Article III standing is that plaintiffs' injury in fact must be fairly traceable to the Defendants' conduct. Plaintiffs cannot establish this element because there is no constitutionally cognizable "injury-in-fact" to be traced back to the CD and DSS

### 3. <u>The Plaintiffs have not suffered an injury-in-fact, so this case is not ripe for adjudication on a Motion for Preliminary Injunction, and any preliminary injunction would be an improper advisory opinion.</u>

As explained in *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (citations omitted):

> federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them. To be cognizable in a federal court, a suit 'must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * It must be a

---

[65] Affidavit of Elizabeth Michelle Palmer, ¶ 15.

real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' However, '(m)oot questions require no answer.' Mootness is a jurisdictional question because the Court 'is not empowered to decide moot questions or abstract propositions,'; our impotence 'to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.' Even in cases arising in the state courts, the question of mootness is a federal one which a federal court must resolve before it assumes jurisdiction.

An advisory opinion is "an opinion 'advising what the law would be upon a hypothetical state of facts.' " *Pub. Water Supply Dist. No. 8. v. City of Kearney, Mo.,* 401 F.3d 930, 932 (8th Cir. 2005). A case is not ripe for adjudication when it is based on a hypothetical set of facts because to do so would be a poor use of scarce judicial resources. *Id.*

This case presents the Court with a request for relief based upon hypothetical facts. Plaintiffs seek to enjoin CD and the CANRB from applying procedures that have been upheld against essentially the same arguments in *Jamison v. Department of Social Services, CD*, 218 S.W.3d 399 (Mo. 2007), and which *they successfully invoked* to obtain requested relief. Plaintiffs have not explained why they failed to challenge the procedures before the case went to hearing before the CANRB. Any real risk has passed. CD has no pending investigation or assessment. There is no pending request for CANRB administrative review. In effect, Plaintiffs seek relief based upon their hypothesis that CD *might* conduct an investigation of child abuse or neglect involving their family in the future and *might* issue a

substantiated finding against them at some unspecified time in the future.  Under, *Public Water Dist.*, such hypothetical facts fail to confer Article III standing.

**D. <u>The interactions between the Plaintiffs' family, CD and the Scott County Sheriff's Department after this lawsuit was filed do not provide any grounds for this court to consider or grant a preliminary injunction.</u>**

**1. <u>Recent reports involving the Plaintiffs' family were not reports of child abuse or neglect and were handled properly.</u>**

Plaintiffs contend that there have been two subsequent "call outs" with allegations of child neglect pertaining to their 13 year old daughter, that the worker alleged that the 13 year old girl was making videos of a sexual nature, but produced no evidence to support this allegation, and that they fear having another finding of child neglect or abuse against them. This claim misstates the facts and is baseless as a matter of law.

In 2015 Missouri's General Assembly enacted legislation requiring CD to respond to hotline reports pertaining to juveniles with "problem sexual behaviors" §210.148 RSMo, to provide children and families with an alternative path for treatment and services, and to attempt to prevent younger children from being brought under the jurisdiction of the juvenile court as a status offender (§211.031.1(2)) or a juvenile delinquent (§211.031.1(3)). This section provides CD with the legal authority to work with families whose children have exhibited sexual behaviors towards other children. Before the General Assembly enacted this statute, CD lacked clear authority to assess families where children may be engaging in sexually inappropriate behaviors with other children. In many parts of

the state this was problematic because CD was unable to mitigate the risk and help a family before a child suffered additional harm.  The statute defines a "juvenile with problem sexual behaviors as "any person, under fourteen years of age, who has allegedly committed sexual abuse against another child." §210.148.3. In responding to these reports the law requires CD to use the "family assessment and services approach" as provided in §210.145.16. §210.148.1. CD does have the authority to commence an investigation if it determines based on the facts that an investigation is required. §210.145.2.

CD has promulgated regulations governing how these reports are to be handled. §210.145.5 RSMo. 13 CSR 35-31.027. CD must notify a parent and obtain consent before interviewing the child who is alleged to have problem sexual behaviors. 13 CSR 35-31.027(5)(A). In responding, CD uses a family assessment and services approach, meaning "an approach by…[CD]which provides for the promote assessment of a child who has been alleged to have engaged in problem sexual behavior and of the child's family, including risk of abuse and neglect and, if necessary, the provision of community-based services to reduce the risk and support the family." 13 CSR 35-31.027(1)(A). CD may offer services to both the alleged child "perpetrator" and the alleged child "victim".  13 CSR 35-31.027(3)(B). Family participation in services is voluntary. 13 CSR 35-31.027(3)(C). However, CD does have the authority and responsibility to refer a matter to the JO in severe cases, where there has been serious injury, use of a weapon, when there are repeated

incidents or when the juvenile declines to engage in the assessment process. See 13 CSR 35-31.027(4) for more details.

CD handled one of the recent cases that Plaintiffs refer to in the PI Motion as a report of a juvenile with problem sexual behaviors and the other as a family assessment. They were handled following the family assessment and services approach, not as investigations. The CD team did <u>not</u> convert either case into an investigation, and both cases have been concluded.

As is seen, Plaintiffs grossly mischaracterize what happened and what they are asking the court to infer, both by what they say and by what they omit. First, the Plaintiffs' Memorandum of Law in Support of PI Motion inaccurately conveys the facts set out in Plaintiff Father's affidavit describing his perspective on what happened. Neither the father's affidavit nor the Defendants Affidavits support an assertion that *<u>the Children's Division worker</u> alleged that the 13 year old girl was making videos of a sexual nature*. Instead, the facts are CD received a hotline report that the daughter was making videos of a sexual nature, and the worker simply responded to that report, as required to by §210.148 RSMo and 13 CSR 35-31.027. There is no basis to imply that a CD worker, or CD itself, was making the allegations when the facts of record do not support such an inference. Second, the CD did not handle this referral as an investigation; CD handled the case as a family assessment and services approach. Third, Defendants are under no obligation at that stage in the process to "offer" Plaintiffs "evidence of the existence" of "videos of a sexual nature" during a family assessment or investigation. (Father's Affidavit,

paragraph 16). CD conducts assessments and investigations *to ascertain the facts* from evidence provided by witnesses, and then decides what do based on the facts learned. CD's investigator notified the parents that CD received the report, asked parental permission to interview the child, received permission, and the child denied that she made sexual videos. That CD did not uncover evidence that the sexual videos existed is not surprising, because SnapChat automatically deletes the message after it is received, leaving no record of the communication. Father's Affidavit, paragraph 10. Neither the father's affidavit nor the Plaintiffs' Memorandum refer to the fact that CD concluded these assessments with no recommendation for additional action or services.

### 2. **The Scott County Sheriff's Deputy's apparent attempt to communicate with Plaintiff's 16-year old daughter has nothing to do with the these Defendants in this case.**

Next, the Plaintiffs allege that on October 20, 2020, Deputy Sheriff Courtland Shannon friended Plaintiffs' 16 year old daughter on Facebook. (Father's Affidavit, paragraphs 7 through 15.) The Father's affidavit and the Plaintiffs' memorandum, however, do not allege that CD or its employees even knew of these activities, much less participated in or condoned them. In fact, they did not know.[66] Furthermore, while CD and its team members do work with law enforcement officials in conducting investigations, *as required by law*, CD and law enforcement investigations are separate and conducted for separate purposes, as Defendants discuss elsewhere. The Sheriff's Department apparently took its actions without

---

[66] Affidavit of Elizabeth Michelle Palmer, ¶ 11; Affidavit of Jeri Leigh Nichols, ¶ 11; Affidavit of Heather Sides, ¶ 11.

prior notice to, or consultation with, anyone at the CD. Ms. Cook, Ms. Palmer and the CD investigators who worked on the two family assessments knew nothing of the actions until Plaintiffs raised it in this case. Accordingly, any actions by the Sheriff's Department have no bearing on whether this Court should enter a preliminary injunction against a state agency.

### E. This Court should deny the Plaintiffs' Motion for a Preliminary Injunction because none of the *Dataphase* factors apply.

As the 8th Circuit explained in *Dataphase*, 640 F.2d at 114, in deciding whether to issue a preliminary injunction, the district court must consider "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." The movant must establish the threat of irreparable harm, with the absence of irreparable injury alone as sufficient grounds for denying a preliminary injunction. *Dataphase*, at 114 and footnote 9. Defendants will take these factors out of order.

### 1. The Plaintiffs have no chance of success on the merits because Missouri's procedures for review of CD's preliminary findings of child abuse or neglect do not violate the Plaintiffs right to procedural due process.

Plaintiff's PI Motion is meritless because Plaintiffs have no chance of success on the merits.

The United States Supreme Court has held "the fundamental requirement" of procedural due process is reasonable notice and "the *opportunity* to be heard 'at a meaningful time in a meaningful manner.'" *Matthews v. Eldridge*, 424 U.S. 319,

333, (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). [emphasis added]. Due process does not dictate the same procedures in every situation; rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972). Further, "[i]n general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 545 (1985) (citing *Matthews*, 424 U.S. at 343). In the context of the termination of a tenured, government employee "the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions— essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545. Due process in the administrative hearing context does not require "that a fair hearing is one that necessarily must follow the traditional common law adversarial method. Rather, on judicial review the question presented is whether, in the particular case, the individual has had an opportunity to answer, explain, and defend, and not whether the hearing mirrored a common law criminal trial." *Gorman v. University of Rhode Island*, 837 F.2d 7, 14 (1st Cir. 1988). The 1st Circuit further warned that "undue judicialization of an administrative hearing, particularly in an academic environment, may result in an improper allocation of resources, and prove counter-productive." *Id., at* 15.[67] As the

---

[67] Plaintiffs favorably cite *Gorman* in their brief in support of the PI Motion. *Gorman* was a challenge by a student alleging that the University of Rhode Island violated his right to procedural due process. He argued, among other things, that he had a due process right to a transcript or record of the administrative disciplinary hearing, the right

1st Circuit further explained "on review, the courts ought not to extol form over substance …. The question presented is not whether the hearing was ideal, or whether its procedure could have been better. In all cases the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual the essential elements of due process." *Id*. at 16. In this case, the CANRB process fully meets that standard, and Plaintiffs seek to unnecessarily and prejudicially "judicialize" the process.

To determine what procedures are constitutionally sufficient the Courts apply the 3 part balancing test in *Matthews,* which Defendants set out in detail their Motion to Dismiss. Rather than rehashing previous arguments, Defendants will focus on applying the *Mathews* analysis to the three categories of relief that the Plaintiffs are specifically asking this Court to order as a preliminary injunction. Missouri's procedures for administrative and judicial review of CD's preliminary findings fully comply with procedural due process requirements.

> ### a. The Plaintiffs elected the remedy of informal administrative review through the CANRB process and their claim for equitable relief is barred by the doctrine of election of remedies.

Due process requires that a person who believes she or he is adversely impacted by governmental action is reasonable notice and an *opportunity* for a hearing. Plaintiffs received notice, had their pre-deprivation hearing over a year ago, and received the relief that they requested.  Plaintiffs brief in support of their

---

to cross-examine witnesses and the right to be represented by counsel. The 1st Circuit held that due process did <u>not</u> require those protections in a university student disciplinary hearing.

PI Motion studiously ignores the fact that Missouri law gave the Plaintiffs a choice of remedies.  First, they had the option to seek informal, administrative review through the CANRB process. §§ 210.152, 210.153 RSMo and 13 CSR 35-31.025. Under that process the Plaintiffs are not listed in the Central Registry unless and until the CANRB conducts a review and upholds CD's preliminary finding following the procedures that have been debated at length in this lawsuit. If aggrieved by the CANRB decision, Plaintiffs had right to file a Petition for *de novo* in Missouri circuit court. §210.152. This process enables the Plaintiffs to have their cake, and eat it, too. Second, Plaintiffs could waive the administrative review process and seek *de novo* judicial review directly in Missouri circuit court. §536.100. Under the second remedy, CD will list the individuals in the Central *Registry* because under the statute they must waive their right to a pre-deprivation, administrative review process to skip CANRB review and proceed directly to circuit court. However, had Plaintiffs elected that remedy they could have asked CD to stay entering their names in the Central Registry, or they could have asked the court to order that CD stay listing them until the Court made a decision. §536.120.

Under both remedies, at the *de novo* judicial review stage Plaintiffs have the right to compulsory process to compel the production of witnesses and evidence, the right to cross examine witnesses, the right to discovery under the Missouri Rules of Civil Procedure, the right to ask the court to order CD to waive any payment for reimbursement costs for producing documents, and the opportunity to argue to the court that Plaintiffs had a right of access to an unredacted copy of Defendants' file.

34

Further, at the *de novo* judicial review stage CD has the burden of proof to establish that the Plaintiffs were responsible for child abuse and/or neglect as those terms are defined in §210.110 RSMo. The Supreme Court of Missouri has stated that this provides Plaintiffs with an even more extensive review process than the Missouri Administrative Procedures Act would have required. *Jamison*, at 414.

The doctrine of election of remedies simply requires a Plaintiff to choose between different remedies allowed by law on the same set of facts, where the party has but one cause of action, one right infringed and one wrong to be addressed. *Popp Telcom v. American Sharecom, Inc.*, 210 F.3d 928, 934 (8th Cir. 2000). Plaintiffs elected to pursue the informal administrative, pre-deprivation review process, followed by an opportunity for a full *trial de novo* if they disagreed with CANRB's decision; they did not elect to immediately seek circuit court, *de novo* judicial review with the full procedural safeguards. Pursuing the process Plaintiffs elected, they successfully convinced the CANRB to overturn the preliminary finding. The CANRB decision, not the preliminary finding, is the CD's final decision. 13 CSR 35-31.025(11). Therefore, Plaintiffs now have no legal cause to complain about the process because they received a favorable result from the remedy elected.

**b. The Plaintiff received notice of Ms. Cook's preliminary that was constitutionally sufficient to appraise the Plaintiffs of her findings and the facts underlying her findings.**

Plaintiffs contend that the notice of the preliminary finding failed to meet due process requirements because it did "not tie together how or why the Brandon

Cook and Tae Kwan Do instructor incidents were evidence of neglect other than stating the Plaintiff Parents allowed their son to drive a car, have a cell phone, and access the internet, including social media."[68] Of course, this statement grossly mischaracterizes Ms. Cook's preliminary finding.[69] Their position is also wholly without merit as a matter of law. The notice that the Plaintiffs received was more than sufficient to satisfy due process standards.

Reasonable notice for due process purposes is "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The due process clause does not require that notice be provided in any particular form or at a particular time during the proceedings. Notice to a party to an administrative proceeding need not come from the institution or the adjudicators if the accused is alerted to the allegations by the party who raised the complaint. *Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858, 867 (8th Cir. 2020).  Oral notice in some contexts is constitutionally sufficient. *A.S. v. Lincoln County R-III School District*, 429 F.Supp. 659 (U.S. E.D Mo. 2019) (school disciplinary proceedings). Nor in the administrative context, especially at a preliminary finding stage, does reasonable notice require a state administrative agency to provide a detailed analysis of its case-theory tying the evidence to the facts, Plaintiffs fail to cite any case law to support their argument.

---

[68] PI Motion, p 19.
[69] Plaintiffs had been provided the preliminary finding for the CANRB.

The notice of the preliminary finding in this case was more than constitutionally sufficient to meet procedural due process requirements. It set out the elements of the definition of "neglect" as that term is defined in state law[70] and it summarized facts that Ms. Cook found applied to each element of that definition. Further, prior to the hearing Defendants provided Plaintiffs with a redacted copy of Ms. Cook's report that contained her witness interview notes. Plaintiffs therefore knew what the preliminary finding entailed and the facts on which it was based. Notably, Plaintiffs do not explain how they were prejudiced by any inadequate notice. They have not alleged that Ms. Cook or CD unfairly surprised them at the CANRB hearing by raising facts or arguments that were not included in the notice or in the materials CD produced.  Of course, they were not prejudiced because they raised their objections and the CANRB granted them the relief that they sought.

### c. The Plaintiffs do not have a due process right to formal discovery and the right compel the production of all evidence, including a copy of CD's entire file, at the pre-deprivation, CANRB hearing.

The Plaintiffs argue that they are entitled to a preliminary injunction because they have a constitutional "right to obtain all evidence, including disclosure of Children's Division's entire, unredacted file, and to compel production of all evidence if necessary"[71] at the pre-deprivation stage of the review process. Tellingly, Plaintiffs fail to cite a single case that supports their position.

---

[70] §210.110(12), RSMo
[71] PI Motion, pp. 2 and 46.

*The private interest*. Any party to a dispute, of course, will frequently argue that as a matter theory and principle, they have an interest in and a right to the production and discovery of every scrap of evidence in the hands of the opposing party that pertains to the adverse decision against them. But that is not the law and it never has been. The law is replete with examples in both civil and criminal cases where statutes, regulations and the common law have held that certain categories of information are not discoverable for various policy reasons, even though the information may be relevant in a particular case. Examples include: attorney/client privilege, doctor/patient privilege, health care records[72], protection of confidential informants[73], law enforcement records[74], substance abuse treatment records[75] and records pertaining to child abuse and neglect.[76] In fact, one district court decision cited in Plaintiffs PI Motion rejected the argument that a student accused of sexually abusing another student in a university disciplinary proceeding was entitled as a matter of procedural due process to the mandatory disclosure of exculpatory evidence and to subpoena witnesses by the university during the administrative review process. *Doe v. University of Miss.*, 2018 WL 3570229 (USDC S.D.Miss. 2018).

---

[72] See, for example, the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub.L. 104-191 (August 21, 1996) and subsequent amendments.
[73] §§ 210.109.3(3), 210.150.2(4), (5), 210.150.3(2),(3) RSMo;  *State ex rel. Dept. of Social Services, Div. of Children's Services v. Tucker*, 413 S.W.3d 646 (Mo. 2013); 42 U.S.C. §5106a(b)(3); 76 A.L.R.2d 262 *Accused's right to, and prosecution's privilege against, disclosure of identity of informer.*
[74] §610.100 RSMo.
[75] See, e.g. 42 USC 290dd-2 and 42 CFR Part 2.1 – Confidentiality of Substance Use Disorder Patient Records.
[76] §210.150.1 RSMo; 42 USC 671(a)(8) and CAPTA discussed elsewhere in this brief.

Defendants submit that there is a strong, private interest in keeping the current informal CANRB procedures; they allows individuals subject to a preliminary finding of child abuse and neglect to elect an informal, inexpensive, and procedurally simple pre-deprivation remedy while the case is within CD.  Imposing such procedures as the rights to discovery and to compel production of evidence will make CANRB proceedings more complex and expensive. This will make it more difficult for those who cannot afford or who are unable to retain counsel to represent them using the more complex procedures. [77]

Plaintiffs were entitled to receive "information and findings" supporting the preliminary finding, §210.150 RSMo at the pre-deprivation hearing stage, and they did receive information and findings. CD, through the Document Management Unit (DMU), produced information and findings pertaining to the incident, and much more:

- **On May 28, 2019** the Defendants produced to the Plaintiff JTH's lawyer approximately 80 pages of redacted records[78] pertaining to the November 7, 2018, investigation *free of charge* which included, among other things: the Family Risk Assessment Map that Ms. Cook prepared; the Three Houses assessment tools that Ms. Cook used in her assessment of the family; the December 6, 2018, Case Consultation form authorizing Ms. Cook to request placement of Son in alternative care executed by Ms. Cook's supervisor; the

---

[77] Over the last three years only 34% of individuals who requested a CANRB hearing were represented by a lawyer. Affidavit of Sara Smith, ¶ 15.
[78] The DMU redacted information which would have identified the hotline reporter, DCN numbers and social security numbers. See Wright, Exhibits A1, B1 and C1 (Redaction Logs).

CD referral of the case to the JO  on December 7, 2018, and the juvenile

officer's response; Plaintiff Father's lawyer's letter of November 23, 2018, to

CD  asking Ms. Cook and the Scott County Division office to recuse from

further involvement in the case and notifying CD  that from that point

further "[Son] and his family will cooperate with DFS[79] through counsel and

only by court order."; CD's  form letter to the hotline reporter notifying the

hotline reporter of the disposition of the case as required pursuant to

§210.145.18 RSMo; a copy of the January 7, 2019, letters to the Plaintiffs

notifying them that she had made the preponderance of evidence finding,

summarizing the reasons for her finding and notifying them of their right to

seek administrative or direct judicial review of the finding; a copy of CD 's

CA/N1 Report pertaining to the November 7, 2018, hotline report containing

the information recorded by the Hotline Operator when the report was

received and how the report was initially classified using the structured

decision making procedures included in the information system; a list of prior

hotline reports pertaining to the family members contained in CD's

information system; a copy of Ms. Cook's investigative conclusions; a copy of a

letter to the Scott County Prosecuting Attorney dated January 7, 2019

pertaining to the case; the Assessment and Services Section of CD's  files

containing Ms. Cooks' documentation pertaining to her assessment of the

family; and last, **but most important, Ms. Cook's investigation notes**

---

[79] Defendants understood this to refer to CD of DSS.  DFS as an entity was eliminated by Executive Order of
Governor Holden and then by subsequent legislation.

**and investigation report pertaining to her investigation of the incident.**[80]

- **On June 28, 2019**, the Defendants produced to the Plaintiff JTH's lawyer an additional 103 pages of records pertaining to the November 7, 2018, investigation *free of charge* which included, among other things: CD's records pertaining to several[81] reports to the Hotline reporting that Plaintiff's son had snuck out of the house and reportedly had sex with Deputy Brandon Cook which were handled as non-caretaker referrals[82] and closed; the documents pertaining to a hotline report involving the Plaintiffs' family which was received on June 4, 2012, and concluded on July 4, 2012 as a family assessment. Ms. Cook handled that case when she was an investigator before she was promoted to Circuit Manager; CD's records pertaining to a hotline report regarding the Plaintiffs' family that was received on August 18, 2008, and found to be unfounded, apparently on the same day.[83]

---

[80] See Wright, ¶ 10; Wright, 0001-0080 is a complete copy of the documents Defendants produced to Plaintiff JTH's counsel on May 28, 2019.

[81] It is not unusual for CD to receive multiple reports to the hotline. Every mandatory reporter has a non-delegable duty to report individually. §210.115.3 RSMo. So, if several mandatory reporters work a case of suspected child abuse or neglect, CD frequently receives a separate report from each reporter.

[82] Under Missouri law mandatory reporters are required to report suspected incidents of child abuse or neglect even where the alleged perpetrator may not be a person responsible for the care, custody or control of the child. §210.115 RSMo. In CD's jargon these are referred to as "non-caretaker referrals."

[83] Wright, ¶ 11; Wright, 0081-0183 is a complete copy of the documents that Defendants produced to Plaintiff JTH's counsel on June 28, 2019.

- **On July 30, 2019,** Defendant produced 27 pages of CD's records containing a
  copy of Ms. Cook's report pertaining to her investigation of the November 7,
  2018, hotline report to HDH's lawyer, Hugh Eastwood, *free of charge*.[84]

Plaintiffs cannot complain that they lacked notice of the facts and reasons
underlying Ms. Cooks' preliminary finding. They had her findings and her report
that contained her notes from the investigation.

The Missouri Court of Appeals has held that the notice requirement in
§210.152 requires CD to provide notice that CD  has "made a determination about
the ultimate issue, whether 'abuse or neglect' exists" and does not limit CD's
evidence in the circuit court at trial de novo to the incidents of abuse set out in the
notice. *C.S. v. Department of Social Services, CD*, 491 S.W.3d 636, 647 (Mo.App.
W.D. 2016). The notice requirement is fact specific and will vary with the
circumstances and conditions presented. *Id.,* at 649. Plaintiffs had Ms. Cook's
findings, her redacted investigation report and her investigation notes. They knew
the basis for the decision and the facts supporting them. Procedural due process
does not elevate form over substance. Plaintiffs had more than sufficient evidence to
be on notice what the issues would be in the CANRB hearing and what they needed
to tell their side of the story.

The only *specific* complaints raised in the PI Motion about the discovery are
that Defendants did not produce Spring Cook for a deposition, Defendants did not
produce a CyberTip that Ms. Cook mentioned in her narrative dated December 7,

---

[84] Wright, ¶ 9; Wright, 0184-0210 contains a complete copy of the documents that the Defendants produced to
Plaintiff HDH's lawyer on July 30, 2019.

2018, and failed to produce Corporal Hamlett's police report and records from a Family Centered Services Case dated April 11, 2017 – December 13, 2017.[85]  The Family Centered Services Case of course, predated the hotline incident and was not mentioned by Ms. Cook as a basis for making her decision to make a preliminary finding[86], so it is hard to see how the alleged failure to produce this record has any bearing on the disposition of the incident in question here. Moreover, Plaintiffs have failed to explain how they were prejudiced by the alleged failure to produce these records or by their inability to depose Ms. Cook before the *pre-deprivation* CANRB hearing. Of course, they cannot because the CANRB decided in their favor.

*The Public Interest*. The State and the public, on the other hand, have a long recognized, compelling interest in investigating reports of child abuse and neglect and taking action to protect children who may have been or are at risk of being abused or neglected, even from their own parents. *Mitchell*, 959 F.3d at 897.  That interest extends to protecting some evidence and information from disclosure at all, *or at certain stages in the process*, to ensure that children and witnesses can be protected, and investigations (especially criminal investigations) can proceed without being compromised by the premature release of information.[87]

In the context of child abuse and neglect investigations, for example, federal and state law limits the circumstances under which the identity of a reporter to a child abuse and neglect hotline is disclosed. Missouri law prohibits the disclosure of

---

[85] PI Motion, p. 24.
[86] Wright, 0001-0210.
[87] See Affidavit of Emmerson "Skip" McGuire, ¶ 8.  . See generally 76 A.L.R.2d 262, *Accused's right to, and prosecution's privilege against, disclosure of identity of informer.*

the identity of a person making a report of child abuse or neglect to CD's hotline to alleged perpetrators and parents. §210.150.2(4), (5) and 210.150.3(2) and (3). RSMo. *State ex rel. Dept. of Social Services, Division of Children's Services v. Tucker*, 413 S.W.3d 646 (Mo. 2013).[88] The Supreme Court of Missouri has noted that there are strong public policy reasons for providing protections for children and reporters in child abuse and neglect cases.

> Child victims of abuse and neglect might be further traumatized by the experience of facing their abuser and being subject to cross examination. *Cf. State v. Uelentrup*, 910 S.W.2d 718, 722 (Mo.App. E.D.1995) (recognizing the purpose of Missouri's Child Victim Witness Protection Law, sec. 491.675 et seq., as an attempt to "minimize the emotional and psychological trauma to the alleged child victim"). Additionally, people who might otherwise report child abuse or neglect may not do so if anonymity is denied, as could occur if reporters could be subpoenaed. *Cf. State v. Rollie,* 962 S.W.2d 412, 415 (Mo.App. W.D.1998) (explaining that the purpose of withholding the identity of confidential informants is "to protect and further public interest in law enforcement by encouraging citizens" to report crimes).

*Jamison,* 218 S.W.3d at 416, n. 19. Missouri law further authorizes CD to determine whether release of identifying information may place a person's life or safety in danger and to decline to release that information. §210.150.2(4), (5) and 210.150.3(2) and (3). RSMo. This is particularly important in cases involving known, suspected or potential domestic violence. Individuals who have a history of violent behavior may pose a threat to the lives and safety of hotline reporters and/or their families. The state has an interest in mitigating the risk that an individual with information about suspected child abuse may be deterred from making a

---

[88] See also *State ex rel. Department of Social Services v. Dougherty*, 568 S.W.3d 153 (Mo.App. E.D. 2018); *State v. Moesch*, 738 S.W.2d 585 (Mo.App. E.D. 1987); *Young v. Pitts*, 335 S.W.3d 47 (Mo.App. W.D. 2011).

report because of a fear for the safety of themselves and their families. In other cases, the only persons with information about suspected child abuse or neglect are close family members of the suspected perpetrator, and they may be reluctant to report their own family member if they know that the family member will find out who reported them.  Keeping the identity of the reporter confidential when the reporter is a family member frequently serves to help preserve family relationships that are so crucial to protecting and nurturing children.

In addition, federal law recognizes the same policy imperatives regarding child abuse and neglect cases and requires states to have laws and procedures in place to protect the confidentiality of information pertaining to child abuse and neglect reports and foster care as a condition for receipt of federal funding.[89] 42 USC §671(a)(8). Federal law requires states to have procedures that provide immunity from civil and criminal liability to individuals who make good faith reports of suspected abuse and neglect to the state's child abuse and neglect hotline. 42 USC §5106a(b)(2)(B)(vi) and (vii). Moreover, 42 U.S.C.A. § 5106a(b)(3) provides:

> With regard to clauses (vi) and (vii) of paragraph (2)(B), nothing in this section shall be construed as restricting the ability of a State to refuse to disclose identifying information concerning the individual initiating a report or complaint alleging suspected instances of child abuse or neglect, except that the State may not refuse such a disclosure where a court orders such disclosure after such court has reviewed, in camera, the record of the State related to the report or complaint and has found it has reason to believe that the reporter knowingly made a false report.

---

[89] Missouri receives federal funding through the Title IV-E and through the Federal Government's child abuse prevention and treatment and adoption reform legislation (CAPTA).

Thus, CD has a compelling interest in controlling the release of information in its records, *especially at the pre-deprivation hearing stage*.

To the extent the Court contemplates entering a preliminary injunction, any order would have to be confined to this case and not apply generally in all cases, for several reasons. First, CD's records pertaining to a family may contain highly sensitive, personal, sometimes embarrassing and frequently private information pertaining to the child, family members and witnesses that would be damaging to the interests of the individuals involved if it were to be released.[90] CD is charged by law with ensuring the confidentiality of these records. §210.150.1 RSMo. Second, CD's records may also contain law enforcement records, including otherwise closed records and information pertaining to pending law enforcement investigations that may prejudice the ability of law enforcement to complete the investigation if the information is released. §610.100 RSMo. *Scroggins v. Department of Social Services, CD*, 227 S.W.3d 498 (Mo.App. W.D. 2007). In *Scroggins* a prosecuting attorney filed petition to enjoin DSS from releasing investigative records to the press pertaining to a child fatality that was investigated by law enforcement and CD pursuant to the Director's authority to release records under §210.150.5 RSMo. The trial court enjoined DSS but the Missouri Court of Appeals reversed in part noting that the

> Director's discretion does not, however, extend to those investigative records and reports contained in its files that were generated by law enforcement agencies and provided to the Children's Division. Such investigative reports are closed records under the clear language of §610.100.2 until the law enforcement investigation becomes inactive."

---

[90] Examples of the types of information may include: all types of medical records, substance use disorder treatment records, information pertaining to sexual abuse and family trauma.

*Scoggins*, at 503. CD is not in the position to know whether and when a law enforcement investigation becomes inactive, so CD must check with law enforcement before releasing any law enforcement records. If the law enforcement agency objects CD must decline to release such records pursuant to a document request. That is what happened here.[91]  The DMU checked with the Highway Patrol about the release of their records and they objected. Nothing prevents Plaintiffs from contacting law enforcement agencies directly to ask for the information, and the record is silent on whether Plaintiffs have made such a request.  Third, CD handles many child abuse and neglect reports where the alleged perpetrator is not a parent or guardian.  Perpetrators can be teachers, other relatives, school personnel, household members, adult friends of the family who have access to the child,[92] and "any person who takes control of the child by deception, force, or coercion" such as pimps and those involved in the illegal trafficking of juveniles under federal law. §210.110(1), (12), (16) RSMo and 22 USC §7102  In many circumstances it would be inappropriate, unnecessary and even dangerous for CD to be required as a matter of procedural due process to release all records pertaining to a child or family to an alleged perpetrator who has appealed a hotline finding where the alleged perpetrator may pose a physical danger to the child or others, or where the alleged

---

[91] Wright, ¶ 10.
[92] Affidavit of Emerson "Skip" McGuire, ¶ 8.

perpetrator may have an interest in causing other types of harm such as using the private information for extortion.[93]

CD's interest in limiting the scope of discovery and disclosure of CD records is particularly compelling during the informal, CANRB administrative review process. The CANRB is a forum with limited jurisdiction and authority. §210.152 and §210.153 RSMo.  It does not have the statutory authority to issue protective orders or to police any of the countless, imaginable (and unimaginable) discovery disputes that may arise during the administrative review process. CD and the CANRB do not have the statutory authority to adjudicate or enforce discovery orders, and CD and the CANRB does not have the statutory authority to hold anyone in contempt if its orders were disobeyed. However, Missouri circuit courts have these powers. Circuit Courts can also compel the production of evidence, decide discovery disputes, issue protective orders and enforce those orders through contempt powers or otherwise when the orders are disobeyed.

The State of Missouri and the public have an interest in providing individuals who are the subject of a preliminary finding with the *opportunity* to choose a simple, inexpensive, informal process for the review of their case by an independent body as discussed above.

The State has solved this problem by giving the subject of a preliminary finding of child abuse or neglect the choice of remedy: he or she can opt for the

---

[93] A list of statutes under which CD is obligated to insure confidentiality includes: RSMo §§43.540, 205.988, 208.120, 208.155, 210.150, 337.736, 407.1500, 478.005, 566.226 and 630.140, Chapters 210, 211 and 454,  20 U.S.C. § 1232g, 34 CFR Part 99, 42 CFR §§ 431.300-.307, and  45 CFR Parts 160-164,

informal, inexpensive, simple CANRB administrative review process with its advantages and limitations and defer the full-blown discovery until the trial *de novo* process if needed; or he or she can immediately go to Circuit Court with the opportunity for formal discovery. §536.100.

Finally, the Plaintiffs' contention that the additional costs of requiring these additional procedures at the CANRB is *de minimis* is flatly wrong. If this Court grants the relief that the Plaintiffs are requesting CANRB hearings will become procedurally complex and will involve more complex questions of law governing the disclosure of records. DSS will have to retain counsel to represent CD at considerable expense. The Defendants have a detailed discussion of the burden and costs that such changes would require in Section E 3 below. That discussion is equally applicable to the due process analysis here.

The State and the Public's interest, including the interests of any families and children who may have been victims of a perpetrator who is not an immediate family member, clearly outweigh the Plaintiffs private interest.

*The risk of an erroneous deprivation.* Under the *Matthews* test the Court is to consider the risk of an erroneous deprivation of the procedures used and the probable value, if any, of additional or substitute safeguards. Defendants submit that the risk of erroneous deprivation as far as Plaintiffs are concerned is practically non-existent. Plaintiffs prevailed at the CANRB without all of the opportunities for discovery that they now demanding. Defendants have no pending

matters involving Plaintiffs.[94]  See: *C.S.,* 491 S.W.3d at 649 (We are aware of no case in which a court has held that due process requires more than the full panoply of discovery and process available to all civil litigants, which the [perpetrator of sexual abuse in a CD Hotline case] was allowed in this case.)

Therefore, in applying the *Matthews* test, it is clear that due process does not require CD to provide a process for compelling the production of witnesses and evidence, including a complete copy of its unredacted records to alleged perpetrators of Child Abuse and Neglect *during the informal, pre-deprivation administrative review process*, when the Plaintiffs had an opportunity to receive direct judicial review with the full powers of the Circuit court to compel discovery and depose witnesses.

### d. Plaintiffs do not have a procedural due process right to receive disclosure of the CD's evidence free of charge.

Plaintiffs contend that procedural due process entitles them to receive free disclosure of the CD's evidence as a matter of constitutional right, but they cite no case to support this claim. Further, the evidence establishes that DSS actually provided them with a free, redacted copy of the records pertaining to the case prior to the CANRB hearing. It is DSS policy to provide a free copy of the hotline record to alleged perpetrators in hotline appeals, to a provide free copy of records those who have been found indigent by a court and a free copy of records to individuals who are represented pro bono by legal aid offices.[95] Plaintiff JTH was represented

---

[94] Affidavit of Elizabeth Michelle Palmer, ¶ 15.
[95] Wright, ¶¶ 8, 12.

by Legal Services of Eastern Missouri and his counsel received copies of the records without charge.[96]

Of course, it is understandable that an accused perpetrator wants a free copy of the opposing party's evidence. However, the State has a legitimate interest in controlling costs, and it costs money to respond to document requests. Staff have to locate, compile and review the records, and confidential material must be redacted. Copies are then provided to the requester. It is reasonable for the state to expect that those who can afford to pay the production costs do pay those costs.

### e. **The Plaintiffs do not have a procedural due process right to cross examine witnesses at an informal, pre-deprivation hearing.**

Plaintiffs are asking this court to enter an injunction requiring the State to give parties at CANRB hearings the right to cross examine witnesses. Of course, this ignores that Plaintiffs had the opportunity to immediately elect the remedy of direct, *de novo* judicial review and a stay where they would have had the right of cross examination. §§ 536.100, 536.120 RSMo.  It also ignores that, had the CANRB issued a decision they did not agree with, Plaintiffs had a right to trial *de novo,* with the right of cross examination in circuit court.

Plaintiffs emphasize the importance of the right to cross examine witnesses. Of course that right is important, *at the appropriate time in the process*. But the issue here is not whether cross examination can be an important procedural safeguard; the question is whether it is constitutionally required at the pre-

---

[96] Wright, ¶¶ 10, 11.

deprivation CANRB hearing when there is a right to a subsequent trial *de novo*.  In *Jamison,* 218 S.W.3d 399, the Missouri Supreme Court held that procedural due process does not require a right to cross examination at the CANRB hearing. Defendants submit that *Jamison* is good law.  Nor, as discussed below, do any of the cases Plaintiffs rely upon call for a different result.

   *The Private Interest*. Plaintiffs appear to contend that they have a private interest in having the right to cross examine witnesses at the CANRB. The Defendants strongly assert that there is a strong, private interest in having a relatively fast, procedurally simple, informal and inexpensive process for individuals who are the subjects of preliminary findings to have their cases reviewed and perhaps overturned while the case is still within CD. This is especially true for low-income individuals who cannot afford a lawyer. If the Court grants the injunction and requires CD to turn CANRB hearings into formal administrative proceedings with a right of cross examination, unrepresented parties, especially alleged perpetrators, will be seriously disadvantaged. That is especially true because CD would have to retain counsel to represent CD at each of hearing.

   Plaintiffs suggest that several recent Circuit Courts of Appeal undermine *Jamison*.  But those cases do not apply.  For instance, in *Doe v. Baum*, 903 F.3d 575 (6th Cir 2018), plaintiff, accused of sexually assaulting another student, faced expulsion. After the university's investigator interviewed the witnesses and recommended finding in favor of the alleged perpetrator, the victim appealed to the

University Appeals Board. The Board reviewed the investigator's report and held two closed door sessions, but did not consider new evidence or interview students. The student had no right to a trial *de novo* in a court of general jurisdiction to challenge the University's decision.  The 6th Circuit held that this process violated Doe's right to procedural due process when there were conflicting narratives as to what happened. The University's process differs significantly from the CANRB process. First, the student in *Baum* had no opportunity to tell his side of the story; here, Plaintiffs had the right to counsel, to present documents and call witnesses. Second, Plaintiffs had the notice of the preliminary finding and a copy of Ms. Cook's investigation report. Third, unlike the student in *Baum*, Plaintiffs had the opportunity to the post-deprivation remedy of a full trial *de novo* in circuit court with the full panoply of rights under the Missouri Rules of Civil Procedure. All of the other cases that the Plaintiffs cite are similarly distinguishable.

*Baum* is also distinguishable on the facts. Unlike *Baum* and many of the student discipline cases Plaintiffs cite, this case does not pose a "he said – she said" conflict over what happened. Plaintiffs have not alleged that Ms. Cook got the facts wrong, they have not alleged that Ms. Cook falsified evidence and they have not alleged that any of the <u>facts</u> that she recorded in her investigation reports were materially incorrect. They only challenge the conclusion that Ms. Cook drew from the facts.

Notably, as the Plaintiffs concede, the procedural due process analysis of the Title IX student disciplinary cases they rely on was recently rejected by the 8th

Circuit in *Arkansas-Fayetteville*, 974 F.3d 858, another university student discipline case alleging sexual assault. After, the university investigator determined that there was insufficient evidence to support a finding of assault, the victim appealed to the University's Appeals Panel. The Panel conducted a *de novo* hearing. Students had a right to submit written questions for the Panel to ask the other student. Ultimately the Panel disagreed with the Investigator and decided that the accused had violated university policy. The accused then sued, alleging that the university's procedure violated his right to procedural due process because he was not afforded the opportunity to cross examine witnesses. The District Court granted the University's Motion to Dismiss the procedural due process claim.  The 8th Circuit affirmed, holding that a process in which the adjudicating panel poses questions to the witnesses is not "so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019); *see also Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987) ("Although an important notion in our concept of justice is the cross-examination of witnesses, there was no denial of appellants' constitutional rights to due process by their inability to question the adverse witnesses in the usual, adversarial manner.")"

The court in *Arkansas-Fayetteville*, at 867–68, went on to explain:

> While adversarial cross-examination, when employed by a skilled practitioner, can be an effective tool for discovering the truth, *see California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), there are legitimate governmental interests in avoiding unfocused questioning and displays of acrimony by persons who are untrained in the practice of examining witnesses. There also would be

> costs and burdens associated with imposing on a university all of the formal procedural requirements of a common law criminal trial. *See Gorman v. Univ. of R.I.*, 837 F.2d 7, 16 (1st Cir. 1988); *cf. Goss v. Lopez*, 419 U.S. 565, 583, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

This is especially true in the context of CANRB proceedings. The topic of child abuse and neglect is highly emotional, and less than half of the subjects of a preliminary finding are represented by counsel at the CANRB hearings.[97]

Under the 8th Circuit's due process analysis in *Arkansas-Fayetteville*, *Jamison* is undoubtedly good law. Plaintiffs in this case have not claimed that they submitted any questions to the CANRB to ask Ms. Cook, nor have they alleged that the CANRB failed to ask the questions that they wanted the CANRB to ask, nor have they alleged or explained how they were prejudiced by their inability to ask questions. Further, unlike the CANRB process approved in *Jamison*, the University's procedure for the administrative review of student disciplinary actions was not followed by an opportunity for a circuit court trial *de novo* with the University bearing the burden of proof. Under *Arkansas-Fayetteville*, Missouri's CANRB process provides more procedural process that the Constitution requires.

In support of their argument the Plaintiffs note that in 2007 that there was a relative "high" rate of reversal of preliminary findings, about 40%, and that this is evidence of a high risk of erroneous deprivation. Of course, the 2007 CANRB reversal rate does not indicate what today's rate is. In fact, the rate that the

---

[97] Affidavit of Sara Smith, ¶ 15. In the last three years only 34% of the individuals who asked for a CANRB hearing were represented by a lawyer.

CANRB has reversed preliminary findings has steadily declined since 2007, and the latest data establishes a reversal rate of only 18%.[98]

*The Interests of the Government and the Public.* Defendants have a detailed discussion of the burden and costs that such changes would require in section E.3 below. That discussion is equally applicable to the due process analysis, so the Defendants incorporate that analysis by reference here.

### f. **Plaintiffs' arguments that they should be allowed an opportunity for formal discovery and to cross-examine Ms. Cook about her motives in making her preliminary finding at the pre-deprivation administrative hearing are meritless**.

Count II asks for prospective, injunctive relief against the DSS and CD, not against Ms. Cook. The question of what procedures Plaintiffs are due under the U.S. Constitution are primarily questions of law that do not turn on whether Ms. Cook made a report to the FBI because, as Plaintiffs infer, she was upset that the CANRB overturned her preliminary finding.

Plaintiffs' PI Motion contains a page-and-a-half laundry list of cross-exam topics for Ms. Cook, either by deposition and/or at the CARNB hearing.[99] Most of the topics appear to be an attack on Ms. Cook's credibility and motives and an attempt to conduct discovery for a possible personal injury claim, rather than to prepare for the CANRB hearing.  Ms. Cook's motives in making her preliminary finding are wholly irrelevant to the issue before the CANRB. The **only** issue the CANRB could decide was whether Plaintiffs were responsible for child neglect or

---

[98]Affidavit of Sara Smith, ¶ 8
[99] PI Motion, ¶¶ 27-28

child abuse as defined in §210.110 RSMo. §210.152 and 210.153 RSMo.  Extensive

discovery into Ms. Cook's personal motives would not help the CANRB in making

its decision.  Defendants respectfully suggest that the Defendants and the public

have a significant interest in keeping the CANRB procedures focused on the most

important issue: the safety and welfare of children. Plaintiffs indicate that they had

the right to cross examine her on topics that would clearly be improper, such as

privileged conversations or communications she may have had with DSS's General

Counsel.  It would also be  improper for Plaintiffs' to cross examine Ms. Cook about

cases in which she had made similar findings or taken similar action, as other cases

are confidential as a matter of law. §210.150 RSMo.

### g. **The fact that the CD's investigation was conducted in cooperation with law enforcement does not mean that the Plaintiffs are entitled to additional due process protections before the CANRB.**

Plaintiffs contend that the potential criminality of child abuse and neglect

means that suspected individuals should receive a higher level of due process

protection,[100]  citing *D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.*, 279

F.3d 155, 162 (2nd Cir. 2002). Unfortunately, this opinion does not analyze the

interaction between criminal and administrative investigations. It only holds that

the NASD is not a governmental entity and therefore its investigation despite a

parallel criminal investigation did not implicate Fifth Amendment concerns.

Plaintiffs certainly have a private interest in invoking their Fifth

Amendment right to remain silent.  Nothing prevents them from exercising that

---

[100] PI Motion, p. 30.

right. Plaintiffs, however, offer no facts or explanation of how the procedures they are demanding at the CANRB hearing would adversely impact their rights under the Fifth, Sixth or Fourteenth Amendments if they were to be prosecuted for a crime arising out of a CD investigation. It is doubtful that a finding by a preponderance of the evidence would be admissible, upon proper objection, in a "beyond a reasonable doubt" criminal proceeding.

The United States Supreme Court has "on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws." *Baltimore City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 556 (1990). In *Bouknight,* the mother of an abused child who was in the legal custody of the City of Baltimore pursuant to a court order refused to disclose the child's location, and contended that a court order to compel her to disclose the location of the child and produce the child violated her Fifth Amendment right to silence because it may incriminate her. The Supreme Court held that it did not. The Court reasoned that "the ability to invoke the privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement." *Id.*, 493 U.S. at 557. The Court noted that the City's efforts to gain access to the child was based on concern for the child's safety and did not "'focu[s] almost exclusively on conduct which was criminal.'" *Id.*, 493 U.S. at 560 (citing *California v. Byers,* 402 U.S. 424, 454 (1971)).

While some incidents of child abuse and neglect rise to the level of criminal conduct, many do not. As the United States Supreme Court has held "[e]ven when criminal conduct may exist, the [juvenile] court may properly request production and return of the child, and enforce that request through exercise of the contempt power, for reasons related entirely to the child's well-being and through measures unrelated to criminal law enforcement or investigation." *Bouknight*, 493 U.S. at 561. CD's child abuse and neglect hotline system is a civil regulatory system intended to protect the safety of children and to provide services to families, not to prosecute criminal charges. CD employees are not law enforcement officers. *Scroggins*, 227 S.W.3d 498.

Missouri's compelling governmental interest in protecting children includes having the option of a relatively simple, swift process for administrative review of preliminary findings. It also includes a need to have children produced during abuse and neglect investigations to ensure they are safe and well cared for. The name of the alleged perpetrator is not listed in the Central Registry until the process is complete. Where there is child abuse or neglect, the State has a compelling interest in listing the information in the Registry in as timely way as possible so that individuals and entities with a need for that information[101] may access it, §210.150 RSMo, to avoid putting children at risk of abuse/neglect.

### h. Plaintiffs' reliance on the old U.S. Supreme Court opinion in *Goldberg v. Kelly* is misplaced.

---

[101] Entities that may access the information *under certain circumstances* include, for example: courts, law enforcement, prosecutors, juvenile officers, schools, physicians, and guardians ad litem for the child. §210.150 RSMo.

Plaintiffs' reliance on the "seminal" case of *Goldberg v. Kelly,* 397 U.S. 254 (1970), for the proposition that a full hearing is required is misplaced.  Notably, the Supreme Court has noted that *Goldberg* was the *only* case in which the Court "required a full adversarial evidentiary hearing prior to adverse government action" in the administrative context. *Loudermill*, 470 U.S. at 546. And, the *Goldberg* Court itself recognized that the "constitutional issue to be decided, therefore, is the narrow one whether the Due Process Clause requires that the recipient be afforded an evidentiary hearing before the termination of [state welfare] benefits." *Goldberg,* 397 U.S. at 260. The Supreme Court also held in *Goldberg,* 397 U.S. at 266-67:

> that the pre-termination hearing need not take the form of a judicial or quasi-judicial trial. We bear in mind that the statutory 'fair hearing' will provide the recipient with a full administrative review. [footnote omitted] Accordingly, the pre-termination hearing has one function only: to produce an initial determination of the validity of the welfare department's grounds for discontinuance of payments in order to protect a recipient against an erroneous termination of his benefits. Cf. *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 343, 89 S.Ct. 1820, 1823, 23 L.Ed.2d 349 (1969) (Harlan, J., concurring). *Thus, a complete record and a comprehensive opinion, which would serve primarily to facilitate judicial review and to guide future decisions, need not be provided at the pre-termination stage.*

[emphasis added].  At the pre-termination hearing the Supreme Court held that "[i]nformal procedures will suffice; in this context due process does not require a particular order of proof or mode of offering evidence *Goldberg*, 397 U.S. at 269.

The procedure challenged in *Goldberg* is not comparable to CD's CANRB review process. In *Goldberg,* New York's procedures did not permit the welfare recipient to appear personally with or without counsel before the official who finally determined their continuing eligibility for benefits. The welfare recipients were not

notified that they had a right to a fair hearing and subsequent judicial review. Further, welfare recipients were not entitled to a full, trial *de novo* in New York's court of general jurisdiction.

Plaintiffs reliance on *Dolic v. Mo. Dept. of Social Services*, 493 S.W.3d 22 (Mo.App. 2016) is equally unavailing. *Dolic* was a case of a denial of public welfare benefits (Medicaid in this case) and was controlled by *Goldberg* because a federal Medicaid regulation expressly required the Department to apply the *Goldberg* procedures in Medicaid appeals. 42 C.F.R. § 431.205(d).

## 2. <u>The Court should deny the PI Motion because there is no credible threat of irreparable harm to the Plaintiffs.</u>

To establish a right to a preliminary injunction, plaintiffs must establish that they will be irreparably harmed if the court does not grant the relief requested. The 8th Circuit has held that the movant is required to establish the threat of irreparable harm, and the absence of irreparable injury alone is sufficient grounds for denying a motion for preliminary injunction. *Dataphase,* 640 F.2d at 114, n. 9. Plaintiffs cannot meet this requirement for the same reason they lack Article III standing: the CANRB reversed Ms. Cook's preliminary finding, Plaintiffs are not listed in the Central Registry, and CD does not have a pending investigation or family assessment involving this family.[102] The entry of a preliminary injunction would only grant the plaintiffs' hypothetical relief *if* CD receives a new hotline report involving the family, *if* the new report rises to the level of an investigation

---

[102] Defendants ask the court to refer back to the Defendant's analysis of Article III standing in this brief and in the Defendant's Motion to Dismiss.

(not a family assessment), and *if* CD makes a preponderance of evidence finding. At present, none of these contingencies exist.

If these contingencies do come to pass, Plaintiffs further have adequate remedies at law and/or in equity to vindicate their rights when there is an actual threat of a concrete and imminent injury. Plaintiffs could seek a Writ of Prohibition in circuit court to stop CD from proceeding in violation of their constitutional rights. They could also seek relief in federal court if they had a real, federal cause of action.

Plaintiffs contend that they will suffer irreparable harm because the damage to one's reputation is a harm that cannot be remedies by a later award of money damages. A listing in the Central Registry, however, is not a public record like the sexual offender registry. Information in the Central Registry is confidential, and can only be disclosed to individuals and entitles who have a need to access the information in order to protect children. §210.150 RSMo. Access to information pertaining to family assessments is even more restricted. §210.150.3 RSMo.

### 3. <u>The Court should deny the PI Motion because the Defendant and other suspected perpetrators of child abuse or neglect will be harmed by the entry of the requested relief.</u>

Under *Dataphase*, 640 F.2d at 114, the court must balance the irreparable injury a plaintiff may suffer if the court does not grant the preliminary injunction against the harm that granting the injunction will inflict on other parties. Plaintiffs essentially argue that the costs to the State to provide the additional procedural protections would be *de minimis*. That is simply untrue.

The additional procedures that Plaintiffs seek to impose on the Defendants as a matter of federal constitutional law will come at great administrative and fiscal cost. The requested procedures will require CD to restructure the administrative review process. The new procedures will mean that the process for preparing for CANRB hearings will be formal, complex and costly. With many of the attributes of a civil trial, hearings will take much longer.

The current administrative review system centers on a board of citizen volunteers appointed by the Governor with the advice and consent of the Senate. §210.153 RSMo. They serve without compensation, although their expenses are reimbursed. §210.153.5.[103] The Board includes professionals such as physicians, lawyers and psychologists.[104] §210.152.2. Service on the Board may require a commitment of a considerable amount of time at the expense of the Board member's professional duties. [105] Having a board with this type of membership and structure provides significant advantages to the review process in that it ensures that each panel of the Board brings a range of professional experience and expertise to the resolution of these difficult cases.[106] CD has difficulty recruiting and retaining Board members under the current rules.[107] In addition, with hearings taking longer CD expects that it will either have to increase the number of panels of the Board to hear the longer cases or it will have to take longer to get CANRB hearings

---

[103] Affidavit of Sara Smith, ¶ 12.
[104] Affidavit of Sara Smith, ¶ 12.
[105] Affidavit of Sara Smith, ¶ 14.
[106] Affidavit of Sara Smith, ¶ 13.
[107] Affidavit of Sara Smith, ¶ 14.

scheduled.[108] Finally, CANRB members will have to undergo additional training on how to implement the new procedures. CD expects that it will experience a significant, and possibly crippling, level of difficulty in recruiting and retaining CANRB members if the Court grants the Motion for preliminary injunction.[109]

CD is rarely represented by a lawyer at CANRB hearings,[110] with non-attorney CD staff presenting information to the Board. If the new procedures are required, Defendants expect that CD will need to retain counsel to represent it in every CANRB matter to ensure that the new procedures are properly implemented. Defendants estimate the costs for the additional representation at over $876,503.[111] There would be added costs related to staff training, drafting new policies and procedures, board member expenses, and a special master needed for evidentiary issues.[112]

The regulations governing the administrative review process would have to be rewritten consistent with the requirements of the injunction. If the preliminary or permanent injunction is reversed on appeal, most or all of that additional work would have to be walked back. Writing and promulgating regulations requires the effort of lawyers and policy staff.

Finally, if the Court grants all or even a part of the injunctive relief Plaintiffs are requesting, where does that leave the right to a trial *de novo* in Circuit Court

---

[108] Affidavit of Sara Smith, ¶ 16, 17.
[109] Affidavit of Sara Smith, ¶ 18 (1st)
[110] Affidavit of Sara Smith, ¶ 18 (2nd)
[111] Affidavit of Sara Smith, ¶¶ 19-21.
[112] Affidavit of Sara Smith, ¶¶ 19 (1st), 20, 21.

under §210.152 RSMo? If this Court grants the preliminary injunction but does not address this question, Plaintiffs and others similarly situated would essentially have the right to a full evidentiary hearing at the pre-deprivation CANRB hearing, and to a trial *de novo* before a circuit judge if they disagree with the CANRB's decision. This means that unless the Missouri General Assembly amends the law, CD and the State may have to formally litigate the same issues twice, once before the CANRB and once before the Circuit court. This fiscal burden on the State is simply unnecessary in light of the interests at stake.

### 4.  The Court should deny the PI Motion because Plaintiffs have an adequate remedy at law.

As mentioned above, Plaintiffs have adequate remedies at law to vindicate their rights when there is an actual threat of a concrete and imminent injury. They could seek a Writ of Prohibition in circuit court to stop CD from proceeding in violation of their Constitutional rights; or even relief in federal court, if they had a real, federal cause of action.

### 5. The public interest will not be served if this court enters the preliminary injunction that Plaintiffs are seeking.

Defendant is an agency of State Government. To a large extent the Agency represents the public interest. Defendants submit that the public interest would not be furthered by this Court granting the relief that Plaintiffs request in the PI Motion, for all of the reasons detailed above and in Defendants' Motion to Dismiss.

## VII. Bond

Defendants object to Plaintiffs' request to waive bond or for a nominal bond. As explained above, Plaintiffs' contention that there is "no ready or apparent cost to the CD from adding" the additional procedures that Plaintiffs seek is untrue. Requiring CD to implement these procedures will come at a substantial price to CD and Missouri taxpayers. In addition, it will come at the expense of many subjects of a preliminary finding of child abuse or neglect who would have preferred to a less costly and cumbersome system. Defendants respectfully suggest that a bond of not less than $250,000 is appropriate to compensate CD and the taxpayers for the cost of having to implement a preliminary injunction which will be likely be reversed on appeal.

## VIII. <u>Conclusion</u>

Plaintiffs' PI Motion should be denied and the Complaint should be dismissed with prejudice.

Respectfully submitted,
**ERIC S. SCHMITT**
Attorney General

*/s/Edward V. Crites*
Edward V. Crites #33985
Assistant Attorney General
815 Olive Street, Suite 200
St. Louis, Missouri  63101
Tel:  (314) 340-7861
Fax:  (314) 340-7029
Edward.crites@ago.mo.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of January, 2021, the foregoing was filed electronically via the Court's electronic filing system and was served by operation of the CM-ECF system on all counsel of record.

*/s/ Edward V. Crites*
Assistant Attorney General