UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| J.T.H., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-222-ACL |
| | ) | |
| MISSOURI DEP'T OF SOCIAL SERVICES, | ) | |
| CHILDREN'S DIVISION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiff Parents' Memorandum of Law in Opposition to Defendants' Motion to Dismiss**

Plaintiffs J.T.H. and H.D.H., by counsel Hugh A. Eastwood and W. Bevis Schock, state as follows for their memorandum of law in opposition to defendants' motion to dismiss:

I.      **Introduction**

A Scott County sheriff's deputy named Brandon Cook sexually abused Plaintiff Parents' 15-year-old son.  Plaintiff Father, then a fellow deputy, asserted civil claims on his son's behalf against the County and its Sheriff.  Those claims were settled before suit.  While the claims were pending, however, defendant Children's Division, through its Sikeston office director defendant Spring Cook, instigated a retaliatory child abuse and neglect investigation into both Plaintiff Parents.  She found the parents were responsible for their son's abuse because they neglected him, in that they allowed him to drive a car, have a cell phone, and access the internet and social media.  Eventually a state board in Jefferson City cleared Plaintiff Parents under a preponderance standard.

On inference, Spring Cook, or someone on her behalf, later referred Plaintiff Parents for investigation to the FBI.  Defendants persist in making call outs to the family home as to Plaintiff

Parents' minor children, including contact after this Complaint was filed, and direct contact of a

minor daughter by another Sheriff's deputy on Snapchat after this Complaint was filed.

Plaintiff Parents seek both damages and declaratory and injunctive relief.

On the same day Defendants moved to dismiss [11], Plaintiff Parents moved for a

preliminary injunction [13] as to certain statutory and regulatory aspects of Missouri's Child

Abuse & Neglect (CAN) Central Registry process.[1]  The issues briefed in each motion overlap

significantly and include: the current Missouri child abuse and neglect investigatory framework;

Plaintiff Parents' standing; the procedural due process defects of the current CAN registry

process; and Spring Cook's lack of immunity.

Much ink has already been spilt in each parties' respective motions.  Plaintiff Parents

draft this memo in opposition to Defendants' motion to dismiss presuming that the Court is

familiar with the prior filings, mindful of those words attributed to Mark Twain or Blaise Pascal:

"I have made this letter longer than usual, only because I have not had time to make it shorter."

## II.    Standard of Review

Under Fed. R. Civ. P. 12(b)(6), a defendant may assert as a defense the plaintiff's "failure

to state a claim upon which relief can be granted."  To survive a motion to dismiss for failure to

---

[1] Plaintiffs moved for a preliminary injunction to enjoin Children's Division during the pendency of this litigation, until it is resolved on the merits, from enforcing the Missouri Child Abuse & Neglect Central Registry statutory and regulatory process, RSMo. 210.152 and 210.153, Missouri CSR 35-31.025, without requiring the Children's Division to grant accused parties the following procedural due process rights:
1.    Right to attend to any child abuse and neglect investigations, findings, and hearings against an alleged perpetrator;
2.    Right to obtain all evidence, including disclosure of Children Division's entire file, and to compel production of all evidence if necessary, with some process to compel production;
3.    Right not to be charged money for disclosure of Children Division's evidence;
4.    Right to cross-examine Children's Division witnesses where there are conflicting narratives of the truth, in light of an alleged perpetrator's interest in avoiding "stigma plus" placement on the Missouri Child Abuse & Neglect Central Registry.

state a claim, a plaintiff's allegations must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal,* 556 U.S. at 678.  Although the Court accepts a complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain,* 478 U.S. 265, 286 (1986). In other words, a Complaint "does not need detailed factual allegations" but must be more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Twombly,* 550 U.S. at 555.  The plausibility requirement is satisfied when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *In re SuperValu, Inc.,* 925 F.3d 955, 962 (8th Cir. 2019).

The reviewing court accepts the plaintiff's factual allegations as true and draws all reasonable inferences in favor of the nonmoving party.  *Torti v. Hoag,* 868 F.3d 666, 671 (8th Cir. 2017).  The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim.  *Twombly,* 550 U.S. at 583 (quoted case omitted).

"When considering a Rule 12(b)(6) motion, 'the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings.'"  *Smithrud v. City of St. Paul,* 746 F.3d 391, 395 (8th Cir. 2014) (quoting *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir. 1999)).

3

Section 1983 claims are not subject to a heightened pleading requirement simply because a government actor may have qualified immunity. *Doe v. Cassel,* 403 F.3d 986 (8th Cir. 2005); *see also Randall v. Scott,* 610 F.3d 701, 705–10 (11th Cir. 2010) (Section 1983 claims subject to qualified immunity governed by *Iqbal* plausibility standard).

III.    **Framework for the Child Abuse & Neglect Central Registry**

Plaintiff Parents do not dispute Defendants' overall summary of various federal and state statutory and regulatory procedures for investigating child abuse and neglect.  They do dispute, however, Defendants' characterization of their Complaint as inferring Spring Cook's retaliatory motive and unfounded findings as being based on solely on the fact that she works "hand in glove" with local law enforcement—in this case, Plaintiff Father's former employer Scott County Sheriff's Department.  While that fact is both true and important, this characterization elides three other allegations pled in the Complaint: (1) the custom and practice of Children's Division workers referring investigation of local law enforcement families to CD offices in other counties because of a potential conflict of interest, (2) that *four* other government actors found either no probable cause or "no evidence" of parental neglect or criminal conduct, and (3) there is no objective connection between the boy's sexual abuse by two men and any parental neglect other than the parents allowing their teenage son to drive a car, have a cell phone, and access the internet and social media.

The Court, drawing on its "judicial experience and common sense," *Iqbal,* 556 U.S. at 679, can make the reasonable inference that Ms. Cook's failure to recuse, her close working connection to the department against whom Plaintiff Father asserted civil claims (his own employer), and the lack of objective basis for her findings total circumstances of a retaliatory, bad faith motive.  Our civil and criminal laws have evolved as our society has become more

4

aware of sexual abuse of children, particularly the evil of abuse by those in trusted positions of authority such as clergy, teachers, and law enforcement.  What those laws do not do, however, is hold parents responsible for the abuse by trusted third parties in positions of authority.  What Spring Cook did here was to re-traumatize both a boy who was sexually abused, and his parents.  She investigated *not* his abusers, but rather his parents, all because his father made claims against an abuser's employer.

IV.     **Standing**

Defendants argue that Plaintiff Parents lack standing because (1) they were not placed on the CAN Central Registry, since the state Child Abuse & Neglect Review Board in Jefferson City reversed Spring Cook's findings of parental neglect under a preponderance of the evidence standard, (2) they did not seek a writ of mandamus from state Circuit Court to challenge the procedures followed by Spring Cook and the CANRB, and (3) they lack a real and immediate threat of repeat injury.

As Plaintiff Parents brief in their memo [13-1] at pp. 6-8, standing requires: (1) an injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that a favorable decision will redress the injury.  *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992).  The injury must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan,* 504 U.S. at 560).  Here, each parent was found by Spring Cook to be neglectful of their minor son, and she continued to prosecute them at the CANRB upon administrative appeal.  Plaintiff Father's POST license and Plaintiff Mother's desire to return to teaching constitute actual interests that would be impaired by being placed on the Registry.  The findings of neglect were concrete and particularized injuries, even if later overturned by the CANRB.

The Eighth Circuit has found standing to challenge a statute or an ordinance is present when the challenger has experienced a direct injury or will soon sustain a direct injury redressable by the court.  *Harmon v. Kansas City*, 197 F.3d 321 (8th Cir. 1999).  Plaintiff and his wife have since had a subsequent call out by the FBI on substantially the same allegations, which involved Spring Cook.  As indicated in Plaintiff Father's Affidavit [13-2], a material "necessarily embraced by the pleadings," Plaintiff Parents have also faced recent subsequent call outs by the same Children's Division office in Sikeston as to alleged social media content by their 13-year-old daughter—again with no evidence of neglect.  Further, *another* sheriff's deputy attempted to befriend Plaintiffs Parents' 16-year-old daughter on Facebook and Snapchat, the latter at 4:22 a.m., just five days after the original Complaint was filed.

Given this record, Plaintiff Parents have shown an actual, well-founded fear that there is a "substantial risk" that such findings of neglect by Spring Cook and CD will continue. Furthermore, damage to one's reputation is a harm that cannot be remedied by a later award of money damages, and the threat of reputational harm may form the basis for preliminary injunctive relief.  *Kroupa v. Nielsen,* 731 F.3d 813, 820 (8th Cir. 2013).

Plaintiff Parents also distinguish the case law cited by Defendants.  In *Mitchell v. Dakota Cnty. Soc. Servs.,* 959 F.3d 887 (8th Cir. 2020), the named plaintiff was a New Jersey resident only temporarily residing in Minnesota when he was investigated and later entered an *Alford* plea to malicious punishment of a child.  After returning to live in New Jersey, he sought to challenge certain Minnesota child welfare statutes, together with an advocacy group as co-plaintiff.  The Eighth Circuit held that any return he might make to Minnesota was speculative, and that the advocacy group did not plead that any of its individual members would otherwise have standing. *See also Frost v. Sioux City,* 920 F.3d 1158, 1161 (8th Cir. 2019) (pitbull ordinance challenge

failed where plaintiff "does not own a dog and does not live in Sioux City"); *Mosby v. Ligon,* 418 F.3d 927, 931, 933 (8th Cir. 2005) (challenge to Arkansas Supreme Court Rules barred by Rooker-Feldman doctrine, and mere speculation that injury will re-occur).  Here Plaintiff Parents' fear of future findings by Spring Cook is real and not speculative.  They continue to live within her CD jurisdiction, and they have undergone investigations subsequent to the CANRB decision in their favor.

Alternatively, Plaintiff Parents have standing under the mootness exception doctrine since the controversy is capable of repetition but evading review.  *Roberts v. Norris,* 415 F.3d 816, 819 (8th Cir. 2005).  Plaintiff Parents emphasize that they are not asking this Court to enjoin or reverse any ongoing state agency or state court proceeding, so no Rooker-Feldman Doctrine or Younger Abstention issues are present here.

Plaintiff Parents have standing to bring a facial challenge as well.  Generally speaking, "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the [statute] would be valid[.]'"  *See Washington State Grange v. Washington State Repub. Party,* 552 U.S. 442, 449 (2008) (first alteration in original) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)).  *See also Wersal v. Sexton,* 613 F.3d 821, 831 (8th Cir. 2010) ("Indeed, a plaintiff can [generally] only succeed in a facial challenge by establish[ing] that no set of circumstances exists under which the [law] would be valid." (alterations in original) (internal quotations and citations omitted)).

Many persons dissimilarly situated to Plaintiff Parents are affected by the statute.  That includes persons who are not parents but who face allegations of child abuse or neglect; persons who wish to confront anonymous accusers (particularly where the accuser is not the alleged victim); and persons who have different "stigma plus" liberty or property interests than Plaintiffs,

such as persons who own or operate day cares, church volunteers, nurses, or pediatric physicians. Since the same procedural due process problems would still apply to a myriad of fact patterns not present in Plaintiffs' particular circumstances, then they have standing to bring a facial challenge to the CAN Central Registry process.

## V.      "Stigma Plus" Injury

Defendants next argue that Plaintiff Parents either must have been placed on the Central Registry, or must have lost their jobs, to show injury, looking to a state court opinion outside of Missouri. *See Georgia v. Dept. of Human Services v. Steiner,* 815 S.E.2d 883, 892 (Ga. 2018). They concede, however, that the Missouri Supreme Court did not require that job loss be shown to demonstrate injury. *Jamison v. Dept. of Social Services,* 218 S.W.3d 399 (Mo. banc 2007). But the question presented here is not one of state law. Whether an interest is protected by the Due Process Clause of the Fourteenth Amendment "is ultimately one of federal constitutional law." *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 756–57 (2005); *Paul v. Davis,* 424 U.S. 693, 701, 711 (1976).

To be sure, most Eighth Circuit cases concern the loss of public employment. *See, e.g., Neal v. Fields,* 429 F.3d 1165, 1167–68 (8th Cir. 2005). But public employment is not the only "right or status" conferred by state law that may warrant procedural due process protection. *See Paul,* 424 U.S. at 708–09, discussing *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971); *Brown v. Simmons,* 478 F.3d 922, 923 (8th Cir. 2007); *Gunderson v. Hvass*, 339 F.3d 639, 644–45 (8th Cir. 2003), cert. denied sub nom *Gunderson v. Fabian,* 540 U.S. 1124 (2004). When state actors deprive a person of a significant right or status based upon their public determination that the person was guilty of "dishonesty, immorality, criminality, racism, and the like," that person may well be entitled to the minimum requirements of procedural due process. *Mercer v. City of*

*Cedar Rapids,* 308 F.3d 840, 845 (8th Cir.2002) (quotation omitted); *see Goss v. Lopez,* 419 U.S. 565, 574–76 (1975).  The Seventh Circuit, in upholding in part a challenge to an Illinois child abuse Central Registry, similarly found a liberty interest to pursue one's chosen occupation. *Dupuy v. Samuels,* 397 F.3d 493, 503 (7th Cir. 2005) (internal citations omitted).

Defendants' argument also understates the injury that Plaintiff Parents did suffer: Spring Cook's findings of child neglect.  This would be a civil death sentence for Plaintiff Father's work as a POST-licensed law enforcement officer, and would prevent Plaintiff Mother from returning to her public-school teaching.  Plaintiff Parents suggest that being found to neglect their child, and thereby somehow be responsible for his sexual abuse by a third-party adult, is sufficiently stigmatic that they are entitled to the minimum requirements of procedural due process. *Jamison,* 218 S.W.3d at 407.

The constitutional gravamen of a procedural due process claim is not the deprivation itself, however, but rather the lack of due process.  *Zinermon v. Burch,* 494 U.S. 113, 125 (1990). Otherwise any individual who was stigmatized under a flawed process, and has shown a likelihood that he or she faces further stigma under the same flawed procedures, would lack standing to challenge those procedures simply because he or she was fortunate enough to have prevailed so far to date.

Similarly, Plaintiff Parents have a liberty interest in being free from State interference in their parenting of their children absent a *reasonable* suspicion of abuse or imminent danger of abuse.  *Croft v. Westmoreland County Children Youth,* 103 F.3d 1123, 1126 (3d Cir. 1997) (emphasis added).  Plaintiff Parents suggest that the lack of any findings against them by the Missouri State Highway Patrol, the Deputy Juvenile Officer, the CANRB, and the FBI create the

reasonable inference at the pleading stage that Spring Cook's findings of child neglect were unreasonable and unsupported by evidence.

Defendants also argue that Plaintiff Father's confrontation with the Tae-Kwan Do Instructor, in which he used his law enforcement training to defuse an attempted physical assault, shows "stunningly poor judgment." But they do not argue, nor can they, that the father did anything other than try to stop any contact between the Instructor and his son. Their conclusory argument that the confrontation is evidence of child abuse or neglect is without support: teenagers routinely drive a car, have an iPhone, and access the internet. Plaintiff Parents cannot find any authority that this constitutes evidence of child abuse or neglect, for surely there is none.

Despite Defendants' contention otherwise, Plaintiff Parents do not plead or argue that they had a right to be free from *investigation*. All they argue is that once a CD official such as Spring Cook makes an official finding of child neglect against them, then they are entitled to additional procedural due process to defend themselves should it be likely that further findings issue.

## VI.    Procedural Due Process

This brings the parties to the heart of this case: what procedural due process is due to someone officially found and declared to have abused or neglected a child as that term is defined by Missouri law. This is where the parties disagree as to what is required under the *Mathews v. Eldridge* balancing test. 424 U.S. 319, 335 (1976).

Plaintiff Parents acknowledge that they make the argument that the Missouri Supreme Court got the Due Process Clause analysis wrong in *Jamison* as to the due process "floor," and/or that intervening "Stigma Plus" precedent has changed the analysis since the Missouri Supreme Court decided *Jamison* in 2007. Defendants appear to concede in their memo [12] at p.

10

40 that Plaintiff Parents have an interest in the integrity of their family relationship, and in avoiding stigma by being placed on the Central Registry. Plaintiff Parents do not assert a right to be free from investigation or make claims about how an investigation should be conducted. *Cf. Neal v. Fields,* 429 F.3d 1165 (8th Cir. 2005) (Nurse lacks standing to challenge her licensing investigation). Rather, they challenge their procedural rights *after* a State official makes a *finding* of child abuse or neglect. Given the stigma associated with being declared a child abuser or neglecter, the current process carries too high of a risk of an erroneous deprivation. *See Neal,* 429 F.3d at 1169 (cleaned up) (recognizing due process claims where government accusations are so damaging as to make it difficult or impossible for the individual to escape the stigma of those charges).

Defendants spend five pages of their Motion to Dismiss on the issue of procedural due process [12 at pp. 38-42]; Plaintiff Parents spend 24 pages of briefing on the same issue in their memo in support of their motion for preliminary injunction [*cf.* 13-1 at 17]. Plaintiff Parents will not repeat them all here for sake of judicial economy, but will summarize them below.

Plaintiff Parents allege with particularity the procedural defects to which they were subjected, both under the CAN system generally and under Spring Cook's process as applied. That distinguishes their Complaint here from those Eighth Circuit cases where the plaintiff failed to sufficiently plead procedural defects. *Cf. Doe v. Univ. of Ark.,* No. 19-1842, at *15 (8th Cir. Sep. 4, 2020); *Gunderson v. Schlueter,* 904 F.2d 407, 409-10 (8th Cir. 1990).

*Mathews* and its progeny consider a three-part balancing analysis: the private interest affected; the risk of an erroneous deprivation and the probable value of additional or substitute procedural safeguards; and finally, the burdens on Government's interest. *Mathews,* 424 U.S. at 332-333.

11

Although there is no discovery or record in this case as to current CD procedures, the record in *Jamison* indicated a high rate of reversal at the CANRB hearing stage, reversing the local director's probable cause determination "somewhere in the vicinity" of 35-40% of the time. 218 S.W.3d at 408.  As the Missouri Supreme Court noted, "this presumably occurs after the local director has reversed additional initial probable cause findings of the investigator."  That means roughly one in three persons found to be abusive or neglectful of a child is wrongly so stigmatized.  Plaintiff Parents read this to make the risk of an erroneous deprivation to be "high," *id.,* calling for additional or substitute procedures.

Plaintiff Parents distill their *Mathews* procedural allegations to two issues: notice, and opportunity to be heard.  They argue that Spring Cook's letter to them was inadequate as to how they were neglectful of their son.  In order to "respond, explain, and defend," the accused must have an opportunity to assess the evidence against him.  *Goss v. Lopez,* 419 U.S. 565, 581 (1975); *see also Newsome v. Batavia Local School Dist,* 842 F.2d 920, 927 (6th Cir. 1988).  Thus Plaintiff Parents sought obtain limited discovery as contemplated by 15 CSR 35-31.025.  But Plaintiffs were asked to pay for production of the CD incident file, and by law are not entitled to certain confidential information.  RSMo. 210.150.2(5); *Pitts v. Williams,* 315 S.W.3d 755, 765 (Mo. Ct. App. 2010).

This is problematic in that an alleged perpetrator should not bear a disproportionate share of the risk of error.  *Santosky v. Kramer,* 455 U.S. 745, 787 (1982); *see also Williams v. Missouri Bd. of Prob. & Parole,* 661 F.2d 697, 700 (8th Cir. 1981) (prisoners seeking parole must "be advised of adverse information in his file"); *cf. Swarthout v. Cooke,* 562 U.S. 216, 220 (2011) (finding sufficient due process where petitioners were, *inter alia,* "afforded access to their records in advance" and "allowed to contest the evidence against them").

Plaintiff Parents allege that they were to be charged for the investigatory file by the state Document Management Unit in Jefferson City, even if there is nothing in the statute or regulations that requires or permits such fees.  By charging considerable, that would be substantial to lower-income persons such as Plaintiff Parents, *see* Complaint ¶¶ 70, 72, the discovery or disclosure process was weighted in favor of the State.   Despite informal assurances to the contrary during the meet and confer between counsel, other documents which Plaintiff Parents sought were never produced.

Nor could Plaintiffs depose Spring Cook despite the reference to "all appropriate material," 13 CSR 35-31.025(2)(B), *cf. Jamison,* 218 S.W.3d at 403, such that an alleged perpetrator can have "enough information to be able to defend the allegations and to present conflicting evidence in a timely manner."  *Jamison,* 218 S.W.3d at 409.  Notwithstanding the CD statutory and regulatory prescriptions, a state legislature does not have the last word as to whether the evidentiary requirements of due process it prescribes as to a particular type of administrative action satisfy the Fourteenth Amendment.  *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 541 (1985).

Not was the CANRB hearing itself a "meaningful" opportunity to be heard.  *Mathews,* 424 U.S. at 333.  There was no sworn testimony or ability to subpoena witnesses.  Despite a statutory right to counsel, RSMo. 210.152.4(2), there was no ability or right for Plaintiff Parents to cross-examine witnesses against them, despite conflicting narratives.  As alleged in the Complaint (*see, e.g.,* ¶ 91), there were serious issues upon which there should have been cross examination: (1) what evidence Spring Cook had of parental neglect; (2) her contact and relationships with other persons connected with the underlying criminal case against Brandon Cook; (3) her contact and relationships with other persons connected with the underlying civil

claims; (4) her potential conflicts of interest as to investigating a Scott County sheriff's deputy, and also whether or not Spring Cook was related to Brandon Cook (the police officer who sexually assaulted Plaintiff Parents' son, with whom she shares a last name) and/or a third Sheriff's deputy who was involved and who also has the same last name; (5) her social media postings and "Friendships" on Facebook with the above-named persons; (6) what other witnesses she had interviewed and/or relied upon as to her findings about Plaintiffs' family; (7) what CD policies or other policies she referred to in her decision-making; (8) her lack of reference to any guidance or objective standards around parental supervision of teenage access to social media; (9) whether there were other similar cases in which she had made similar findings and/or taken similar action; (10) conversations with other CD officials about the case, including the General Counsel's office related to Plaintiff Parents' concerns as to discovery production and cost; (11) the findings of "no evidence" by the DJO officer from the Circuit Court, despite knowing the same factual bases for the allegation, and accompanying her on her call out to Plaintiff Parents' household; (12) the finding of no probable cause by each of the Highway Patrol; (13) her motivation in referring the minor son for an anal and genital exam, months after any alleged sexual encounter, for which Plaintiff Parents saw no medical or therapeutic purpose, and high risk of trauma to their child; (14) why the parents' response to each of the three alleged abuse incidents, and cooperation in the prosecution of Brandon Cook, did not mitigate her child neglect finding; (15) why the teenage boy going on a date with another teenage boy, with their mothers' approval, was considered to be child abuse or neglect, and (16) why she mischaracterized the minor son as having problem sexual behaviors, since under the regulations usually means children who forcibly exploit children under 14 years of age.  13 CSR 35.31-027.

14

Plaintiff Parents argue extensively why they disagree with the *Jamison* analysis in
moving for their preliminary injunction [13-1 at pp. 28-41].  Most of the federal case law
surveyed by the *Jamison* court in 2007, *see, e.g.,* 218 S.W.3d at 414 n. 17, is at least four decades
old, and only two authorities are at the appellate level.  Thus, *Jamison* cannot be said to rely on a
"a robust consensus of cases of persuasive authority that places the constitutional question
beyond debate."  *Hanson v. Best,* 915 F.3d 543, 548 (8th Cir. 2019).

But Plaintiff Parents also suggest that post-*Jamison* "Stigma Plus" case law, in the
context of Title IX higher educational proceedings as to alleged campus sex assaults, has
changed the analysis as to the level of procedural due process required.[2]  *See, e.g., Doe v. Baum,*
903 F.3d 575, 581 (6th Cir. 2018) (requiring cross-examination where competing narratives of
the truth); *Doe v. Purdue Univ.,* 928 F.3d 652 (7th Cir. 2019) (then-Judge Amy Coney Barrett
finding procedural due process issues with tribunal without deciding right to cross examination);
*Doe v. Univ. of Cincinnati,* 872 F.3d 393 (6th Cir. 2017) (failure to provide any form of
confrontation of the accuser made the proceeding fundamental unfair).  Even those circuits that
have held that an accused may not personally cross-examine an accused have still held that some
cross-examination is constitutionally required.  *Haidak v. Univ. of Mass.-Amherst,* 933 F.3d 56,
69 (1st Cir. 2019).  Furthermore, here, where there is already a statutory right to counsel at the
CANRB hearing, a lawyer may easily perform cross.

---

[2] Not all educational cross-examination cases are recent.  *Dillon v. Pulaski County Special
School District,* 594 F.2d 699, 700 (8th Cir. 1979) (Benson, J., concurring) (to resolve disputed
issue of fact, high school student should have been allowed to cross-examine his accuser, who
did not testify at the expulsion hearing); *Winnick v. Manning,* 460 F.2d 545, 549-50 (2d Cir.
1972) (cross-examination of witnesses might be essential to a fair hearing if credibility is at issue
in the suspension of a university student).

Plaintiff Parents suggest that now that courts have articulated a higher required floor of process in the college disciplinary context, then the floor should be higher for parents accused of child abuse or neglect.  The right to an education is less significant than the rights of parents implicated here.  *Esteban v. Cent. Mo. State Coll.,* 415 F.2d 1077, 1089 (8th Cir. 1969); *see also Doe v. Purdue Univ.,* 928 F.3d at 663.

Further, given the potential criminality of child abuse and neglect[3], the *Jamison* court did not consider whether a parent accused of misconduct that may form the basis for criminal prosecution changes the *Mathews v. Eldridge* calculus in a manner requiring more than minimal notice and an opportunity to respond.  Defendants want it both ways: they argue that child abuse and neglect are so serious that their reporting and investigation are mandatory, *see, e.g.,* RSMo. 210.145.4; *Pitts,* 315 S.W.3d at 759, but not so serious that the alleged perpetrators are entitled to more procedural due process after a finding of abuse or neglect.

There are inherent limitations to an inquisitorial process by the adjudicator.  In the Anglo-American legal tradition, adversarial process normally reveals the true facts of a case. *See, e.g., Schaal v. Gammon,* 233 F.3d 1103, 1106 (8th Cir. 2000) (quoting *Maryland v. Craig,* 497 U.S. 836, 845 (1990)).  The Eighth Circuit has thrown cold water on continental European-style inquisitorial factfinding procedures, even where mandated by statute, for failure to sufficiently develop the record.  *See, e.g., Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004) (reversing ALJ as to social security hearing for failure to develop the record).

---

[3] *See, e.g.,* RSMo. 568.060.  Plaintiff Parents suggest that the co-extensive potential criminal and CD investigations affect the *Mathews v. Eldridge* analysis. See*, e.g., D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.,* 279 F.3d 155, 162 (2d Cir. 2002) (discussing intersection of Fifth Amendment privilege and noncriminal investigations); *see generally* 1 Wayne R. LaFave et al., Criminal Procedure § 2.7(a) (4th ed., Dec. 2017 update) (discussing the many ways in which criminal accusations raise due process questions).

The Second Circuit has held that a meeting is no substitute for a hearing, and simply does not satisfy the requirements of due process of law. *Patterson v. City of Utica,* 370 F.3d 322, 337 (2d Cir. 2004) (in the context of termination of public employment). Further, employment terminations do not foreclose the ability of the employee to seek work elsewhere, and even to receive compensation for wrongful decisions. *Dupuy v. Samuels,* 397 F.3d 493, 508 (7th Cir. 2005). But that is not so for a parent found to be a child abuser or neglector, which the Ninth Circuit has compared to "moral leprosy" in terms of stigma. *Humphries v. County of Los Angeles,* 554 F.3d 1170, 1186 (9th Cir. 2008); *see also Dupuy,* 397 F.3d at 503. The Court, exercising its judicial experience and common sense, can determine that few law-abiding citizens would want to hire such persons. Therefore, the harm from an erroneous registration is as important a public interest as the evil that registration is trying to prevent. *Pitts,* 315 S.W.3d at 761 n.5; *Pleva v. Norquist,* 195 F.3d 905, 915 (7th Cir. 1999) (

Nor are these procedural shortcomings solved by *de novo* judicial review in state circuit court. There is no right of the alleged perpetrator under the statute for the accused parent to subpoena or otherwise require the testimony of the alleged victim or reporter—thus depriving the accused perpetrator of the truth-seeking tools of confrontation and cross-examination, which aid fact-finder determination of witness credibility, demeanor, and trustworthiness, even where the finding of abuse or neglect is based on evidence from the victim or reporter. *Doe v. Baum,* 903 F.3d at 581. Further, Children's Division can still attempt to introduce evidence from an accuser or reporter through affidavits or other hearsay-exception evidence that are near impossible to challenge if admitted.

Finally, the third *Mathews* factor tips in favor of Plaintiff Parents. The additional procedural safeguards suggested in the Complaint, such as the ability to request a more definite

statement as to notice of a finding, and cost-free production of the evidence against the alleged

perpetrator, are easy methods of improving accuracy with *de minimis* cost.  Cross-examination

carries no cost to the State.  Nor do Defendants argue cost or burden.  Further, it is

fundamentally unfair for the government to make a highly stigmatic finding against a parent and

then charge the parent to obtain the evidence against him or her.

VII.   **Substantive due process**

Defendants next argue that Spring Cook's conduct fails to rise to the level of a

substantive due process violation.  Plaintiff Parents agree with the Eighth Circuit formulation of

the cause of action stated by Defendants in their memo [12] at p. 43:

> To state a substantive due process claim against a state official, a plaintiff must
> demonstrate that a fundamental right was violated and that the official's conduct shocks
> the conscience.  *Folkerts v. City of Waverly,* 707 F.3d 975, 980 (8th Cir. 2013). Whether
> conduct shocks the conscience is a question of law.  *Id.*  Conscience shocking conduct
> only includes "the most severe violations of individual rights that result from the brutal
> and inhumane abuse of official power." *White v. Smith,* 696 F.3d 740, 757–58 (8th Cir.
> 2012) (quotation marks omitted). "Only a purpose to cause harm unrelated to the
> legitimate object of the government action in question will satisfy the element of arbitrary
> conduct shocking to the conscience, necessary for a due process violation." *Folkerts,* 707
> F.3d at 981 (cleaned up).
>
> *Mitchell v. Dakota Cnty. Soc. Servs.,* 959 F.3d 887, 898 (8th Cir. 2020)

Plaintiff Parents suggest that the conduct they allege in their Complaint, if proven, would

amount to a substantive due process violation.  They alleged that Spring Cook abused her official

power to retaliate against Plaintiff Father's civil claims against the Scott County Sheriff's

Department, with whose deputies Spring Cook worked hand-in-glove.  They allege that her

conduct was reckless and unrelated to the legitimate object of preventing child abuse and

neglect, penalizing not the minor's true abusers but instead the parents for speaking up.  They

allege that there was no evidence to support Spring Cook's findings of neglect since *four* other

government actors (MSHP, DJO, CANRB, and FBI) found either no evidence or no probable

cause of misconduct by the parents.  And, despite Defendants arguments to the contrary, they do allege facts that plausibly state what conflicts of interest Spring Cook has as to her investigation and findings.  It is important to differentiate *Mitchell*, which discussed racial slurs used by investigators in the course of an otherwise legitimate child-abuse investigation, from verbal threats that amount to official "brutal or wantonly cruel[ty]."  *Id.* at 898, citing *King v. Olmsted Cty.,* 117 F.3d 1065, 1067 (8th Cir. 1997).  If Spring Cook intended to "get" Plaintiff Father's POST license, and was doing it for motives unrelated to the prevention of child abuse or neglect, then her actions in finding Plaintiff Parents to be neglectful would be "brutal or wantonly cruel."  The same is true if the purpose of Spring Cook's findings of neglect was to place "coercive pressure" on Plaintiff Parents for Plaintiff Father as to his civil claim.  *See Bishop v. Tice,* 622 F.2d 349, 354 (8th Cir. 1980).  Accordingly, Plaintiff Parents have pleaded the deprivation of a constitutional right.

While substantive due process claims do not have a "calibrated yard stick," nevertheless the Supreme Court has held that a government actor is liable where she has "an intent … to worse [a suspect's] legal plight."  *County of Sacramento v. Lewis,* 523 U.S. 833, 835 (1998).  *See also Terrell v. Larson,* 396 F.3d 975, 980 (8th Cir. 2005)*:*

> Substantive due process liability, like Eighth Amendment liability, turns on the government official's evil intent, either criminal recklessness, if the deliberate indifference standard applies, *see Farmer v. Brennan,* 511 U.S. 825, 836-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), or intent-to-harm, if the standard of *Lewis* and *Whitley v. Albers* applies.

Whether measured under deliberate indifference or intent-to-harm, Spring Cook's evil intent creates a substantive due process violation because Plaintiff Parents have pled that her intent was to retaliate or place coercive pressure on the parents for Plaintiff Father's assertion of his civil claims.

VIII.   **Injunctive Relief**

19

Plaintiff Parents have already briefed the four *Dataphase* factors for injunctive relief in the Eighth Circuit in moving for a preliminary injunction [13-1].  Without exhausting duplication of their arguments therein, Plaintiffs meet all four factors.  *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir. 1981).

First, Plaintiffs must demonstrate that they are likely to succeed on the merits.  *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 520 F.3d 725, 732 (8th Cir. 2008).  Under *Dataphase* and *Rounds* they likely to succeed on the merits of their procedural due process claim, for the reasons stated above.

Defendants further state without citation to any authority that this Court lacks subject matter jurisdiction.  To the contrary, the Complaint cites to 28 U.S.C. § 1331, which provides that federal jurisdiction exists if the request for relief involves a question of federal constitutional or statutory law.  Plaintiffs' Complaint is brought pursuant to 42 U.S.C. § 1983, alleging that the CAN statutory and regulatory process violates the guarantees of procedural due process under the Fourteenth Amendment.  This Court has subject matter jurisdiction.

Second, Plaintiff Parents will suffer irreparable harm if an injunction is not granted as to certain procedural aspects of the CAN Central Registry process.  Plaintiffs suggest that the referral of the matter to the FBI with "similar to near-identical" language as to Spring Cook's earlier findings of neglect, and the visit by the FBI to Spring Cook's office, create a reasonable inference that Spring Cook was connected to the FBI complaint.  Furthermore, as Plaintiff Father's Affidavit [13-2] avers, a material necessarily embraced by the pleading, there have been continued call outs by Children's Division, as well as a Snapchat friend request by a sheriff's deputy.  These all create a reasonable fear that Plaintiff Parents will again be found neglectful and placed on the Central Registry, with inadequate procedural due process to defend

20

themselves.  They also suggest that the threat to their reputations is another factor in favor of irreparable harm.  "Because damage to one's reputation is a harm that cannot be remedied by a later award of money damages, the threat of reputational harm may form the basis for preliminary injunctive relief." *United Healthcare Ins. Co. v. AdvancePCS,* 316 F.3d 737, 741 (8th Cir. 2002).  The harms that Plaintiff allege are serious and well-founded, and rise above mere speculation.

Third, Plaintiff Parents suggest the injunctive relief they seek will prevent more net harms on balance than the procedural "cost" to the State.  *See Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009).  The damage to each parent's reputation, and loss of occupation, from any underlying State finding of child abuse or neglect overwhelms the balance-of-harms factor. *Kroupa,* 731 F.3d at 822.  The injunction would only require defendants use their discretion to promptly give Plaintiff whatever "process is due," *Mathews* at 332, rather than prevent the swift investigation and prosecution of child abuse and neglect by Children's Division.  The State has no interest in enforcing an unconstitutional law.  Nor is there a significant hardship or cost to the County.  *Cf. Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 489-90 (8th Cir. 1993).  Any interest Children's Division has in protecting children from abuse or neglect can be adequately and better addressed by the enforcement of Missouri law with adequate procedural due process.

Fourth, the grant of a preliminary injunction would serve the public interest.  "It is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007).  The public interest in preventing child abuse and neglect is the *same* public interest in affording constitutionally-required procedural due process by only registering true

abusers and neglecters, not by punishing those who are falsely accused or suspected of such conduct. *Kroupa,* 731 F.3d at 822 n. 6.

## IX.   First Amendment Retaliation

Defendants next argue that the Complaint fails to state a claim for First Amendment retaliation by Spring Cook.  Citing to the Eighth Circuit Model Instruction 13.40 and 5.21 as to causation, however, Plaintiff Parents have alleged particularized facts as to how Plaintiff Father's assertion of civil claims against the County and its Sheriff was "a motivating factor" that "played a part" in Spring Cook's retaliatory findings of child neglect.  Furthermore, the pleading states that certain Sheriff's deputies routinely work hand-in-glove with Spring Cook—and that two even share a last name, and social media friendships.

Making a civil claim against a government entity related to a matter of public concern— that is, the sexual abuse of a minor by an on-duty, uniformed police officer—is surely a First Amendment-protected activity.  Plaintiff Parents cannot locate a case on all four for this proposition—perhaps because it is obvious that the sexual abuse of a minor under color of law by a powerful government official is a matter of public concern, but thankfully is such a rare event.

The determination of whether the plaintiff's speech addressed a matter of public concern appears to fall exclusively within the province of the court. *See Lewis v. Harrison School Dist.,* 805 F.2d 310, 312-13 (8th Cir. 1986).  The fact the speech also implicates plaintiff's self-interest does not lessen the public concern of the speech. *Darnell v. Ford*, 903 F.2d 556, 563 (8th Cir. 1990).

 Even if it not clearly a matter of public concern, however, then that simply makes resolution an issue of fact for the jury. *See* Note on Use 3 to Model Instruction 13.40.   The jury

can answer through special interrogatories or other special instructional devices. *See Cook v. Tadros*, 312 F.3d 386, 388 (8th Cir. 2002); *Shands v. City of Kennett*, 993 F.2d 1337, 1342-43 (8th Cir. 1993).

Second, Spring Cook initiated her visit to the family home just seven weeks after Plaintiff Father asserted his claims, based on an alleged hotline, and before the resolution of the claims. (The Deputy Juvenile Officer and the Highway Patrol troopers accompanied her, but as the pleading alleges, they did not find any evidence of parental abuse or neglect.)  A child abuse and neglect investigation by itself would chill a person of ordinary firmness from speaking.

Third, Plaintiff Parents disagree with Defendants' argument that they must allege "but-for" causation.  Model Instruction 13.40 holds that the appropriate causation standard is "a motivating factor" or "played a part," citing to Model Instruction 5.21.  So does Eighth Circuit case law.  It does not matter that Spring Cook was not a final decision-maker.  *See Darnell v. Ford*, 903 F.2d 556, 561-62 (8th Cir. 1990); *Cox v. Dardanelle Pub. School Dist.*, 790 F.2d 668, 676 (8th Cir. 1986).

Defendants' cited case, *Peterson v. Kopp,* concerns retaliatory arrest.  754 F.3d 594, 602 (8th Cir. 2014).  That follows from a Supreme Court case adding a no-probable-cause element in First Amendment retaliatory arrest cases.  *Hartman v. Moore,* 547 U.S. 250 (2006).  In the arrest context, the Eighth Circuit has held that "retaliation need not have been the sole motive, but it must have been a 'substantial factor' in the decision to arrest.  Furthermore, a plaintiff who was arrested must show that a retaliatory motive was a "but-for" cause of the arrest — *i.e.*, that the plaintiff was "singled out" because of their exercise of constitutional rights." *Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir. 2010).  *Peterson* at 602 also states that probable cause eviscerates a First Amendment retaliation claim, at least in the arrest context.

Plaintiff Parents were not seized, nor was their minor son.  Assuming without deciding that they must plead and prove the element of a lack of probable cause, however, their pleading still states a claim.

Reading the facts of the Complaint as true and drawing all reasonable inferences in their favor, the lack of findings of any evidence or any further process by each of the MSHP, the DJO, the CANRB, and the FBI suggests that Spring Cook lacked probable cause.  As discussed below in the context of Plaintiff Parents' state law malicious prosecution claim, termination of the proceeding in plaintiff's favor also raises a threshold inference that there was no probable cause.  Despite Defendants' protestations to the contrary, the only objective facts to support a finding of child neglect were that the 16-year-old minor was allowed to drive a car, have an iPhone, access the internet and social media.  To be sure there was sexual abuse of the minor, *but not by the parents*.  And, the fact that Spring Cook included in her findings of neglect that the parents let the minor go on an age-appropriate date to a shopping mall with a boy in neighboring Arkansas only *helps* to their allegation that there were not reasonable grounds or probable cause for her findings.

Defendants also make collateral allegations that Plaintiff Parents are mandatory reporters and thus committed a crime in allegedly failing to report the abuse.  That is a matter far beyond the pleadings—indeed, it is essentially a criminal complaint against the parents—but again, the Complaint's allegation that each of the MSHP and the FBI investigated and took no further process suggests the opposite: that there was not probable cause to believe a crime had been committed by the parents.

## X.     Judicial and Qualified Immunities

Defendants argue in the alternative that Spring Cook has judicial and qualified immunity from Section 1983 claims.  Not so.

Defendants argue that a 1986 North Carolina district court case makes a social worker functionally like a prosecutor, and thus entitled to judicial immunity.  *Mazor v. Shelton,* 637 F. Supp. 330, 334 (N.D. Cal. 1986).  But appellate courts have not extended absolute immunity to social workers.  *See, e.g., Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.,* 724 F.3d 687, 694 (6th Cir. 2013) (when social workers removed the children from the home, they were acting in a police capacity rather than as legal advocates); *Doe v. Heck,* 327 F.3d 492, 499 (7th Cir.2003) (social workers violated child's Fourth and Fourteenth Amendment rights by interviewing him without his parents' or the school's consent); *see also Greene v. Camreta,* 588 F.3d 1011 (9th Cir.2009), vacated in part on mootness grounds, 563 U.S. 692 (2011).  Nor was Spring Cook was relying in good faith on a valid court order.  *Cf. Martin v. Hendren,* 127 F.3d 720 (8th Cir. 1997).  Spring Cook lacks judicial immunity.

She also lacks qualified immunity.  As a threshold matter, it is not clear that qualified immunity even applies to unconstitutional conduct that involves an element of culpability inconsistent with a finding that the defendant acted in a reasonably objective manner.  *See, e.g., Chism v. Washington State,* 661 F.3d 380, 393 n. 15 (9th Cir. 2011) (no reasonable officer would could believe it constitutional to act dishonestly or reckless with regard to the basis for probable cause to seek a warrant); *see also Slone v. Herman,* 983 F.2d 107 (8th Cir. 1993) (no qualified immunity available in due process case).  Thus qualified immunity is not available as a defense to Spring Cook's due process violation of Plaintiff Parents' rights.

As to Plaintiff Parents' First Amendment claims, it was clearly established that First Amendment retaliation for engaging in constitutionally protected speech during Spring Cooks conduct. *Solomon v. Petray,* 795 F.3d 777, 787 (8th Cir. 2015).

Defendants argue that in child-abuse cases that investigators are nearly always entitled to qualified immunity.  But that ignores the Eighth Circuit's requirement that the suspicion of child abuse be *reasonable.  Mitchell,* 959 F.3d at 901.  There was plenty of evidence that the boy had been sexually abused.  There was no evidence that the parents were neglectful.  Further, Plaintiff Parents argue that it was not the investigation but the finding of child neglect that was unreasonable.

## XI.    Official Immunity

Spring Cook next argues that she has official immunity.  Plaintiff Parents disagree. Official immunity does not apply to conduct that is willfully wrong, or done with corruption or malice. *Southers v. City of Farmington,* 263 S.W.3d 603, 610, n. 7 (Mo. banc 2008).  The pleading alleges that Spring Cook willfully acted out of corrupt and malicious intent in making her findings of child neglect.  This is not just a subjective allegation as to her intent.  It is also objective: no reasonable official acting in good faith and without legal malice would make a finding of child neglect against parents of an abused teenage child under the circumstances here simply because the boy drove a car, had an iPhone, and accessed the internet, because such a finding is materially false or misleading.  Otherwise even parents of a child who was unknowingly abused by a teacher or a priest or a cop—or by *any* adult in a trusted position of authority—would be liable for child neglect.  As a matter of experience of common sense, the recent spotlight on such cases has not resulted in a slew of CD findings of parental neglect as far as the published case law shows; Plaintiff Parents cannot find any cases so holding.

Further, Spring Cook acted with legal malice, in that she was reckless in her findings of child neglect.  Reckless indifference to the right of others as one form of malice to which official immunity does reply.  *See State ex. Re. Twiehaus v. Adolf,* 706 S.W.2d 443, 447 (Mo. 1986) (reviewing multijurisdictional case law as to malice exceptions to official immunity[4]).

This is also not a case where Plaintiff Parents allege that Spring Cook merely made a bad judgment call as to her findings of parental neglect.  *Cf. James ex Rel. James v. Friend,* 458 F.3d 726 (8th Cir. 2006).  Nor is this a case where the allegations are that Spring Cook properly exercised her reason in developing a means to a legitimate government end. *Hawkins v. Holloway,* 316 F.3d 777, 788-89 (8th Cir. 2003) (denying official immunity to Sheriff).  Rather, the allegations are that Spring Cook acted with bad faith or malice.  *Davis v. Bd. of Educ.,* 963 S.W.2d 679, 688-89 (Mo. Ct. App. E.D. 1998).

To the extent that Defendants argue that Spring Cook's hand was forced, and that once she received a hotline call that she was legally obligated to investigate, then that means her conduct was ministerial rather than discretionary in that it was mandatory.  Plaintiff Parents dispute this, of course, because they allege that Spring Cook should have recused herself and referred the case to another county CD office.  Even assuming it was mandatory for CD to investigate the hotline call, it does not mean that it was mandatory for Spring Cook to run the investigation into a Plaintiff Father, with whom his colleagues she routinely worked hand-in-glove.

The extent to which Spring Cook's conduct was prescribed and mandatory, rather than up to her judgment and reason, is beyond the scope of the pleadings, and a matter better put for

---

[4] As *Tweihaus* makes clear at n. 3, the analysis for statutory immunities under 42 U.S.C. § 1983 and other statutes inapposite here because there is no claim for deprivation of constitutional or statutory rights.

development in discovery. *Compare Hutson v. Walker,* 688 F.3d 477 (8th Cir. 2012) (granting summary judgment on official immunity based on record of social worker's conduct under CAN manual) with *Porter v. Williams,* 436 F.3d 917, 920-23 (8th Cir. 2006) (failure of social worker to comply with consent order is ministerial).

To the extent that her conduct was ministerial in nature, then official immunity does not apply because she was negligent in her findings of child neglect. *Kanagawa v. State By and Through Freeman,* 685 S.W.2d 831, 836 (Mo. banc 1985).

## XII.  **State Legal Defense Fund**

Defendants argue that the State Legal Defense Fund bars claims against Spring Cook for her conduct in connection with her duties. RSMo. 105.711.5. Plaintiff Parents read the statute to create a limit on the liability of the fund for Cook's misconduct, not a statutory bar to or immunity from suit. So does the Missouri Supreme Court. *Laughlin v. Perry,* No. SC98012 (Mo. banc June 30, 2020). This does not bar Plaintiff Parents' state law claim.

## XIII.  **Missouri state law malicious prosecution**

Plaintiff Parents agree with Defendants' citation to *Copeland v. Wicks.* The Missouri Supreme Court has affirmed that there is a viable cause of action for malicious prosecution at state law based on the following elements: (1) commencement of an earlier suit against the party; (2) instigation of that suit by the adverse party; (3) termination of the suit in the party's favor; (4) lack of probable cause for filing the suit; (5) malice by the adverse party in initiating the suit; and (6) damage sustained by the party as a result of the suit. 468 S.W.3d 886, 889 (Mo. banc 2015).[5]

---

[5] The jury instruction for civil malicious prosecution in MAI 23.07 contains the following three elements: First, defendant "instigated" or "continued" a judicial proceeding against plaintiff that terminated in favor of plaintiff; Second, in so doing defendant acted maliciously and without reasonable grounds; Third, plaintiff was thereby damaged. Both "maliciously" and "reasonable grounds" must be defined.

*Copeland* concerns a civil action, which is apposite here since although the State's findings carry

"stigma plus" and a serious liberty deprivation, there is no criminal conviction

      As to the first element, Spring Cook initiated *and* continued an administrative rather than

a judicial proceeding.  Considering the Restatement (Second) of Torts §680 and persuasive

federal and state law from other jurisdictions, the Missouri Court of Appeals has suggested

without deciding that a civil malicious prosecution action can arise out of an administrative

proceeding. *Davis,* 963 S.W.2d at 685 ("liability for malicious prosecution may be based on the

commencement of an administrative proceeding where 1) the administrative proceeding has the

adjudicatory attributes of a judicial proceeding and 2) the administrative board has the power to

adversely affect a person's legally protected interests.").  Here the CANRB process is sufficiently

like a judicial proceeding, despite its procedural shortcomings.  Thus, the first element can be

modified to replace "judicial" with "administrative."

      Plaintiff Parents acknowledge that Judge Baker of this Court declined to extend the cause

of action to non-litigation proceedings such as a city council impeachment proceeding.

*Abernathy v. White,* No. 4:19-CV-00009-NAB (E.D. Mo. Sep. 30, 2019).  But they stress that

such a proceeding is not like a judicial proceeding, whereas the CANRB process is.  The

Missouri state court appellate cases cited by Judge Baker are not as hostile to malicious

prosecution in administrative proceedings, and cite to *Davis,* but do not concern judicial-like

proceedings. *See Holland v. Healthcare Serv. of The Ozarks D/B/A Cox Health Sys.,* 347 S.W.3d

166, 168 n. 2, 169 (Mo. Ct. App. 2011) (assuming *arguendo* that a malicious prosecution theory

can be based upon the commencement of an administrative proceeding in the nurse licensing

context); *Teefey v. Cleaves,* 73 S.W.3d 813, 816 (Mo. Ct. App. 2002) ("We need not decide,

however, whether the action does extend to administrative proceedings [such as a zoning board]")

As to malice, in civil malicious prosecution the degree or type of malice that need be argued is that the civil proceeding was intentionally initiated or continued "without the honest belief that it was lawful when done." *King v. Young,* 304 S.W.3d 224, 227 (Mo. Ct. App. 2010) (internal citations omitted); *see also Sanders v. Daniel International Corp.,* 682 S.W.2d 803, 807-08 (Mo. banc 1984) (comparing three types of malice). This is a less rigorous standard that legal malice, which requires the plaintiff must prove that the primary purpose for initiating or continuing the proceedings was one other than that of securing the proper adjudication of the claim. *Id.*; *see also* MAI 16.01(1): "The term "maliciously" as used in this [these] instruction[s] means intentionally doing a wrongful act without just cause or excuse. It does not necessarily mean hatred, spite or ill will."

The term "reasonable grounds" is defined to mean "under the circumstances an ordinarily careful person after having made a reasonable inquiry would have believed the facts alleged and that the judicial proceeding was valid." MAI 16.06. (Again, here this should be modified to "administrative.")

To be sure, Missouri malicious prosecution actions are no favorites of the law. *Copeland,* 468 S.W.3d at 889 (claims for malicious prosecution "are regarded by law with jealousy and ought not to be favored but managed with great caution.") (internal citation omitted). "As such, courts require strict compliance with the requisite elements." *Id*. That just means, however, the Hills must have evidence of Spring Cook's improper motive to support their allegations.

Plaintiff Parents do not ask the Court to exercise supplemental jurisdiction over this claim if it otherwise dismisses all of the Section 1983 claims.

## XIV.   Conclusion and Prayer

Plaintiff Parents have stated plausible claims under *Iqbal* and *Twombly* as to the constitutional torts by Spring Cook, who is not entitled to judicial or qualified immunity.  Under *Dataphase* and *Rounds*, they are entitled to injunctive relief.  They have also stated a Missouri state law claim for malicious prosecution that should not be dismissed, nor as to which Cook is officially immune.

In the alternative, Plaintiff Parents' claims should not be denied with prejudice and they should be granted leave to amend.  Fed. R. Civ. P. 15(a).

WHEREFORE Plaintiff Parents J.T.H. and H.D.H. pray the Court to DENY the motion to dismiss [11] by Defendants Missouri Department of Social Services Children's Division and Spring Cook, and for such other relief as may be just, meet and reasonable.

Respectfully submitted,

Co-Counsel for Plaintiff

/s/ Hugh A. Eastwood
Hugh A. Eastwood, 62058MO
Attorney at Law
7911 Forsyth Blvd., Ste. 300
St. Louis, MO 63105-3825
hugh@eastwoodlawstl.com
(314) 809 2343
(314) 863 5335 Fax

    /s/ W. Bevis Schock   .
W. Bevis Schock, 32551MO
Attorney at Law
7777 Bonhomme Ave., Ste. 1300
St. Louis, MO  63105
wbschock@schocklaw.com
Fax:    314-721-1698

Voice: 314-726-2322

Certificate of Service

The undersigned certifies that on 1/22/2021 (s)he served this document on all parties of record by operation of the Court's CM/ECF system.

*/s/ Hugh A. Eastwood, 62058MO*